1                BEFORE THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES OF AMERICA,          .
                                        .  Case Number 21-cr-32
4              Plaintiff,               .
                                        .
5         vs.                           .
                                        .  Washington, D.C.
6    GUY WESLEY REFFITT,                .  August 1, 2022
                                        .  10:08 a.m.
7              Defendant.               .
     - - - - - - - - - - - - - - - - -
8

9                 TRANSCRIPT OF SENTENCING HEARING
               BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                  UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the United States:      JEFFREY NESTLER, AUSA
                                 RISA BERKOWER, AUSA
13                               United States Attorney's Office
                                 601 D Street Northwest
14                               Washington, D.C. 20530

15   For the Defendant:         F. CLINTON BRODEN, ESQ.
                                 Broden & Mickelsen
16                               2600 State Street
                                 Dallas, Texas 75204
17

18

19

20

21   Official Court Reporter:    SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               U.S. Courthouse, Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24

25   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.

P R O C E E D I N G S

1  COURTROOM DEPUTY:  Your Honor, we are in Criminal

2  Action 21-32, the United States of America versus Guy Reffitt.

3  If I can have the parties approach the podium and state

4  your name for the record, starting with the United States.

5  MR. NESTLER:  Good morning, Your Honor.  Jeff Nestler

6  on behalf of the United States.

7  THE COURT:  Good morning, Mr. Nestler.

8  MR. NESTLER:  And I'm with AUSA Risa Berkower as well.

9  THE COURT:  All right.  Good morning.

10  MR. BRODEN:  Good morning, Your Honor.  Clinton Broden

11  for Mr. Reffitt.

12  THE COURT:  Good morning, Mr. Brody.  Welcome to the

13  case.

14  MR. BRODEN:  It's Broden, Your Honor.

15  THE COURT:  Broden.  And Mr. Reffitt.

16  MR. BRODEN:  I was going to say, ask your husband.  We

17  used to hang back in the day in Texas.

18  THE COURT:  All right.

19  COURTROOM DEPUTY:  Excuse me.  We also have Crystal

20  Lustig from Probation.

21  THE COURT:  Yes.  Thank you, Ms. Lustig.

22  All right.  So with respect to masks, anyone who has been

23  vaccinated and is speaking, feel free to take your mask off.

24  So we are here for sentencing.  I've reviewed the final

presentence report and recommendation.  I've also read the
parties' sentencing memoranda and exhibits, including all of the
letters submitted on behalf of Mr. Reffitt.  I've also reviewed
all of the exhibits, including the videos contained in the
government's Dropbox.

Are there any other exhibits that I should have reviewed or
mentioned here?  Mr. Nestler?

MR. NESTLER:  Not from the government, Your Honor.

THE COURT:  All right.  Mr. Broden?

MR. BRODEN:  Your Honor, depending on sort of how
today plays out, we have a couple of videos we may play for the
Court.

THE COURT:  All right.  What do these relate to?

MR. BRODEN:  They relate to the timing of different
events prior to Mr. Reffitt appearing on the Capitol steps.

THE COURT:  All right.  Have you provided these to the
government?

MR. BRODEN:  This morning, yes, Your Honor.

THE COURT:  All right.  Mr. Nestler, have you had a
chance to take a look at them?

MR. NESTLER:  Yes, very briefly.

THE COURT:  All right.  Are you prepared to proceed,
or would you like more time?

MR. NESTLER:  We're prepared.

THE COURT:  Okay.  So Mr. Broden, you're going to wait

```
1    and see how things shake out?  You're not definitely playing

2    those?

3              MR. BRODEN:  Probably.

4              THE COURT:  All right.  Mr. Nestler, are there any

5    victims who seek to be heard today?

6              MR. NESTLER:  Yes, Your Honor.

7              THE COURT:  And who would that be?

8              MR. NESTLER:  Jackson Reffitt submitted a letter,

9    which will be read by Ms. Berkower, and former Police Officer

10   Shauni Kerkhoff is here to deliver her victim impact statement

11   in person.

12             THE COURT:  Okay.  And you've provided the letter to

13   the defense?

14             MR. NESTLER:  We have not.  We just received the

15   letter.  It's short, but Ms. Berkower is going to read it on

16   Mr. Reffitt's behalf.

17             THE COURT:  Okay.  Mr. Broden, do you want a few

18   minutes to see that now?

19             MR. BRODEN:  Yes, Your Honor.  And we have another

20   victim.  Peyton Reffitt would like to address the Court.

21             THE COURT:  Okay.  In what format are you suggesting

22   that these victims address the Court?  By witness testimony or

23   just want to speak at the podium?

24             MR. NESTLER:  Ms. Kerkhoff would like to speak at the

25   podium.
```

```
 1              THE COURT:  Okay.

 2              MR. BRODEN:  The same, Your Honor.

 3              THE COURT:  Mr. Nestler, do you have a copy for me?

 4              MR. NESTLER:  Yes, Your Honor.

 5              THE COURT:  To the extent either of you have any paper

 6     that reflect what the officer or Ms. Reffitt will say, please

 7     provide that now.  I understand you may not.

 8              MR. NESTLER:  For Ms. Kerkhoff, we do not have a copy

 9     of her statement.  She intends to address the Court.

10              THE COURT:  Okay.  And this is the officer who

11     testified?

12              MR. NESTLER:  Yes, Your Honor.

13              THE COURT:  Okay.  Do you have a copy of Jackson

14     Reffitt's statement?

15              MR. NESTLER:  Yes, Your Honor.

16              THE COURT:  And Mr. Broden, is it fair to assume

17     Ms. Reffitt doesn't have a written statement?

18              MR. BRODEN:  It is, Your Honor.

19              THE COURT:  All right.  Mr. Broden, you have this?

20              MR. BRODEN:  I do, Your Honor.

21              THE COURT:  Are you prepared to proceed?

22              MR. BRODEN:  I am.

23              THE COURT:  All right.  Both parties have submitted

24     objections to the probation officer's presentence report.  And

25     both parties, I assume, have received the recommendation of the
```

1   probation officer?  Mr. Nestler?

2           MR. NESTLER:  Yes, Your Honor.

3           THE COURT:  Mr. Broden?

4           MR. BRODEN:  We have, Your Honor.

5           THE COURT:  All right.  Mr. Reffitt, have you had a

6   chance to review the presentence report?

7           THE DEFENDANT:  Yes, Your Honor, I have.

8           THE COURT:  And have you had adequate time to talk to

9   your attorney about it?

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT:  All right.  Have you had a chance to

12   correct any errors in the report?

13           THE DEFENDANT:  Previously, with the previous

14   attorney, we didn't correct a few things.  The January 19th date

15   in the presentencing report isn't correct.  I was arrested on

16   the 16th of January.  So there's a few anomalies.

17           THE COURT:  Okay.  But your attorney is going to raise

18   those here?

19           MR. BRODEN:  Your Honor, to the extent there are

20   misdates or something that don't affect the guidelines, I don't

21   intend to raise those.

22           THE COURT:  Okay.  Well, I prefer to get the facts

23   correct in the PSR.  So even if they're not going to affect my

24   calculations, this report will follow Mr. Reffitt.  So I do want

25   you to take a few minutes and consult with him on any additional

1    factual inaccuracies that need to be corrected in the report.

2    In all likelihood, I'm going to direct the Probation Office to

3    change some things in the report.  So let's do it all.

4              MR. BRODEN:  I will do that, Your Honor.

5              THE COURT:  But I will give you a few moments to do

6    that in just a second.

7         Mr. Reffitt, have you also had enough time to talk to your

8    attorney about the other filings in this case by the government?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  Are you sure?

11             THE DEFENDANT:  What do you mean by "filings"?

12             MR. BRODEN:  The sentencing memoranda.

13             THE COURT:  The sentencing memoranda, and then there

14   were a number of exhibits attached to the government's

15   sentencing memoranda.  Have you had a chance to review those and

16   talk to your attorneys about those?

17             THE DEFENDANT:  Yes, Your Honor, I have.

18             THE COURT:  All right.  Mr. Broden, have you had

19   enough time to discuss the PSR with Mr. Reffitt?

20             MR. BRODEN:  I have, Your Honor.

21             THE COURT:  All right.  So Mr. Broden, let's take just

22   a few minutes.  I'm not going to leave the bench unless

23   Mr. Reffitt thinks this will take a while.

24             MR. BRODEN:  I think we're good with you staying, Your

25   Honor.

1          THE COURT:  All right.  Take a few minutes, and let me

2     know when you're ready to proceed.

3          (Discussion off the record.)

4          MR. BRODEN:  I think we're good.  There was just the

5     one date, Your Honor.

6          THE COURT:  So let's start with the alleged factual

7     inaccuracies.  Mr. Broden, if you could just briefly run through

8     the additional ones that Mr. Reffitt has mentioned to you this

9     morning.

10          MR. BRODEN:  Your Honor, the only thing is on page 2,

11     Mr. Reffitt states that he was arrested on January 16 in the

12     Eastern District of Texas, not January 19.

13          THE COURT:  And that's the only additional

14     inaccuracies other than the ones that you've already noted in

15     your memorandum?

16          MR. BRODEN:  Correct.

17          THE COURT:  Okay.  Mr. Nestler, do you agree?

18          MR. NESTLER:  Yes, Your Honor, we agree.

19          PROBATION OFFICER:  I was just going to note that the

20     arrest warrant received from the -- from Texas and the docket

21     reflect January 19.  That's why that was in the presentence

22     report.

23          THE COURT:  Okay.  But there's no dispute -- what's

24     the accurate date?

25          MR. NESTLER:   January 16.

1          THE COURT:  So there was an error in the arrest

2    warrant?

3          MR. NESTLER:  Mr. Reffitt was initially arrested on a

4    misdemeanor complaint, and then there was a superseding

5    complaint filed late that day on the 16th.  He was formally

6    arrested on that superseding complaint on the 19th.  But he was

7    taken into custody in connection with this event on January 16,

8    and we agree January 16 is the appropriate date.

9          THE COURT:  Okay.  All right.  So Ms. Lustig, I will

10   direct you to make that change to the PSR.

11      And if you all can please make an effort to speak into the

12   microphones, because the court reporter is having trouble when

13   you just stand up and speak directly to me.  So if you want to

14   come to the podium, that's fine.  If not, speak in the

15   microphone.  At some point I am going to bring you up to the

16   podium, but right now going through these factual issues, I

17   don't think it's necessary.

18      All right.  Before I address each of the defendant's

19   alleged factual inaccuracies, Mr. Nestler, let me just ask you,

20   do you agree with any of the inaccuracies the defense has raised

21   with respect to the PSR?

22          MR. NESTLER:  No, Your Honor.

23          THE COURT:  Okay.  All right.  So first, the defense

24   objects to the claim in paragraph 20 that Mr. Reffitt recruited

25   Rocky Hardie to join him on the trip to Washington, D.C.

1        I tend to disagree.  I think it's fair to say that

2    Mr. Reffitt attempted to recruit others to join him in D.C. by

3    sending a message to the members of the Texas Three Percenters.

4    It's true that the evidence at trial showed that Mr. Hardie was

5    already thinking about going to D.C., but "recruiting" is

6    defined as the action or the process of recruiting or enlisting

7    people, often for a job or a cause.  Here, in the message,

8    Mr. Reffitt stated, among other things, "Stand and be counted."

9        I think it's appropriate, considering the context of the

10   message, to say that he recruited, attempted to recruit others

11   to travel with him to D.C.  So Mr. Broden, I'm not making a

12   change to the word "recruited."

13       The defense also objects to the claim in paragraph 22 that

14   Mr. Reffitt instructed the crowd how to move forward to ascend

15   the staircase and overwhelm police officers.

16       I do agree that by waving his arms he was, in effect,

17   instructing the crowd to move forward, but I do agree with the

18   defense that his waving of his arm did not provide any

19   instructions to the crowd about how to move forward or how to

20   overwhelm the police officers.

21       Mr. Nestler, I will give you a chance to convince me I'm

22   wrong, but I do think that that's an overstatement to say that

23   he instructed the crowd.  For much of the tape, we don't know

24   what he was saying, but there's no evidence that he gave any

25   specific instructions to the crowd.  He was simply waving and

gesturing for the crowd to move forward.  I think that's an

overstatement to characterize it the way the probation report --

PSR does.

Do you agree?

MR. NESTLER:  In half, Your Honor.  We believe that

the defendant instructed by showing the other rioters the way

forward, and one of the definitions of "instruct" is to teach or

to train.

But Your Honor's point is well-taken.  If the language is

changed to "showed" or "demonstrated," that would certainly get

the point across that he was showing the rioters --

THE COURT:  Well, what I think is correct to say is

that he waved the crowd forward, but it's not correct to say

that he instructed the crowd how to do so.  So it should read

that he waved the crowd forward, and I don't think he modeled

anything that the crowd did behind him.  He stood on a step, and

he took a bunch of, you know, rubber bullets and ultimately

pepper spray, and he would slowly step up another step.  I don't

think he modeled anything that followed him.

Agreed?

MR. NESTLER:  The evidence at trial showed that he

also used his megaphone to address the people below and above.

THE COURT:  And what did the evidence at trial say he

said in the megaphone?

MR. NESTLER:  It was not specific.  It was generally

1  go forward.

2          THE COURT:  Go forward, right.  So he -- I think it's

3  fair to say he waved his crowd forward and he encouraged the

4  crowd to go forward.  That's fair, but --

5          MR. NESTLER:  Yes, Your Honor.

6          THE COURT:  -- anything more than that to me misstates

7  the evidence.

8      Mr. Broden, anything you would like to say?

9          MR. BRODEN:  No, as long as it's limited to the

10  waving.  And you all are more familiar with the trial record

11  than I did.  I didn't see anything in the trial record that he

12  gave any instructions in the bullhorn to move forward.

13          THE COURT:  I think -- I'm not going to recall the

14  specific words, but I think that there was some testimony -- or

15  video evidence, rather, about go, go forward, something --

16          MR. BRODEN:  Certainly with the --

17          THE COURT:  I think it's a distinction without a

18  difference.  I agree with you he waved the crowd forward, he

19  communicated go forward, but beyond that, he did nothing else.

20  So I will direct the probation officer to make that change.

21      The defense also objects to the claim in paragraph 23 that

22  Mr. Reffitt charged at the officers.

23      Again, Mr. Nestler, I'm inclined to agree with the defense.

24  Although Mr. Reffitt moved up the stairs toward the officers, he

25  did not charge them.  "Charge" in this context is generally

1   defined as rushing forward as if an assault.  Mr. Reffitt wasn't

2   rushing forward.  He slowly advanced up the stairs as the

3   officers shot him with rubber bullets and pepper spray.  But I

4   don't think he rushed at the officers.

5        Do you disagree?

6        MR. NESTLER:  We believe the evidence could show that

7   he did rush forward in or as if in an assault, which is one of

8   the definitions, that he was trying to get to the officers.  So

9   he was going towards the officers.

10       THE COURT:  He was going toward the officers, but what

11  evidence of rushing did you produce at trial?

12       MR. NESTLER:  Well, his continuous movement forward,

13  we believe, would constitute rushing.

14       THE COURT:  Again, I think it's fair to say he moved

15  toward the officers, but not charged.

16       MR. NESTLER:  Yes, Your Honor.

17       THE COURT:  All right.  The defense also objects to

18  paragraphs 24 and 29 of the PSR stating that Mr. Reffitt

19  directed the deletion of messages regarding his plans and

20  intentions while in D.C. on January 6, including being armed at

21  the Capitol.

22       Again, I'm going to instruct the probation officer to state

23  the facts of Mr. Reffitt's instructions and not to characterize

24  them.  As I read the texts, I didn't find Mr. Reffitt to be so

25  specific.  He simply directs recipients to delete all chats

```
1    immediately.  Yes, contained in those chats are chats, I'm sure,

2    related to the January 6 trip, but there was no specific

3    direction about what to delete.  He said delete all chats.

4         Correct, Mr. Nestler?

5              MR. NESTLER:  That's correct, and in those chats, the

6    defendant had been communicating with Mr. Teer about being armed

7    on January 6.

8              THE COURT:  Fine, but I think that there's a lot of

9    characterization going on.  You can argue all this, and I don't

10   disagree with you.  But the way the PSR reads, he directed the

11   members of the -- this is the Texas Three Percenters to delete

12   all chats, and this is on Telegram; is that right?

13             MR. NESTLER:  Yes, Your Honor.

14             THE COURT:  And were these chats encrypted?

15             MR. NESTLER:  Yes, Your Honor.  They're only available

16   on the individuals' phones.

17             THE COURT:  So I'm fine saying that he directed the

18   Texas Three Percenters to delete all chats on the Telegram app.

19             MR. NESTLER:  Yes, Your Honor.

20             THE COURT:  Okay.  All right.  The defense also

21   objects to paragraphs 26 and 52 of the PSR stating that

22   Mr. Reffitt instructed Mr. Hardie on what to bring, including

23   firearms.

24        Mr. Nestler, on this one, I've reviewed Hardie's testimony.

25   He did not testify that he brought the firearm at Mr. Reffitt's
```

1    instruction.  And in his pretrial interview, he specifically

2    said he could not remember whose idea it was.  The report can

3    state that both Mr. Reffitt and Mr. Hardie brought firearms, but

4    it should not say whose idea it was.  The evidence isn't there

5    one way or the other.

6         Do you agree?

7              MR. NESTLER:  We believe it's a little more nuanced

8    than that, Your Honor, in the sense that Mr. Reffitt had sent

9    messages on Telegram to the whole group, including Mr. Hardie in

10   advance of Mr. Hardie deciding to come, telling them that

11   Mr. Reffitt would be driving so that he could bring firearms.

12             THE COURT:  But did he instruct them to come and bring

13   firearms, too?

14             MR. NESTLER:  No.  He said that that's what he would

15   be doing.

16             THE COURT:  Again, we're talking about what

17   instructions he gave.

18             MR. NESTLER:  Yes, Your Honor.

19             THE COURT:  I don't think it's accurate to say he

20   instructed Mr. Hardie on what to bring, including firearms.  I

21   think the report can state that both Reffitt and Hardie brought

22   firearms and other gear, but no reference to instruction.

23        All right.  I think these are all the factual objections,

24   Mr. Broden?

25             MR. BRODEN:  Your Honor, I was only going to say in

relation to that, we also objected to the idea that he recruited

Mr. Hardie.  I know you overruled that.  But I think for the

record, it was made in connection with that objection also.

THE COURT:  That, too, but again, I think the

word "recruited" can mean a lot of different things, and often,

it means a larger scale effort to recruit for an army or

something like that.  But I do think that we're splitting hairs

to say that that message wasn't an effort to recruit others to

join him.  I think it's -- in that context, I think it's

factually accurate.

And I appreciate where you're coming from in terms of

whether this warrants a role adjustment, and we will get there.

But just in terms of the word itself, I think it's an accurate

statement.

MR. BRODEN:  And then to answer your question

directly, that does contain all the factual objections we've

made.

THE COURT:  All right.  So moving on to the legal

objections, the defense raises several.  First, the defense

objects to the three-level and the eight-level enhancements

under Section 2J1.1(b) of the guidelines because the defense

argues that the official proceeding is not related to the

administration of justice.

The defense also objects to the extensive in scope,

planning, or preparation enhancement in 2J1.1(b)(3), and

1    finally, the defense objects to the two-level aggravating role

2    adjustment.

3        The government, for its part, objects to the sequencing of

4    guideline analysis for each count and the impact that that has,

5    in the government's view, on the application of the obstruction

6    of justice enhancement under Section 3C1.1.

7        The government also argues that the Court should depart

8    upwards under several -- or two different -- several, rather,

9    departure provisions, namely the terrorism exception and the

10   weapons departure, as well as the 5K2.0 departure.  I think the

11   government makes an argument under that one as well.

12       So starting with the guidelines, the specific calculations

13   and the legal objections, before we address each objection, let

14   me just confirm, looking at the PSR -- let me get it in front of

15   me.  I want to confirm that the parties do agree with the

16   general approach that Probation has taken on pages 9 through 12

17   of the PSR.  I want to confirm that with the exception of the

18   objections I've just noted, the parties otherwise agree that,

19   one, Probation has used the appropriate guidelines.

20       You agree, Mr. Nestler?  Do you agree, Mr. Broden?

21           MR. NESTLER:  Yes, we agree.  Just one factual

22   clarification, Your Honor.  I think Your Honor said 2J1.1.

23   They're all 2J1.2.

24           THE COURT:  2J1.2.  I've made that mistake before.

25   But yes, 2J1.2 is the guideline that Section 1512(c)(2)

 1    references.

 2             MR. NESTLER:  Yes.  And that's what the PSR says.  I

 3    just heard Your Honor say 1.1.

 4             THE COURT:  You're correct.  I did.  Apologies for

 5    that.

 6             MR. NESTLER:  Thank you.

 7             THE COURT:  Yeah, 2J1.1 is contempt.  That was a

 8    mistake.  Okay.

 9             MR. BRODEN:  Your Honor, the only other thing I would

10    add, it's not as clear in our objections as I would like them to

11    be, but I know Mr. Nestler addressed it.  With regard to the

12    eight-level enhancement, there's also the question of whether he

13    caused or threatened to cause physical -- whatever the term is,

14    physical injury or property --

15             THE COURT:  We'll get there.  All right.  So you

16    agree, Mr. Broden, as well that Probation used the correct

17    guidelines?

18             MR. BRODEN:  I do.

19             THE COURT:  2J1.2 and the others?

20             MR. BRODEN:  Correct.

21             THE COURT:  Okay.  The parties also agree that

22    Probation has grouped the offenses appropriately.  Again, with

23    the exception of what the government has argued with respect to

24    the application of the Section 3C1.1 obstruction enhancement,

25    the government otherwise agrees with the grouping analysis;

1    correct, Mr. Nestler?

2              MR. NESTLER:  Yes, Your Honor.

3              THE COURT:  And same for you, Mr. Broden?

4              MR. BRODEN:  We do, Your Honor.

5              THE COURT:  And both of you agree that the driver of

6    the sentence is the obstruction of justice offense and the

7    corresponding Section 2J1.2 guideline?

8              MR. NESTLER:  Yes, Your Honor.

9              MR. BRODEN:  We do, Your Honor.

10             THE COURT:  Okay.  All right.  So under Section 2J1.2,

11   the parties agree that the base offense level is a 14.  We're

12   going to discuss in a moment whether the eight- and the three-

13   level administration of justice-related enhancement should apply

14   here.  We'll also address whether the offense was extensive in

15   scope, planning, or participation.  And we will discuss whether

16   Mr. Reffitt should be given an aggravated role enhancement as

17   well as the obstruction of justice enhancement more than once.

18        So I'm correct that the parties are in agreement on the

19   multiple-count adjustment in the PSR?  The parties also agree on

20   the acceptance of responsibility adjustment, that it does not

21   apply here given that Mr. Reffitt went to trial and contested

22   the government's factual proof?

23        Correct, Mr. Broden?

24             MR. BRODEN:  That is correct, Your Honor.

25             THE COURT:  All right.  So on all of these issues,

I've independently calculated the guidelines, and I've consulted with the Sentencing Commission, and I too agree that Probation has accurately calculated the guideline issues that we've just discussed.

But let's start with the objections.  Let's start with the administration of justice enhancement.  Mr. Nestler, you agree the government bears the burden for the enhancements under 2J1.2?

MR. NESTLER:  Yes, Your Honor.

THE COURT:  All right.  And Mr. Broden, as I understand your arguments -- I understand you clarified.  I wasn't appreciating that you were arguing that the eight-level enhancement shouldn't apply because I guess what you're arguing or going to argue is that Mr. Reffitt's words were not a threat. Is that right?  Is that the additional argument you're making that wasn't clear to me in your papers?

MR. BRODEN:  Well, certainly, the comments he made prior to arriving at the Capitol could be -- I don't think you could not characterize them as threats.  How real of a threat they are are something different.  But I don't think -- once he arrived at the Capitol, I don't think his actions threatened to cause whatever the proper term is, physical injury or property damage.

THE COURT:  But what you're saying is the comments he made about Speaker Pelosi and Senator McConnell, dragging them

1    out -- I'm not going to be able to quote it exactly, but

2    dragging them out by their heads and their heads bumping down

3    every step?

4            MR. BRODEN:  Those are threats.

5            THE COURT:  Okay.  And you do agree those are threats?

6            MR. BRODEN:  I do.

7            THE COURT:  So how does your argument on the other

8    threats help Mr. Reffitt in terms of applying the eight-level

9    enhancement?

10           MR. BRODEN:  Well, I think the eight-level enhancement

11   is for the, quote unquote, obstruction that happened at the

12   Capitol.  I don't think those threats -- I mean, had he

13   threatened somebody a day before or two days before, granted,

14   the temporal difference is a lot less, but I think we need to

15   look at what happened --

16           THE COURT:  The microphone.

17           MR. BRODEN:  I'm sorry.  I think we need to look at

18   what happened at the Capitol.

19           THE COURT:  Okay.  Understood.  But your arguments are

20   going more to the 3C1.1 enhancement as opposed to the

21   eight-level enhancement?

22           MR. BRODEN:  Well, the eight-level -- the eight-level

23   is if the offense involved causing or threatening to cause

24   physical injury to a person, property damage.

25       And I don't think the offense, the offense being the

1    obstruction that happened going up the Capitol steps to

2    allegedly stop the electoral count, I don't think that involved

3    causing or threatening to cause physical injury to a person.

4              THE COURT:  I want to make sure I'm tracking your

5    argument.

6              MR. BRODEN:  Sure.

7              THE COURT:  You concede Mr. Reffitt made the threat

8    about the speaker and Senator McConnell, and you agree that

9    that's a threat that should count in calculating the guidelines

10   under 2J1.2; correct?

11             MR. BRODEN:  I agree that those are threats.  I don't

12   agree that they should --

13             THE COURT:  Count for the eight-level enhancement?

14             MR. BRODEN:  Correct.

15             THE COURT:  Okay.  But you don't contest that he made

16   them or that they're sufficiently tied to the offense that I

17   should consider whether they cause physical injury to a person

18   or property damage -- or threaten that, rather, threaten to

19   cause physical injury to a person or property damage?  You're

20   just saying that you don't think that threat was one to cause

21   physical injury to a person or property damage?

22             MR. BRODEN:  No, it's the sufficiently tied that I

23   have a problem with.  I agree he made the threats.  I don't

24   think it's sufficiently tied to the offense of trying to

25   obstruct the counting of the electoral vote that allegedly took

1    place when he started up the stairway of the Capitol.

2              THE COURT:  Okay.  So you agree that it's a threat to

3    cause physical injury to a person?

4              MR. BRODEN:  Correct.

5              THE COURT:  But you don't agree that the threat was

6    made in order to obstruct the administration of justice; is that

7    what you're saying?

8              MR. BRODEN:  Correct.

9              THE COURT:  And what is your argument about why the

10   threat was made?  Was it to dismantle the government as a whole?

11   What is the argument there?

12             MR. BRODEN:  The argument really is that it isn't tied

13   to his actions at the Capitol.  It's hyperbole.  That's probably

14   not the best phrase for it.

15             THE COURT:  But the hyperbole argument is it's not

16   really a threat, isn't it?  I'm having a hard time not tying it

17   to his actions at the Capitol.  As you say, it was made

18   temporally close to his actions at the Capitol.  It seems like

19   you're arguing that wasn't a genuine threat, it was bluster.

20             MR. BRODEN:  Yes and no.  I mean, we're sort of

21   parsing now.  I mean, it was a threat.  Whether it was a real

22   threat, who knows.  But I don't think it is tied to the offense

23   of the obstruction.  I mean, he could have made that, you know,

24   the day after the election.  That doesn't tie it to the

25   obstruction.

```
1          THE COURT:  But you concede that he made it at the

2     time he's at the Capitol?

3          MR. BRODEN:  No.  I concede he made it wherever they

4     came from, The Ellipse --

5          THE COURT:  But you think that temporally that's not

6     close enough to tie it to his actions at the Capitol?

7          MR. BRODEN:  Fair characterization, yes, Your Honor.

8          THE COURT:  All right.  So I thought you were saying

9     there wasn't a temporal problem.

10         MR. BRODEN:  No, I agree that it's certainly more

11    temporally related than the examples I gave you, but I do not

12    think it's temporally sufficient.

13         THE COURT:  All right.  I think I understand it.  Are

14    you or are you not arguing that the three-level and/or the

15    eight-level enhancement, administration of justice related

16    enhancements, overstate the seriousness of the offense?

17         MR. BRODEN:  Well, we're -- there's a couple things.

18    One is we're relating -- we're objecting under the whole

19    administration of justice and whether it applies.

20         THE COURT:  Right.

21         MR. BRODEN:  Then to the extent we believe the

22    ultimate guideline level, if you include those, would overstate

23    the offense and would justify a variance.

24         THE COURT:  And are you tying the overstatement of the

25    offense to any particular portion of the guideline calculations
```

1    that the Probation Office has made?

2         MR. BRODEN:  Honestly, I hadn't considered that

3    question.  I think it is fair to say that an eight-level

4    enhancement encounters a lot of different type of behavior.  So

5    to that extent, if you're asking me to tie it to, you know, why

6    I think we got so high and why a variance is in order, that's

7    sort of the big one, the eight-level one.

8         THE COURT:  All right.  So you are making that as a

9    part of your broader argument that the guideline range is too

10   severe in this case?

11        MR. BRODEN:  Right, the variance argument.  I mean, if

12   the Court agrees it applies, it applies eight levels.  It

13   doesn't give the Court an opportunity to apply less than eight

14   levels.  But I do think it would justify a variance downward.

15        THE COURT:  Okay.  All right.  Before we move forward

16   with the objection to the administration of justice argument

17   here, Mr. Nestler -- and I'm going to start having you come on

18   up because we're talking more.  Come on up to the podium.  And

19   if you can just address what Mr. Broden has said regarding the

20   threat.  There are a couple of different layers to that

21   argument.  But I'm most interested right now not in the 3553(a)

22   overstatement argument but, rather, this threat's too attenuated

23   to what he did at the Capitol.

24        MR. NESTLER:  Sure, Your Honor.  So the answer is the

25   threat is not too attenuated to when he entered the Capitol.  At

1    the Ellipse, in the hour or so before he got to the Capitol, he

2    tried to recruit other people to come with him.  And we

3    submitted the videos as exhibits at the trial.  The defendant

4    stood around almost proselytizing, having everybody stand around

5    him in a semicircle where he told everybody this is what we're

6    going to do, I'm armed, we're going to the Capitol, I'm going to

7    go drag Nancy Pelosi and Speaker McConnell out of the Capitol,

8    and we're going to do it violently.  And that was the gist of

9    what he was saying to everybody at the Ellipse immediately

10   before he went to the Capitol and tried to do those exact

11   things.

12        So we do believe that the threats that he uttered at the

13   Ellipse were tied temporally to what he did at the Capitol.  He

14   made the same comments to Rocky Hardie in the car ride from

15   Texas to D.C.  We think that's also tied.  And similar comments

16   on the Telegram threats.  But we don't even need to get to those

17   because what he said at the Ellipse counts.

18        In addition to the actual threat that came out of his

19   mouth, we do believe the defendant's conduct was also considered

20   threatening.  That is exactly what Chief Judge Howell found in

21   the *Rubenacker* case when she did overrule the defendant's

22   objection to this exact eight-level enhancement and found that

23   the defendant's conduct in that case, pointing at officers,

24   walking towards officers, was threatening conduct.

25             THE COURT:  And the failure to respond to the

1    officers' commands to stand down?

2          MR. NESTLER:  That's exactly right, Your Honor.  And

3    so we believe that also is threatening conduct.  We also will

4    point out, Your Honor, that the guideline is written broadly.

5    It's the offense involved causing.  So it's a very broad use of

6    the word "involved," and we do believe that here the offense

7    certainly involved causing or threatening to cause physical

8    injury to a person.

9          And finally, we do believe that the offense also involved

10   causing property damage.  The defendant was directly responsible

11   for the cutting down of the scaffolding near where he was both

12   to protect him and to allow the other rioters to use that

13   scaffolding to penetrate further up and go over the officers.

14         THE COURT:  But that's -- I mean, this is tied into

15   what he instructed the crowd to do behind him.  His message to

16   the crowd is come on.  It's not destroy things as you come.

17         MR. NESTLER:  Right.  But this is not talking about

18   how he directed the crowd.  This enhancement here -- we can get

19   to the 3C1.1 enhancement later, I understand.  This is if the

20   offense involved causing physical injury to a person or property

21   damage.

22         THE COURT:  So he doesn't have to be tied to it; it's

23   just an automatic?

24         MR. NESTLER:  He's tied to it, but he doesn't have to

25   be the one to instruct other people to do it.  He is benefiting

from it.  Going back to the 1B1.3 and just talking about the

conduct for which he is responsible for, he is responsible for

the conduct that aided and abetted him.  These other individuals

were cutting down scaffolding and tarps in order to protect him

from the less-than-lethal weapons that were coming his way.  And

so those people aided and abetted -- there was an

aiding-and-abetting relationship there.  And so even if he

didn't direct them to do it, the offense did involve property

damage.

THE COURT:  You know, I'm understanding what you're

saying about the failure to stand down and how that's

threatening.  It does seem to me that the guideline that says if

the offense involved causing or threatening to cause physical

injury to a person or property damage -- I mean, you're saying

basically he implicitly had an agreement with the other rioters,

and therefore, he's -- it's almost like relevant conduct

analysis here.  He's responsible for everything that was

reasonably foreseeable.

And can we say as we sit here now -- looking back at it,

it's obvious.  But as we sit here now, can we say that, one,

there was that sort of meeting of the minds and that it was

reasonably foreseeable that all of the inaugural platform,

et cetera, were going to be ripped down?  You think so?

MR. NESTLER:  I don't think we have to go to a level

of what property damage was reasonably foreseeable.  We believe

1   it's reasonably foreseeable that property damage would have

2   occurred as a result of his offense.  And so whether it was

3   people damaging the stairs or damaging the windows or the doors

4   of the Capitol or cutting down the scaffolding or ripping apart

5   the scaffolding or the tarp, it's reasonably foreseeable, and it

6   should have been to the defendant, that his offense involved

7   causing property damage.

8           THE COURT:  So the analysis that I do in terms of his

9   state of mind for this guideline enhancement with respect to

10  property damage, is it akin to what I do in terms of

11  restitution?  Is it the same kind of analysis?  There's nearly

12  $3 million of property damage done, and he's on the hook for

13  that?

14          MR. NESTLER:  We believe he is on the hook for that,

15  for all of that property damage.  We believe that the damage to

16  the Capitol --

17          THE COURT:  You're not seeking --

18          MR. NESTLER:  We're not seeking that, but we believe

19  he is.

20          THE COURT:  But you believe he should pay a portion

21  like every other January 6 defendant; right?  I'm not arguing

22  with you now about the merits of that.  I'm just wondering if

23  it's the same -- if I agree with you on restitution, is it the

24  same analysis with respect to this guideline provision?  I don't

25  know.

1          MR. NESTLER:  We believe it is.  It is reasonably

2     foreseeable, and he does bear responsibility and culpability for

3     the conduct of others that was reasonably foreseeable in

4     committing his offense.  Even though he didn't personally break

5     a window or damage a door, we believe that he is culpable for

6     that conduct under the guideline analysis.

7          THE COURT:  Just to be clear, though, for the record,

8     there is no evidence that he himself committed any property

9     damage?

10          MR. NESTLER:  That's correct.

11          THE COURT:  Okay.  All right.  Anything else you want

12     to add on that issue, Mr. Nestler?

13          MR. NESTLER:  No.  I assume we will talk about

14     administration of justice and the definition of that separately.

15          THE COURT:  Yes.  Just a moment.

16          MR. NESTLER:  Thank you.

17          THE COURT:  Mr. Broden, let me bring you up.  Before

18     we get into the administration of justice, let me ask you about

19     the property damage argument the government is making.

20          Obviously, there's no question that there was an

21     extraordinary degree of property damage all around Mr. Reffitt.

22     The way this guideline is structured, can I hold him responsible

23     for that, because it was reasonably foreseeable -- as he ignored

24     commands of the officers and advanced up the stairs, certainly,

25     it's foreseeable people are going to follow him, and it's

1  also -- I'm asking, is it also foreseeable that some of the

2  people who followed him were going to destroy the platform to

3  the right of him as he advanced up the stairs?

4        MR. BRODEN:  Well, to the extent we're sort of talking

5  about relevant conduct, I think (a)(1)(A) would more likely

6  apply.  And the question is, did he counsel or command or induce

7  and all those words to commit property damage, and I don't think

8  there's any evidence of that.

9        THE COURT:  Wait.  Where are you directing me?

10        MR. BRODEN:  1B1.3(a)(1)(A).

11        THE COURT:  Wait.  You're in the guideline, or you're

12  in the relevant conduct guidelines?

13        MR. BRODEN:  The relevant conduct guideline.

14        THE COURT:  So tell me where you are.  1B --

15        MR. BRODEN:  1.3(a)(1)(A).  I don't know if you have

16  the same book as me, but it's 23 if you do.

17        THE COURT:  So all acts and omissions committed,

18  aided, abetted, counseled, commanded, induced, procured, or

19  willfully caused by the defendant.  Because -- so the government

20  is arguing more that this is (a)(1)(B), a jointly undertaken

21  criminal activity, a scheme, if you will, all actions and

22  omissions of others that were within the scope of the jointly

23  undertaken criminal activity in furtherance of that criminal

24  activity and reasonably foreseeable the defendant would be

25  responsible for.

1       So is that the line that I have to -- or the issue I have

2   to decide, whether this is jointly undertaken criminal activity

3   or, you know, acts that he willfully caused acting alone?

4       MR. BRODEN:  Right.  And I think we're all sort of in

5   uncharted waters, and this is not the usual drug case or bank

6   robbery where it's easy to find those.  But I don't think, in

7   looking at the -- just looking at it overall and looking at the

8   purposes of the guidelines, that this constitutes jointly

9   undertaken criminal activity.  I mean, he acted by himself.

10  Now, there were thousands, if not hundreds of thousands of

11  others who were committing the same -- some of the same, some

12  different acts.  But I think 1B1.3(a)(1)(A) is the better

13  analysis.

14      THE COURT:  Okay.  In terms of jointly undertaken

15  criminal activity, you would agree that he's on the hook for

16  anything Rocky Hardie did, but as Rocky Hardie testified --

17      MR. BRODEN:  Correct.

18      THE COURT:  -- he testified that he thought all this

19  was bluster and Mr. Reffitt's prone to gross exaggerations and

20  he couldn't believe it when he walked from The Ellipse to the

21  Capitol and saw people like spiders climbing up the Capitol.

22  And my recollection is that he testified that he just watched it

23  all and walked up and touched the outside of the Capitol

24  building.  But he had -- it seemed convincing to me that he had

25  no intention of going in.  To the extent Mr. Reffitt thought

```
1   they had a jointly undertaken -- you know, jointly undertaken

2   criminal activity, he was not on board with that plan, he

3   thought it was preposterous and not going to happen.

4            MR. BRODEN:  Right.  And that's more sort of the

5   typical guideline analysis, that if they planned to rob a bank

6   together he would be on the hook for what Mr. Hardie did.

7            THE COURT:  So you agree he's on the hook for anything

8   Hardie did, but he's not on the hook for everybody else?

9            MR. BRODEN:  Anything that Hardie did that would have

10  been foreseeable to him, yes.

11           THE COURT:  And what about -- we will get there, but

12  on the restitution analysis, is this the analysis I do, or do I

13  look at that differently?

14           MR. BRODEN:  Candidly, the government is only asking

15  for $2,000.

16           THE COURT:  So I don't have to reach this issue?

17           MR. BRODEN:  We have bigger fish to fry than $2,000.

18           THE COURT:  So you're not going to object to a $2,000

19  restitution payment?

20           MR. BRODEN:  No, we did not object.  It was more of a

21  strategic decision in the sense that we had bigger fish to fry.

22           THE COURT:  Okay.  All right.  So let me -- one

23  moment.  I'm making notes.

24       All right.  You're arguing based on law of the case that I

25  can't apply these administration of justice enhancements, and to
```

1    make that argument, you're relying on my opinion in *Sandlin* and

2    the related rulings I've made in this case; right?

3              MR. BRODEN:  Right.  And of course, there was the -- I

4    forget the -- I guess it was the *Montgomery* decision, but that

5    wasn't from this Court.  So I think it's a cleaner argument

6    that, you know, we should have some --

7              THE COURT:  So you like Judge Moss's analysis better

8    than mine?

9              MR. BRODEN:  Well, his wording in the motion to

10   dismiss was a little cleaner --

11             THE COURT:  Cleaner, okay.

12             MR. BRODEN:  -- or more precise.

13             THE COURT:  I thought I was pretty precise.

14             MR. BRODEN:  Well, you were.  It's just I like the

15   wording that Congress was not engaged in the administration of

16   justice, which Judge Moss put in an actual sentence, but you

17   were pretty close.

18             THE COURT:  Well, in effect, I think that's the point

19   I was trying to make.  Judge Howell, I think, in a recent case,

20   applying these enhancements, did suggest that that defendant's

21   actions, and I think it's the defendant Mr. Nestler just

22   mentioned --

23             MR. BRODEN:  He is cited in his -- obviously, if the

24   Court was to adopt that, then I couldn't make this argument.

25             THE COURT:  But there's tension between that analysis

1    and my ruling.

2        But here's the thing.  There's no question, I did not

3    decide this guideline issue in any of the opinions.  This is a

4    new issue.  So I think your law of the case argument doesn't

5    work here.

6        And the question for me is, 2J1.2 is in Part J of the

7    guidelines that generally in its heading define the guideline as

8    offenses involving the administration of justice.  We all know

9    that by and large the 1512(c)(2) prosecutions involve courts,

10    grand juries, things that we think of as relating to the

11    administration of justice.  Nonetheless, the vast majority of

12    judges on this court have held that that statute does apply to

13    this context.

14        MR. BRODEN:  With one notable exception.

15        THE COURT:  With Judge Nichols's exception.  The

16    circuit will resolve that soon enough, and you've certainly

17    preserved that argument for appeal.

18        But once I've decided that this crime can be prosecuted

19    under that statute, the guidelines very clearly direct that

20    statute to 2J1.2, which is entitled "Obstruction of Justice."

21    And it's hard for me to conclude simply because the Sentencing

22    Commission didn't anticipate and incorporate every definition in

23    the statute in the shorthand, if you will, for these

24    enhancements, that that means that the Commission intended to

25    exclude this offense.  Right?

1        I get the argument that I'm sure will be argued on appeal

2   in this case, that I erred by allowing the government to bring

3   this obstruction charge for the official congressional

4   proceeding in this case, that that statute doesn't apply.  But

5   once I determine that statute applies, the back of the

6   guidelines take me to this guideline.

7        And it seems like it would lead to unwarranted sentencing

8   disparities to apply it, these enhancements, in only cases

9   involving what we classically think of as administration of

10  justice.  It seems like the Commission would need to be clear

11  that we are carving out this type of offense for me to draw the

12  conclusion that this administration of justice language that's

13  used as the title to Part J -- to me, it seems like shorthand

14  for what's covered here -- somehow makes these adjustments not

15  applicable in this context.

16       MR. BRODEN:  Well, I guess the short answer to the

17  Court's question is, you know, I think we agree that the

18  Sentencing Commission didn't prepare or think of these type of

19  offenses.

20       But then the question is, if it's not clear whether it

21  applies or not, does that go to not applying the guideline or

22  applying the guideline?  And it seems to me under the rule of

23  lenity that you would not apply the guidelines.

24       THE COURT:  Even if I took the sort of plain language

25  approach and did what you're suggesting, why wouldn't I, under

3553(a), enhance his sentence in a commensurate amount based on these enhancements?  Why wouldn't I, by analogy, get to the same place under 3553(a)?

MR. BRODEN:  Well, because the Court has a lot more discretion under 3553(a).  We talked about it a little earlier.  Would you apply an eight-level enhancement if you were doing it under 3553(a).  You'd have a lot more discretion.  Whereas, if you decide this guideline applies, you have no choice but to apply an eight-level enhancement.

THE COURT:  But I also could say under 3553(a) that I think the guideline is too high.

MR. BRODEN:  There's different ways to skin the cat.

THE COURT:  I can get there either way.  I'm just making the point that even if I were to buy your argument, which I am not, you can tell, on this, you still face the same problem under 3553(a).  So you can still make the overstatement of the offense argument with the guideline applying, just like you would be arguing with me on why an eight-level enhancement shouldn't apply under 3553(a).

MR. BRODEN:  You could make that argument for any objection.  It kind of cuts into my job a little bit, but --

THE COURT:  Well, I just don't see -- one, I don't think the law of the case applies, given that I was looking at an entirely different issue.  I know that the wording is the same.  I also think Part J generally refers to the

1    administration of justice, and I don't think that we can infer

2    simply because the Commission didn't include the phrase

3    "official proceeding of Congress" that it meant for that type of

4    offense prosecuted under Section 1512(c)(2) to not be subject to

5    the same aggravating factors that the Commission has delineated

6    here.  So I'm denying that.

7         Is there anything more you want to say about the

8    government's argument with respect to the threat, the

9    attenuation of the threat and -- I don't know that I need to

10   reach the difficult issue regarding the property damage and how

11   I look at that under the relevant conduct guidelines.  I think

12   that, in my view, the threat at the Ellipse is not too

13   attenuated to his conduct immediately thereafter.  And I also

14   think his failure to stand down and follow the lawful commands

15   of the officers was threatening to them.  And I think we're

16   going to hear from Officer Kerkhoff, when she gives her victim

17   impact statement, about how that impacted her as she was

18   defending the Capitol and everyone inside.

19        So I don't -- I hear your argument that, you know, maybe

20   this is an overstatement given the plus 11 under the guideline.

21   But I think the this is not a threat associated with the offense

22   is not a compelling one.

23             MR. BRODEN:  That's all I have, Judge.

24             THE COURT:  Okay.  All right.  Before I end with this,

25   you're also not disputing that clearly the three-level

1    enhancement certainly would apply, given my ruling on the

2    administration of justice issue, because there's no question

3    that this costs the government a lot to respond with law

4    enforcement officers and the delay in the vote, keeping members

5    of Congress there late into the night to finish their job?

6    You're not arguing with that factual finding I have to make for

7    the three-level adjustment to apply?

8            MR. BRODEN:  I am not, Your Honor.

9            THE COURT:  Okay.  So let me keep you up there.  The

10   defense is also objecting to the extensive planning enhancement

11   under 2J1.2(b)(3), which applies if the offense was extensive in

12   scope, planning, or participation -- or preparation, sorry.  The

13   Court should increase the guideline by two levels.

14       I'll hear you out here, but the record reflects that

15   Mr. Reffitt started planning this trip a couple weeks ahead of

16   time.  He assembled a lot of gear.  It did take some extensive

17   planning, I think.

18           MR. BRODEN:  I guess that's where I -- it took some

19   planning.  But I think some planning --

20           THE COURT:  The definition of "extensive planning"?

21           MR. BRODEN:  Right.  It wasn't spur of the moment for

22   sure, but I don't think this qualifies for extensive planning.

23   I haven't seen any cases that found the District Court erred in

24   applying this case but -- that type of enhancement.  But the

25   same point, if you look at some of those cases, the planning

1    that's gone into them, even the case that the government cites

2    in its sentencing memoranda, I think the planning is

3    significantly more extensive.

4         THE COURT:  So we found little case law on this,

5    nothing in D.D.C. or the D.C. Circuit.  There's some appellate

6    case law affirming District Courts' imposition of the

7    enhancement.  It was upheld where a defendant had a plan to

8    manufacture a false confession.

9         MR. BRODEN:  I think that was the case the government

10   cited.

11        THE COURT:  That required multiple steps.  That's the

12   *Petruk* case.  It was upheld where the defendant took photos of

13   the victim's daughter and sent them to him from a fake e-mail

14   account to disguise his actions.  That's the *Bakhtiari* case.  It

15   was applied where a defendant prisoner got a semen sample from

16   her boyfriend that she preserved and used to accuse a

17   correctional officer three times of sexual assault -- that's the

18   *Rodriguez* case -- and where the defendant allowed prisoners to

19   avoid testing positive for controlled substances by giving them

20   advanced notice of drug tests or giving them his urine, and the

21   conduct was far from an isolated occurrence.

22        So there's not a lot right on point, but is it not the case

23   that other judges have applied this in similar contexts?

24        MR. BRODEN:  Well, first, when you talk about the

25   appellate deals, that's always a danger looking at appellate

1    cases.  All they say is the District Court didn't clearly error.

2    Where the defendant wins, there's rarely an appeal.  So we don't

3    have the luxury of those cases.

4        But just listening to them, I mean, they took the same --

5    at least with the semen sample and the urine testing at the BOP,

6    I mean, that is extensive because it's happening and happening

7    and it's happening on repeated occasions.  This is essentially

8    getting ready for a -- and I hate to minimize it, but getting

9    ready for a trip.

10            THE COURT:  Not a normal trip.

11            MR. BRODEN:  And that's why I don't for a moment want

12   to minimize it.  But I don't think it is the extensive type of

13   planning.  Would the Court -- would the Court of Appeals decide

14   the Court clearly erred in applying it?  I don't think so, but I

15   don't want to concede that point.

16            THE COURT:  Are you aware of any case in this

17   district, any of these January 6 cases, in which one of my

18   colleagues has not applied the enhancement in similar

19   circumstances?

20            MR. BRODEN:  I don't, and the government can speak on

21   this more than I do.  I only represent one other defendant

22   charged in this case, and I don't even believe that was a part

23   of the plea offer, to apply that.

24            THE COURT:  We certainly have that issue, what's the

25   offers in these cases versus, in this case, the trial.

1          MR. BRODEN:  I think the case the government cites in

2     front of Judge Howell, I think that was probably the only case

3     where there wasn't a plea agreement.

4          Am I wrong about that?

5          MR. NESTLER:  To date, the *Rubenacker* case, as far as

6     I'm aware, is the first case that went to sentencing without a

7     plea agreement.

8          THE COURT:  Okay.  And this is the first sentencing

9     post-trial; correct?

10         MR. NESTLER:  Yes, Your Honor.

11         THE COURT:  Okay.  All right.  Well, I hear you, and I

12    think this is a close call.

13         MR. BRODEN:  Close call goes to the runner, Your

14    Honor.

15         THE COURT:  Let me hear from Mr. Nestler.  I'm

16    curious.  Do you have any evidence that Mr. Reffitt ordered

17    items for this trip, or is this just gear he had in his closet?

18         MR. NESTLER:  We're not aware of any specific orders

19    he made in advance of this trip.  We do know he made orders for

20    additional items --

21         THE COURT:  Afterwards.

22         MR. NESTLER:  -- afterwards.  We do believe that --

23    and I think Your Honor cited a couple of cases about the

24    extensive planning and preparation.  We believe that applies

25    here.  He did drive more than halfway across the country with

another person, four guns in the car.  He had all of his own

bulletproof armor.  Mr. Hardie had his bulletproof armor.  They

had radios.  He had a helmet.  He had a camera for his helmet.

Of course, he brought his firearm with him to the Capitol.

This is not an issue -- so one of the issues we will get to

later with allocution, some of the defendant's letters and the

defendant's letter and the defendant's memo talked about how he

was sort of encouraged by President Trump's speech at the rally

to go to the Capitol.

And we believe the evidence shows, in fact, the complete

opposite.  The defendant intended to go to the Capitol from the

time he was still in Texas.  He always planned to go to the

Capitol.  That's what the evidence at trial showed.  That's what

his messages showed.  So whereas somebody may have gone to The

Ellipse and then decided to go with the crowd to the Capitol,

Mr. Reffitt is certainly on the other end of that continuum.  He

was the one encouraging other people to go to the Capitol in

order to overtake Congress.

THE COURT:  All right.  Has the government sought this

enhancement in any other case?

MR. NESTLER:  Not that I am aware of, Your Honor.

THE COURT:  And in your view, is the nature of the

planning Mr. Reffitt made in this case any different than the

other cases in which defendants brought a lot of gear?  What

makes this different?

1          MR. NESTLER:  Well, first of all, for many of the

2    cases that have gone to sentencing, the defendants did not bring

3    the amount of gear that Mr. Reffitt brought.  He probably

4    brought more gear than anybody else we have talked about who has

5    gone to sentencing.

6          THE COURT:  There was the guy who had a whole arsenal

7    of weapons and explosives, and he never got on the Capitol

8    property, or they didn't catch him on the Capitol property, but

9    he had a ton of stuff.  He wasn't, I guess, charged with the

10   obstruction offense.

11         MR. NESTLER:  Correct.  So he wasn't charged with

12   obstruction, correct.

13         THE COURT:  But there were others who -- I've

14   sentenced some as misdemeanors who had helmets and gear and

15   ties.  Other judges have sentenced those.  He's not the first to

16   come with a lot of gear.

17         MR. NESTLER:  We believe he had more gear than almost

18   anybody else who has been sentenced so far.  So it's true, if

19   some other individuals might have had a helmet or a plate

20   carrier or a weapon that was not a gun -- this is the first

21   defendant being sentenced who we understand in connection with

22   January 6 had a firearm on Capitol grounds.  So they may have

23   had one of those things.  Mr. Reffitt had all of those things,

24   plus is responsible for Mr. Hardie's conduct.

25         And Ms. Berkower just corrected me.  There are other plea

1   agreements where this enhancement is agreed to by both parties.

2   I'm not sure any of those have gone to sentencing yet, but there

3   are other defendants who have agreed to this particular --

4   THE COURT:  In the plea agreement?

5   MR. NESTLER:  In the plea agreement.

6   THE COURT:  Based on gear that a defendant brought?

7   Is that the driver?

8   MR. NESTLER:  I can't speak to whether it's the gear

9   in terms of the planning and preparation, which would go a lot

10  towards the gear and what he was planning to do.

11  But we also here have the issue about extensive in scope.

12  The defendant was trying to overtake Congress.  He wanted to sit

13  in Congress's chair and start a new Congress.  It's hard to

14  imagine an offense that was more extensive in scope than what

15  the defendant was trying to accomplish here.

16  THE COURT:  That's a true point.

17  At some point we're going to have to take a break for the

18  court reporter.  But I would ask the government, I would like,

19  if you can get in the break, a list of those cases and any, you

20  know, brief summary of those cases.

21  I'm just -- I'm interested because a refrain you're going

22  to hear from me a lot today is certainly Mr. Reffitt should be

23  sentenced more severely than similarly situated defendants who

24  did not go to trial.  I mean, he does not get acceptance of

25  responsibility.

What concerns the Court, and we will get there in a moment when we talk about the departures that the government is seeking, is his decision to exercise his constitutional right to go to trial should not result in a dramatically different sentence and position by the government because he went to trial.

In other words, like the cases that have pled that involve assaults and involve weapons nearby -- I know he's the first one to have, at least that you've been able to prove, a weapon on him, but that is a concern because, you know -- again, I'm getting ahead of myself, but the government is asking for a sentence that's three times as long as any other defendant or defendant who did not assault an officer.  And I know he said some outrageous things, some absurd things.

So this is why I'm asking on the extensive planning, because the fact that the government has sought this in similar circumstances makes me inclined to exercise discretion -- and I do think you've made a good point, Mr. Nestler.  I wasn't focused so much on the extensive and scope of the offense, and I do think there's a lot in the record regarding what Mr. Reffitt's intentions -- stated intentions were.  In all likelihood, Mr. Broden will argue here that this was in line with his, you know, long history of hyperbolic statements.  But it is, as he claimed, hugely extensive in scope.

And I do think that there's enough evidence of planning and

preparation here in terms of organizing the trip, in terms of

gathering together this wide range of sophisticated gear, not

just firearms, but a helmet, bulletproof vest, flex cuffs,

radios, and megaphones.  There was a lot of thought and planning

that went into this offense.

So I will under the guidelines give the enhancement, and

I -- Mr. Broden has already telegraphed that this is probably a

part of his argument under 3553(a), that the guidelines

overstate the seriousness of the offense.

Am I clear about what I want?  I just want the names of

those cases and a brief description of what drove that

enhancement in those cases.

MR. NESTLER:  Yes, Your Honor.

THE COURT:  And if you're able to give them to me

before then through the law clerk, that would be helpful.

MR. NESTLER:  Yes, Your Honor.

THE COURT:  All right.  So turning to the role

adjustment under Section 3B1.1, again, the government does bear

the burden in showing that this enhancement applies.  The

question for purposes of this adjustment is whether Mr. Reffitt

was an organizer, leader, manager, or supervisor in the criminal

activity.  And in deciding whether the adjustment applies, the

guidelines instruct courts to consider factors like the exercise

of decisionmaking activity, the recruitment of accomplices, the

degree of planning and organizing of the offense, and the degree

of control over others.

Mr. Nestler, I will hear from you first on this.  For the same reasons that I've asked Probation to make some factual corrections to the PSR, I do have some concerns about applying the role enhancement here vis-a-vis Hardie.

I do think he encouraged others to come for sure.  He did gather a bunch of gear.  The record is equivocal in terms of whose idea it was to bring the guns and maybe the rest of the gear, too.  We don't know.  I don't recall the government producing evidence that Reffitt was the leader of all this.  I can understand why the government assumes he was, but I'm looking for hard evidence that he was a leader.  He certainly didn't control Hardie, who, again, testified convincingly he thought he was off his rocker and he was not going in the Capitol.

So given the facts elicited at trial, it's difficult for me to conclude that you've met your burden on the role enhancement.

MR. NESTLER:  Yes, Your Honor.  I would like to start first by pointing to the sentencing guidelines, the background commentary for 3B1.1.  It indicates that 3B1.1(c) was included by the Sentencing Commission to account for organizations without a clearly delineated division of responsibility.

And I point that out because we are not -- as Mr. Broden pointed out, this is not a typical bank robbery case.  This is not a typical gang case.  So we don't have an organization here

with clearly delineated divisions of responsibility, which is
why we believe Probation was correct to apply 3B1.1(c) and not
(a) or (b).  Considering the number of people that were involved
here, (a) or (b) might actually be applicable, but I think (c)
is in the right heartland of what we're talking about.

THE COURT:  Right.  But is your leader argument
vis-a-vis Hardie or the crowd?  What is it?

MR. NESTLER:  Well, it's both.  But we're focusing on
the crowd.  We understand what Your Honor is saying about
Mr. Hardie.  We're focusing on Reffitt's actions with respect to
the crowd.  But if I can just --

THE COURT:  But we've covered this.  I mean, what I
found is he encouraged the crowd to move forward.  Is that
enough to apply the role adjustment?

MR. NESTLER:  It's not just that, but that's what
we're getting at.

So let me start with Mr. Hardie, if we could.  So
Mr. Reffitt did provide Mr. Hardie with flex cuffs the morning
of, that's what Mr. Hardie testified to, in order to detain
people.  And Mr. Reffitt, of course, had flex cuffs with him in
order to detain people, members of Congress he wanted to
physically pull out of the building.

THE COURT:  But Hardie is out of the picture.  He did
trespass, but in terms of 1512(c)(2), which is a driver, he's
not charged with that.  There's a lack in some ways of a meeting

1    of minds of those two.

2          MR. NESTLER:  Understood, Your Honor.

3      So if we go to the Ellipse, so what Mr. Reffitt was doing

4    at the Ellipse was encouraging those people there at the Ellipse

5    to come with him to the Capitol in order to storm the Capitol

6    and overtake the Capitol.

7          THE COURT:  Do you have any evidence he knew anyone

8    else on that day?

9          MR. NESTLER:  Yes.  In the video that's played, he

10    yells out to somebody named Gina, and he talks to somebody named

11    Gina, which is introduced into evidence.  So he did know

12    somebody else who was there.

13          THE COURT:  Was this another Three Percenters?

14          MR. NESTLER:  That's our understanding, Your Honor.

15          THE COURT:  Does the government have any evidence that

16    he colluded or planned ahead of time with other Texas Three

17    Percenters?  Or there was a reference he made at one time, I

18    think it was in the Government's Exhibit 1A, the Zoom video,

19    about being a part of -- a member of the Oath Keepers.  Is there

20    any evidence that he worked collaboratively with other Three

21    Percenters, the Oath Keepers, or the Proud Boys?

22          MR. NESTLER:  Not directly, no, Your Honor.

23          THE COURT:  Because it seemed, my impression from the

24    trial is kind of he's a lone guy there who couldn't even get the

25    leader of the Three Percenters to join him.

1           MR. NESTLER:  Right.  So he was trying to recruit

2    others.  So when we talk about his conduct at the Ellipse

3    immediately preceding the Capitol, he was saying, I'm a member

4    of Texas Freedom Force, of Texas Three Percenters, of Oath

5    Keepers, I have all of these other guys here.

6       Now, we don't believe that to be accurate, but what he was

7    doing was trying to recruit these accomplices in order to go to

8    the Capitol, to storm the Capitol.

9           THE COURT:  Yeah, but a lot of people are ready to go

10   to the Capitol.  To make him out to be like the leader who but

11   for him individuals were not going to go to the Capitol or, for

12   that matter, storm the Capitol is, I think, a stretch.

13          MR. NESTLER:  We don't believe it's a stretch, Your

14   Honor, not just to go to the Capitol, but he told them all he

15   was armed and that he had more people in the crowd who were also

16   armed.

17          THE COURT:  Do you have any evidence to support that?

18          MR. NESTLER:  No, not that he actually had that.  He's

19   using those words in order to recruit these accomplices.  He

20   needed the crowd at his back in order to be successful, and he

21   got it.  So what he was trying to do was tell people, you can be

22   assured that I am armed, all of my people here are armed, if you

23   come with me and you help me storm the Capitol, we're going to

24   be able to accomplish our desired objectives because I have all

25   this support behind me.  And he was trying to recruit additional

1     accomplices in order to get that.

2          We're not saying he was the leader.  We're saying he was a

3     leader.  And so he was a leader, manager, organizer, or

4     supervisor.

5               THE COURT:  Okay.  So in the same way he recruited

6     Hardie, to some degree -- I agree, he certainly recruited

7     people, come with me.

8          The other factors I need to look at are the exercise of

9     decisionmaking activity.  He didn't have any -- aside from

10    encouraging people to come with him, he didn't have any degree

11    of planning or organizing of the offense.  He didn't have any

12    control over the others.  He wants other people around.  He

13    wants people behind him.  He wants to be the big guy, the first

14    to try to storm the Capitol, the first to go to trial.  Clearly,

15    that's what he wants.

16         But does that make him a leader?

17              MR. NESTLER:  Court's brief indulgence.

18         Mr. Hopkins, do you mind putting the -- I just want to show

19    a photo, Your Honor, if we could have the HDMI attached.

20         These are two of the photos that were introduced into

21    evidence at the trial, Judge.  When we're talking about a leader

22    and what kind of control he had over others, we have to look at

23    where Mr. Reffitt was.  He is in front of hundreds, if not more

24    than a thousand people on the west front of the Capitol, and he

25    is out in front of them.  They are behind him with a giant

wooden plank to protect themselves moving up as he moves up.
He's pointing forward.  He has his megaphone.  He's addressing
the crowd.  I understand we don't have direct evidence of what
he was saying, but he was generally telling other people "move
forward" and telling the police officers "stand down or you're
going to be tried for treason."

So what he is doing is he is not just encouraging the
crowd, he is directing the crowd to come with him.  They're all
behind him.  Look how many people are on the west front here.
If there's any particular person here at this exact time -- this
is 1:50 p.m. -- who is a leader, Mr. Reffitt is the leader here.
He is the one out in front directing people behind him.

And he knew the crowd was watching him.  He knew that he
was acting with the intent that they follow his lead.  He told
the other members of the Texas Three Percenters on the Zoom call
a couple days later, "Nobody was moving forward until I climbed
up the banister and got wrecked the hell out.  And then
everybody -- and then I just kept going, go forward, go forward.
I kept screaming take the house.  Everybody started ripping the
scaffolding apart."

The defendant is bragging about how what he was doing was
controlling, causing, inducing other people to do what he wanted
them to do.  Every time he moved forward, they moved forward.
He sent a Telegram message to the other members of the Texas
Three Percenters later on January 6, Exhibit 1B4.1, at 4:17, he

told them, "I was the lead up the Capitol stairs."  His word, he was the lead.  At 4:19 p.m., he said, "A battle cry like in Braveheart.  The insurrection began immediately after."  What does Mel Gibson's character do in Braveheart?  He leads his troops in battle on the battlefield.  He emits a vigorous battle cry and charges forward, and hundreds, if not thousands of people behind him charge behind him.

That is exactly what the defendant was trying to accomplish here.  He was trying to lead others, including using his megaphone.  And when the officers shot his megaphone out of his hand, he discarded that and used his voice.  And when he couldn't use his voice anymore, he used his arms to continue leading people up and pushing them to go forward.

I don't need to replay the video.  I'm sure Your Honor is aware of it.  But one of the videos, you can clearly see, every time the defendant moves forward and gets shot, the crowd boos.  The whole crowd is watching him.  Everyone is watching him.  Every time he moves forward, the crowd cheers.  Then he gets shot, and the crowd boos.  They are all looking to him as their leader.  And he was invigorated by that.  He wanted that.  That was what he was doing there.

Sergeant Flood even testified that he interpreted the defendant's hand gestures after he was sitting on the banister as trying to direct the crowd to follow his lead to move forward.

He didn't need to personally breach the building in order to be a leader of the building.  And we know he didn't personally breach the building, but he accomplished what he wanted to do.  He got the mob to overrun the officers and actually breach the building and actually stop the certification.

He wrote in one of the Telegram messages, Exhibit 1B4.6, on January 9 that he "made it to the top of the stairs."  And we know he did.  That was introduced into evidence.  And then "they broke through the doors."  And then in the defendant's words, he said, "My job was done then."  That's exactly right.  The defendant's job was to encourage, lead, motivate all the people behind him to continue pushing forward in order to get into the building.

He told Mr. Teer on the Zoom call, "When everybody saw me get bear sprayed and shot and go down the banister rail, it was a full onslaught move forward.  Nobody stopped from that moment on.  When I got to the top of the stairs, people were coming up to me calling me a patriot and knuckle bumping me.  Nobody was moving forward until I climbed up the banister."  The defendant was the one who was leading that crowd there.

We have more about his actions with respect to Mr. Hardie and other members of the TTP.  I understand Your Honor's point about that.  But just to show where the defendant's mind-set was, Mr. Hardie testified he read the defendant's message from

1    December 21st saying he was going to D.C. and encouraging

2    members to go with him, and Mr. Hardie testified, "I was already

3    thinking about it.  I read Reffitt's Telegram message, and I

4    said well, I need to go."

5            THE COURT:  But again, the argument vis-a-vis Hardie,

6    I think your stronger argument is the crowd.

7            MR. NESTLER:  We understand, Your Honor.  And we know

8    this is not a unique -- sorry, this is a unique circumstance.

9    The guidelines don't specifically account for this.  So that's

10   why we point to the background commentary.  We're dealing with

11   the flexibility here of an organization that's not clearly

12   delineated responsibilities.

13           THE COURT:  I hear you, and it's a difficult

14   situation.  Usually, the classic role adjustment up or down does

15   come in a case in which there's a degree of advanced planning

16   and control and supervision and, you know, less discretion with

17   those who are below.  And I get that it applies in many more

18   contexts other than classic conspiracy, and yet, it's difficult

19   to -- particularly given all of the other enhancements that

20   apply and what the government is seeking in terms of departure,

21   to cumulatively apply this when he's basically -- your argument

22   is he's assuming the role of the leader that day; right?

23           MR. NESTLER:  Yes.

24           THE COURT:  And he -- you say he does know an

25   individual you know of.  But he doesn't know any of those people

1    behind.  He's just the first up.  Right?  It's consistent with

2    the "I want to be the big guy and I want to go first" and --

3          MR. NESTLER:  He's not just the first up, Your Honor.

4    He has bulletproof padding on.  He's wearing plates that can

5    stop rifle rounds.  The people behind him don't appear to be

6    doing that.  He is wearing a ballistic helmet.  He is wearing --

7    he has a gun on his hip, obviously.  He has the flex cuffs on

8    him.  He has the megaphone on him.  The people behind him in

9    this picture don't have megaphones with them, they don't appear

10    to have ballistic helmets, they don't appear to have the same

11    body armor that he has.

12       He is not only prepared for this, but he is there as the

13    leader.  He is doing what he wanted -- and he said, the Mel

14    Gibson role in Braveheart.  He is leading the battle cry, and

15    the insurrection is beginning because of his actions.  He is

16    leading this crowd.

17          THE COURT:  All right.  Mr. Broden, why shouldn't I

18    conclude -- and I want you to focus on the crowd argument.  Why

19    shouldn't I conclude, based on all the evidence, that he assumed

20    the role, he was a self-appointed leader that day who, you know,

21    in his words lit the fire?

22          MR. BRODEN:  I was about to say, after listening to

23    the government's argument, had Mr. Reffitt not shown up,

24    January 6 never would have happened.

25          THE COURT:  Well, you don't have to go that far.

1          MR. BRODEN:  Well, I think we're getting close to

2    there.

3          THE COURT:  He can still empower other people who

4    might have not gone in maybe.  We don't know.  But did he not

5    take steps to designate himself as the self-appointed leader?

6          MR. BRODEN:  Well, what the government doesn't tell

7    you, and that will be a part of our presentation on the

8    variance, there were several other people that climbed those

9    stairs before Mr. Reffitt.

10          THE COURT:  And they're also going up the walls at the

11    same time?

12          MR. BRODEN:  The crowd is behind them, and they're

13    going up the stairs.

14          THE COURT:  Well, the stair argument --

15          MR. BRODEN:  Or the banister.

16          THE COURT:  I watched the video, Mr. Broden.  He's

17    definitely up front.  That's not --

18          MR. BRODEN:  At that point in time, he is.  I know.

19    I've seen the video, too, so at that point.  But to say that

20    wouldn't have happened --

21          THE COURT:  I don't think that's what they're saying,

22    that it wouldn't have happened.  They're saying that he took

23    steps -- he kind of took charge.  He took -- he was well

24    prepared to be hit with a lot with his bulletproof helmet and

25    vest, and he stepped up.  He showed leadership.  And he helped

pave the way for those behind him, not that they wouldn't have done it but for him, but he --

MR. BRODEN:  I guess "helped pave the way" implies that the way wouldn't have happened but for him.  That way happened for people before Mr. Reffitt who climbed that staircase.  All those people would have come up the stairs regardless.

The burden of proof is on the government here.  Yes, Mr. Reffitt was the first person up there, but to suggest that he was managing those people or whatever the -- leading the people, organizing the people, supervising the people, that's just not the case.

THE COURT:  So here are the factors, again, that the guidelines instruct courts to consider:  Whether he's exercising decisionmaking activity.  I mean, did he --

MR. BRODEN:  Is that an application note you're reading from?  I tried to find that myself, too.  It's Note 4, the government tells me.

THE COURT:  So just going through these, the exercise of decisionmaking authority, I think the sole exercise of decisionmaking authority is just to stand first and go, right, be the shield for the crowd.  There's more than that that's at least in evidence.  I found that he wasn't instructing others to come around the inaugural platform or anything like that.  He might have been doing that, we don't know, but there's no

1   evidence before me that he guided or instructed the crowd.  So

2   the decisionmaking authority is just to kind of assume the role

3   of being the first guy.

4       The nature of participation in the commission of the

5   offense, same thing.  It doesn't add anything.  The recruitment

6   of accomplices, he did encourage the crowd at the Ellipse.  The

7   fruits of the crime do not apply at all.

8       The degree of participation in planning or organizing the

9   offense, this arguably -- looking at this factor in this context

10  arguably is double counting with the extensive planning that I'm

11  already saying he's on the hook for, two levels.  So I'm not

12  looking at that too much here.

13      The nature and scope of the illegal activity, pretty big

14  scope.  The degree of control and authority exercised over

15  others, I would say zero.

16      But anything else you would like to add in considering

17  those factors?

18          MR. BRODEN:  No.  I think the Court needs to

19  understand that he wasn't the first person up there, and we will

20  get to that in the variance.  He was certainly the first person

21  or the head of the crowd at that point in time, but when you

22  think of a leader, you think of -- you do think of exercising

23  some authority over the people you're leading, and that's just

24  not the case here.  And those people would have come up the

25  stairs regardless of Mr. Reffitt, and I think we all know that.

1          THE COURT:  All right.  Mr. Nestler, anything you want

2     to add?

3          MR. NESTLER:  Just briefly, Your Honor.

4        The *Bapack* case, B-a-p-a-c-k, I think Your Honor cited it

5     earlier, from the D.C. Circuit in 1997, there's some language

6     there that the determination of a defendant's role in the

7     offense is to be made on the basis of all of the conduct within

8     the scope of 1B1.3, not solely on the basis of the elements and

9     acts cited in the counts of conviction.

10        The reason we cite that is we're talking about the acts of

11     all the other individuals who were there with Mr. Reffitt at the

12     time that he was leading them to go forward.  We understand Your

13     Honor's point, and we believe that those factors in Note 4 are

14     appropriate.  We've cited them in our memo.

15        We do believe that the defendant did exercise some control

16     over others.  They weren't doing anything, and he went forward

17     in front of them and told them to go forward.

18          THE COURT:  But he didn't stop them.  He didn't say,

19     "No, you stay back.  I'm going first.  Follow me."  He's

20     certainly encouraging.

21        I agree 100 percent that he's encouraging people at the

22     Ellipse to come.  He's encouraging people behind him to come.

23     He's putting himself out front.

24        The struggle I'm having is his self-appointed leadership

25     position that he assumed in the moment.  I'm not saying it can't

ever justify an upward adjustment.  The problem I'm having is a
lot of what he did stems, in part, from -- like his degree of
participation and planning the offense and him bringing, as you
said, the shield and him bringing the helmet enabled him to do
this stuff.  And I'm just having concerns in applying this
because, one, it's your burden; two, I've already held him
accountable for an additional two levels for extensive
preparation.  And I just feel like applying both the role
adjustment, as well as the extensive planning adjustment, a
four-level swing, overstates what happened here.

I don't -- I mean, I think you've got a good argument.  I
think this is a very close call.  I don't think he's -- I think
it would be a slam dunk for the government if Rocky Hardie had
joined.  He clearly was recruiting.  But this sort of meeting of
the minds with everyone behind him, it happened in the moment.
Yes, they were all there to do that.

But it just seems to me like -- so Mr. Broden made the
point earlier that whether I apply it because I think it
technically meets the definition, which I think the government
has made a strong argument, and under 3553(a) reduce the
cumulative effect of these two enhancements or I don't apply it,
I think I get to the same answer, which is regardless of whether
this enhancement applies, and I'm inclined to say -- gosh, I
just -- Mr. Nestler, I'm directed to look at these factors.

Again, one of them is the exercise of decisionmaking

1    authority.  I don't think he has any.  I don't think the nature

2    of participation -- yes, he's like number 1, first one up.  So

3    he's assuming a position of importance there.  The recruitment,

4    he encouraged other people.

5        The claim of a right to a larger share of the fruits, no.

6    You agree that doesn't apply; right?

7                MR. NESTLER:  That's correct.

8                THE COURT:  The nature and scope of the illegal

9    activity, it's significant.  The degree of control and authority

10   exercised over others, it's, I think, zero.

11       So again, I struggle with this.  I'm not going to apply it.

12   And again, this, in large part, stems from the cumulative effect

13   of the enhancement on the extensive planning.  And so whether a

14   reviewing court would disagree and say I should give him a role,

15   even so, I think that I would under 3553(a) reduce the sentence

16   to not have the four-level swing for all of this conduct that I

17   think is kind of related and tied together.

18       So for that reason, I'm not going to apply the guideline

19   here.

20       All right.  So moving on to the government's objections,

21   the government objects to a single two-level adjustment under

22   Section 3C1.1.  I think, Mr. Nestler, you've tied this to the

23   grouping rules, but I just want to take a step back.

24       If Mr. Reffitt were convicted of one and only one offense,

25   the obstruction offense, which everyone agrees is the driver

here, the guidelines are pretty clear.  He wouldn't get two

3C1.1 enhancements for two separate obstructive acts.  Yes, he

threatened his kids.  Yes, he told his fellow Three Percenters

to delete all chats.  Both are obstruction-related conduct, and

if there were the only offense, he would get a plus 2, and the

Court would look at the additional obstructive conduct as

perhaps a reason to go higher under 3553(a), but not to apply

3C1.1 twice.

           MR. NESTLER:  We agree.

           THE COURT:  So I think that this grouping argument

you're making, when you concede that the Probation Office has

properly grouped offenses 1, 2, 3, and 5 together and 4

separately, I just think that that argument doesn't help you

any, simply because he also has a civil disorder offense,

coupled with that that we can throw an extra obstruction

enhancement on it to -- to count it when it wouldn't count

otherwise.

   All of these are being grouped together as the same

conduct; right?

           MR. NESTLER:  Sorry.  To be clear, the civil disorder

has nothing to do with this.  Count 4 has nothing to do --

           THE COURT:  No, no.  I mean there's two civil

disorders.  The civil disorder related to the Capitol; right?

There's one that's grouped, and there's one that's not.

           MR. NESTLER:  Correct.

1          THE COURT:  So you're saying there's multiple counts

2     and you could tack this on to something other than the 2J1.2

3     guideline calculation before you start the grouping rules.  And

4     I think the grouping rules themselves contemplate not every

5     additional criminal act results in a commensurate increase in

6     the guideline range.  And this is a perfect example of one where

7     it doesn't happen.

8          MR. NESTLER:  We agree with everything Your Honor has

9     said.  I believe there is a specific rule which we've cited

10    here, which is Note 8 under 3C1.1, that does actually apply to a

11    specific unique grouping rule for an obstruction of justice

12    conviction, not conduct.  We agree with what Your Honor said.

13    If he were not convicted of obstruction of justice in Count 5

14    for threatening his children, we would not be having this

15    argument.  There would be one 3C1.1 application for two points,

16    and we would not be proceeding further.

17         Because he has a count of conviction, Count 5, for

18    threatening to harm his children and because of that group's --

19    there's a unique grouping rule under 3D1.2(c) and 3C1.1, Note 8,

20    and that's what we're talking about here.  In fact, the way that

21    the guidelines talk about how to apply Note 8 says it needs to

22    be applied after grouping, not before grouping.

23         THE COURT:  So I've read this a couple of times.

24    You're in 3C1.1, Note 8?

25         MR. NESTLER:  Yes.

1          THE COURT:  So the government's argument is

2     essentially because you charged -- this is where it kind of

3     undermines the whole structure of the guidelines.  Simply

4     because the government added a separate charge for that, the

5     government gets a plus 2?

6          MR. NESTLER:  Well, not just adding the charge; the

7     jury convicted him of that conduct.

8          THE COURT:  No, of course.  We're not arguing that he

9     wasn't convicted.  But simply because the way the government

10    chose to charge this, you're entitled to an additional two

11    points for the obstructive conduct?

12         MR. NESTLER:  Correct.  Note 8 is actually quite clear

13    on how it applies.  If we look at the second sentence beginning

14    with "the offense level," "The offense level for that group of

15    closely related counts," so this is going to be group 1, which

16    is Counts 1, 2, 3, and 5, "will be the offense level for the

17    underlying offense," which I suppose now is 29 points because

18    after argument earlier, "increased by the two-level adjustment

19    specified by this section."

20         So that is -- we're reading the guideline commentary.

21    That's exactly what it says.  It's the group -- the group

22    itself, which is group 1, is 29 points.  Now increase by two

23    levels because one of the counts that grouped, which is Count 5,

24    is an obstruction offense.

25         THE COURT:  Okay.  Well, like Probation -- this is a

1    tough issue -- I reached out to the Commission as well, a

2    separate person, someone who has been at the Commission for 20

3    years, does not read this application note in the way the

4    government does.

5         So I think you make a good argument.  I think that it's --

6    it also seems, regardless of whether you're right or not, that

7    simply through the charging decision -- certainly, charging

8    decisions affect penalties, and I'm not suggesting otherwise

9    here.  But this is another one where even if I bought your

10   argument, I'm not sure that there wouldn't be an adjustment

11   under 3553(a).

12        I certainly am going to consider the multiple acts of

13   obstruction in deciding where to sentence Mr. Reffitt in the

14   guideline range.  The Commission, the experts are saying that

15   this is not how to read this application note.

16             MR. NESTLER:  We hear Your Honor.  We believe it's

17   Your Honor's discretion to interpret it.

18             THE COURT:  No, I agree, but I think that there's

19   something problematic when you agree that Counts 1, 2, 3, and 5

20   all grouped together and that if he were convicted of just the

21   single obstruction offense as opposed to all these group counts,

22   that you would only get plus 2 here, and to throw in the extra

23   count and get the extra plus 2 -- I see why you're doing it, but

24   I just don't think that that's -- the whole structure of the

25   guidelines are designed that way.

1          MR. NESTLER:  Understood, Your Honor.  Thank you.

2          THE COURT:  So I won't apply 3C1.1.

3      Is there anything for the record, Mr. Broden, that you

4  would like to add?

5          MR. BRODEN:  I'm going to quit while I'm ahead, Your

6  Honor.  So no.

7          THE COURT:  So I do find that Mr. Reffitt's total

8  offense level, after applying the grouping rules and considering

9  all the counts, is a level 29.

10     Do the parties agree, based on the rulings I've made, that

11  that's correct?

12         MR. NESTLER:  Yes, Your Honor.

13         MR. BRODEN:  Yes, Your Honor.

14         THE COURT:  Okay.  And with a criminal history

15  category of I, his guideline range is 87 to 108 months in

16  prison, which is 7.25 years to 9 years.

17     Agreed?

18         MR. NESTLER:  Yes, Your Honor.

19         THE COURT:  All right.

20         MR. BRODEN:  I'm sorry, Judge.  Can you say that

21  again?

22         THE COURT:  87 to 108 months at level 29, criminal

23  history category I.

24         MR. BRODEN:  Yes, I agree.

25         THE COURT:  Okay.  Mr. Nestler, now for your argument

1    related to the multiple departures, under 3D1.4, also firearms

2    under 2K2.6 and 5K2.0, I've sort of telegraphed what my concerns

3    are here with this.

4         And I do want to know, has the government sought -- I know

5    it's reserved the right to seek this enhancement in multiple

6    plea agreements.  Has it to date sought this enhancement in any

7    other case?

8              MR. NESTLER:  Not yet.

9              THE COURT:  All right.  And we've got the long list of

10   cases here that you didn't respond to the defense's responses,

11   not that I necessarily expected it.  But it's -- there's a lot

12   of troubling conduct that the government -- not just assaults

13   but also words that the government chose not to seek a departure

14   for.  And you can say well, they were pre-plea, but as I've

15   already explained, that's troubling to me, because he's getting

16   a penalty for not pleading guilty of three levels extra.  I

17   don't think that the plea should drive the seeking the

18   enhancement.  I think it should apply regardless.

19             MR. NESTLER:  We agree with that, Your Honor.  We are

20   not saying that there aren't cases which in the future we will

21   not seek the enhancement because somebody pled guilty.  We've

22   reserved that right in many of our plea agreements, and there

23   are many defendants for whom we may very well be seeking this

24   enhancement in the future.  This happens to be one of the first

25   defendants who is coming before a court for sentencing for which

1    we are seeking this enhancement.

2            THE COURT:  Okay.  And I assume in all likelihood it

3    might be most applicable in these cases where there's colluding

4    of efforts.  You haven't really disagreed with me that

5    Mr. Reffitt, except for what he did that day, was acting alone.

6            MR. NESTLER:  We believe he was acting as a part of

7    the malitia group.  But in terms of the number of people that he

8    brought with him to D.C., he only brought one other person with

9    him to D.C., that's correct.

10           But we do believe that what Mr. Reffitt was intending to do

11   that day was very different than many other people who Your

12   Honor has sentenced or have been sentenced previously.

13   Mr. Reffitt was intending to violently overthrow Congress and

14   physically drag lawmakers out of the Capitol using his plastic

15   police-style flex cuffs and his gun.  Many people who have come

16   before Your Honor for sentencing did not have that same intent.

17   We do not believe that was proven in other cases.

18           THE COURT:  Certainly before me.  I'm talking about

19   the range of cases that I've reviewed the dockets for, some

20   serious assaults, multiple assaults, outrageous statements of

21   what's going to happen to Speaker Pelosi and others, huge caches

22   of firearms nearby.  Again, I know it's a different charge in

23   that case because that defendant wasn't on Capitol grounds.

24   Nonetheless, this is a departure that can apply in any case.

25           MR. NESTLER:  It is a departure that can apply in any

case, and if the government believes that the guideline range as found by the Court is not sufficient to capture the defendant's conduct, the government certainly reserves the right to seek it and may seek it in other cases.

This happens to be the first case, in the government's estimation, where the guideline range was not sufficient to capture the extent of the defendant's conduct.

THE COURT:  And given that the most severe sentence that's been imposed to date is 63 months, the government believes that his conduct is nearly three times as aggravated as those other defendants?

MR. NESTLER:  Yes.  The government believes -- and if we're talking about the application of 3553(a)(6) and unwarranted sentencing disparities, the D.C. Circuit is clear that the best way to guard against unwarranted sentencing disparities is by sentencing within a guideline range.

And so when we're getting to talk about allocution -- I believe we're just talking about the departure now, but none of the defendants who -- none of the other people who have been sentenced that the defendant proffered are legitimate comparators, we believe, because they don't have the same guideline range as him.  None of them had a level 29, as far as I'm aware.  So none of them have the same guideline range and so, therefore, don't have the same comparators.

THE COURT:  But that doesn't mean that they're still

1    not comparators in some sense.  What did those other defendants

2    lack that Mr. Reffitt had here?

3           MR. NESTLER:  For one, having a firearm on the Capitol

4    grounds.

5           THE COURT:  Huge, huge, yeah.  And does the firearm

6    justify three times the sentence?  It wasn't brandished or used

7    in any way.  That's -- I guess that the question.  I agree.  The

8    two distinguishing factors in this case are, one, the firearm,

9    and two, he went to trial.  Those are the biggest.

10          MR. NESTLER:  So not just the one firearm.  We

11   deliberately did not structure this in such a way that we're

12   asking for a certain numerical enhancement for the terrorism

13   departure or for firearms.  We believe that both of those are

14   two different categories, including we believe the inadequate

15   scope for a grouping for the firearms.

16          THE COURT:  But you didn't seek the firearm departure

17   in the case where the individual had a whole cache of firearms

18   in his truck nearby in the Capitol.

19          MR. NESTLER:  I don't believe that individual went to

20   the Capitol, Your Honor.

21          THE COURT:  He was near the Capitol.

22          MR. NESTLER:  Are we talking about Lonnie Coffman?

23          THE COURT:  I neglected to bring my sheet.

24          MR. NESTLER:  Mr. Coffman was only convicted of having

25   an unregistered firearm.  He was not convicted of any

obstruction charge.  He was not on the Capital grounds.  He did
not interfere with police.  He was convicted of a single offense
of unregistered firearm, 26 U.S.C. 5861(d).

       That's far different conduct from what Mr. Reffitt was
dealing with.  We don't believe he's a sort of Jane 6 comparator
for Mr. Reffitt in any sense.

              THE COURT:  My law clerk is getting it for me.  But
didn't he make a bunch of also really vitriolic statements as
well?

              MR. NESTLER:  It's possible, Your Honor.  I don't have
the facts right in front of me right now.  But I do -- aside
from that, his offense of conviction was for unregistered
firearm.  So the guideline range for him is completely separate
and not even close to what the guideline range is for
Mr. Reffitt.

              THE COURT:  But there were others who had multiple
firearms, again maybe not on their person, but he's getting the
bump for the firearm.  He's getting a separate count for
firearm.  He's getting --

              MR. NESTLER:  But the firearm is not driving his
guideline range.  That's why we asked for a departure upward.
We're asking for a departure upward because -- whether he was
convicted of Counts 1 or 3, which are civil disorder,
transporting a firearm, Count 1, and Count 3 is unlawful entry
with a firearm, neither of those two offenses do anything to his

1    guideline range.  His guideline range would be the exact same

2    without them.  And in fact, as Your Honor indicated, it would be

3    the exact same without Count 5.

4         THE COURT:  But the problem in these cases, correct me

5    if I'm wrong, but I suspect that a lot of the defendants in

6    cases involving obstruction counts with serious assaults, really

7    disturbing, threatening language, that those defendants also

8    have had the 2J1.2 enhancements applied, for example the plus 8

9    and the plus 3; right?

10        MR. NESTLER:  That's correct.

11        THE COURT:  And so the courts are not following the

12   guidelines necessarily, are they, in sentencing them

13   commensurate with the guidelines in every case, in part because

14   of -- I don't know.  You tell me.

15        MR. NESTLER:  I'm sorry.  I'm not following.

16        THE COURT:  For so many guideline ranges -- or

17   sentences imposed, rather, to be in the range of 41 to 51

18   months, there's two that are 63 months, in those cases, haven't

19   some of those defendants had the large bump under the 2J1.2

20   guideline?

21        MR. NESTLER:  Yes.

22        THE COURT:  All right.  And if they were -- I guess

23   maybe they didn't have the extra planning?

24        MR. NESTLER:  So if they didn't have the extra

25   planning, that's an extra two points.  Of course, they're

getting three points off for acceptance of responsibility and
then an additional two-point bump for obstruction of justice.

And here, Mr. Reffitt has multiple obstructions of justice,
but we're only counting two points there.  So that is a
seven-point swing.  So that would answer Your Honor's question
going from a level 22 to a level 29.

THE COURT:  Okay.  So these folks were 51 to 63
months, a lot of them.

MR. NESTLER:  I believe some were, and I believe some
were in the 41 to 51 range.  I don't have the numbers in front
of me for every defendant who's been sentenced.  But I believe
it's -- between levels 22 and 24 sounds about correct, Your
Honor.

THE COURT:  But you've also said that some of those
folks got the planning.

MR. NESTLER:  And we're looking into providing Your
Honor with that information.  Not everyone will get the planning
and the other plus 8 and the other plus 3, depending on their
conduct.

THE COURT:  So you haven't had another defendant where
they got plus 8, plus 3, and plus 2 for planning?

MR. NESTLER:  I can't answer that right now, but if we
take a break, we can try to run that answer down.

THE COURT:  Okay.

MR. NESTLER:  But if we get back to what we were

talking about with firearms, Your Honor, none of these other

defendants have firearms that are driving their sentence for

their 1512 convictions.  And Mr. Reffitt is responsible under

1B1.3 for four firearms here:  The loaded pistol on his hip, the

AR-15 that he had fully assembled in his car in his hotel in

Georgetown, Rocky Hardie's AR-15 fully assembled in the car in

Georgetown, and Rocky Hardie's pistol and extra magazines that

Rocky Hardie had on him on the Capitol grounds.

    Those are all factors that make Mr. Reffitt far different

and require, we believe, an upward departure from these other

defendants and, we believe, warrants an additional departure

from the guideline range of a level 29.

            THE COURT:  Okay.  All right.  Anything else?

            MR. NESTLER:  I'm happy to address it further.  I know

we laid it out in our sentencing memorandum.  I'm happy to

address these arguments.  I have more arguments to make, but I

also know Your Honor wanted to hear from Mr. Broden.

            THE COURT:  I will give you a chance to respond if

there's anything you would like to add.

            MR. NESTLER:  Thank you.

            THE COURT:  Mr. Broden?

            MR. BRODEN:  I don't want to belabor some of my

overarching points.  It seems like the distinction in this case

is Mr. Reffitt went to trial, and for that, he is being denied

acceptance of responsibility, and circuit courts have decided

that's fair.  But to continue to pile on -- I don't want to
necessarily go down this road, but if you look at what the
government is arguing, that Mr. Reffitt's actions were to affect
the conduct of government by intimidation or coercion, we're not
just talking about January 6 cases.  We're talking about a lot
of activities that went on in this country, and yet, this is the
only case, the only case where the government has asked for a
terrorism enhancement.  And likely, this is the only case where
the defendant has gone to trial.  So I don't think it takes
rocket scientry to figure out why the government is asking for
the enhancement in this case.

    I mean, this could apply to almost every January 6 case,
that somebody took their actions to influence and affect the
conduct of the government by intimidation or coercion.  It could
affect any rioting case throughout the United States.  It could
affect anybody who engages in a sit-in in some sort of
congressional committee.

    I think we've really got to be real here and ask why is the
government asking for this enhancement when it could apply to
all these other cases, some far worse activities than
Mr. Reffitt engaged in.  And as I said, I don't think it takes a
rocket scientist to figure out why.

            THE COURT:  I'm sorry.  I didn't hear that last part.

            MR. BRODEN:  I don't think it takes a rocket scientist
to figure out why they're asking for this enhancement as opposed

1    to the thousands of other cases that would technically involve

2    somebody committing a federal criminal offense to influence or

3    affect the conduct of government by intimidation or coercion.

4         THE COURT:  All right.  Thank you, Mr. Broden.

5         Mr. Nestler, let me start with the 5K2.6 departure.  So

6    this is a departure that can apply to any offense.  If a weapon

7    or dangerous instrumentality was used or possessed in the

8    commission of the offense, the Court may increase the sentence

9    above the authorized guideline range.  The extent of the

10   increase ordinarily should depend on the dangerousness of the

11   weapon, the manner in which it was used, and the extent to which

12   its use endangered others.  The discharge of a firearm might

13   warrant a substantial sentence increase.

14        So you look at this offense, and you look at the guideline

15   for possession of a firearm.  As we've discussed, in multiple

16   contexts, the guidelines don't have increases in punishment one

17   for one for firearms.  Like I think you have to get three and

18   above for firearms.

19        And in my review of cases, these sorts of enhancements on

20   this ground -- I'm not saying there's not an argument you can

21   make, but by and large, these tend to be involving cases with

22   more than, you know, several firearms; isn't that fair?

23        MR. NESTLER:  That's fair.  And to be clear, the way

24   we tried to structure the argument, and maybe this didn't come

25   across correctly, we are trying to say that because of Reffitt's

possession of the firearms, the two for himself and the two he
was responsible for Hardie, he should have an upward departure.
Now, whether it's under 5K2.6 or the background commentary in
3D1.4 or even the note in 2J1.2, which 2J1.2, Note 4, has
similar language, which is if the defendant possessed a firearm
in connection with the offense, the Court may consider departing
upward.  That's 2J1.2 and Note 4.

THE COURT:  Because these cases under 5K2.6 really are
different, show me in the guidelines where exactly the firearm
enhancement is?

MR. NESTLER:  2J1.2, Your Honor, Note 4.

THE COURT:  So that provision says, "If a weapon was
used or bodily injury or significant property damage resulted,
an upward departure may be warranted."

So you agree this is discretionary?

MR. NESTLER:  Yes.

THE COURT:  "In a case involving an act of extreme
violence, for example retaliating against a government witness
by throwing acid in the witness's face or a particularly serious
sex offense, an upward departure would be warranted."  Right?

MR. NESTLER:  Right.  We're looking at the first
sentence there, yes.

THE COURT:  All right.  I'm not going to exercise my
discretion to apply either this application note in 2J1.2,
Application Note 4, or the firearm departure provision, which is

1    2K2.6.

2          MR. NESTLER:  The related part of that, Your Honor,

3    just to make sure our record is clear, 3D1.4, the background

4    commentary also says because of the grouping rules certain

5    conduct was not adequately accounted for.  And we believe the

6    same thing there.  Because the firearms offenses, Counts 1 and

7    3, don't affect Mr. Reffitt's guideline range of 29, that's an

8    additional reason to depart upward from the guideline range.

9          THE COURT:  Okay.  All right.  I understand the

10   argument, and I'm not in any way minimizing the seriousness of

11   the conduct, having a firearm, and I think it's fair to infer

12   that it was a loaded firearm.  I'm not in any way minimizing

13   that.  I'm just not going to enhance here where he did not use

14   or brandish it in any way.  I think it's an aggravating factor

15   that I will absolutely consider under 3553(a).  I think it

16   increased the risk to everyone who was present, even though he

17   didn't brandish or use it, certainly law enforcement officers

18   and the entire crowd.  So I think it's certainly an aggravating

19   fact.

20       I just don't think it's of -- in this context, of the

21   nature of the cases in which courts -- or the Commission

22   instructs courts and courts do exercise their discretion to

23   impose a departure.  So for that reason, I'm not.

24       With regard to the terrorism guideline, and this is

25   3A1.4 -- and to be clear, 3A1.4 has a specific departure

provision that applies to a felony that involved or was intended

to promote a federal crime of terrorism, which this is not.

MR. NESTLER:  We agree.

THE COURT:  I know you're not arguing that.  But just

to be clear what we're considering here, it's -- everyone agrees

that the terrorism departure itself does not apply, but what the

government is relying on is Note 4 that says there may -- again,

this is discretionary.  There may be cases in which the offense

was calculated to influence or affect the conduct of government

by intimidation or coercion or to retaliate against government

conduct, but the offense involved an offense other than one of

the offenses specifically enumerated as a terrorism offense,

statutory terrorism offense.

So I think Mr. Broden did a good and thorough job of

pointing out a large number of cases where the guidelines are

lower than this case.  I hear the government that there's

probably certain enhancements that are applying here that

weren't in play in all of these cases, and I will certainly take

that into account.

But I do want to note for the record some of these cases

that -- correct me if I'm wrong, Mr. Nestler.  I think the

government's concern with Mr. Reffitt, obviously, is not just

the actions, but it's his statements as well, the statements

that are captured on video, that are captured on the Zoom

meeting.

1        By the way, how did you get the Zoom meeting?

2            MR. NESTLER:  It was recovered from the hard drive at

3    his house.  It appears to have been set up -- his Zoom or his

4    wife's Zoom account appears to have been set to automatically

5    record their Zoom meetings.

6            THE COURT:  Was this another situation where he was

7    trying to record, I guess, for posterity's sake what happened in

8    the meeting like the GoPro?  Or is this just a default setting

9    that enabled the government to see the --

10           MR. NESTLER:  It was not found from Zoom.  It was

11   found on the defendant's hard drive.  So when his hard drive was

12   seized during the search warrant on January 16 and then the hard

13   drive was searched, this video was located on the hard drive by

14   the FBI.

15           THE COURT:  So he had -- correct me if I'm wrong, but

16   does that mean that he had to affirmatively decide to tape that

17   meeting?

18           MR. NESTLER:  I don't know the answer to that.  He did

19   decide to tape it.  Whether it was a default setting that he

20   somehow had enabled or whether he decided to do it, it was taped

21   by him and found on the hard drive.

22       To answer Your Honor's question, it's not just his conduct

23   on January 6 and it's not just his statements before January 6.

24   It's also everything that he is doing and planning.  He was

25   planning to overtake our government.  He wasn't just trying to

1    stop the certification of the vote.

2         And so we included all of the extra language that did not

3    come out of trial about his future plans.  He wasn't done.

4    January 6 was the preface.  When we get into our allocution in a

5    minute, we will get into that more.

6         But to answer Your Honor's question, the terrorism

7    enhancement is warranted here because of all of those factors,

8    including that the defendant planned to attack our government

9    both on January 6 and afterwards.

10        And we do believe that the language applies.  The

11   defendant's offense was calculated to influence or affect the

12   conduct of government by intimidation.  And the second sentence

13   after that, Your Honor, says, "In such cases, an upward

14   departure would be warranted."

15             THE COURT:  Let me just for the record -- and I know a

16   lot of this is in the sentencing memoranda, and I'm not going to

17   mention every case.  I think there are a large number that make

18   the point that I'm going to make here, which is there are a lot

19   of cases where defendants committed very violent assaults and

20   even possessed weapons in their cars or hotel rooms nearby that

21   received -- did not receive this departure.  And some of these

22   defendants also made statements in line with the extremely

23   disturbing statements Mr. Reffitt made.

24        So I do want just for the record to highlight a few, the

25   first being -- and you can have a seat, if you would like.

1          MR. NESTLER:  Yes, Your Honor.

2          THE COURT:  The first being *Languerand*, 21-35.  In

3    this case Judge Bates imposed a sentence of 44 months'

4    imprisonment after the government asked for 51 months'

5    imprisonment.  In that case the defendant, at the Lower West

6    Terrace, threw objects, including a traffic cone, at officers.

7    He got a police riot shield and held it in front of him as he

8    was confronting cops defending the Lower West Terrace archway.

9          He bragged about the riot on social media afterwards.  He

10   posted, "Next time we come back with rifles.  It's not a game."

11   He likened the riot to the American Revolution saying "violence

12   isn't always the answer, but in the face of tyranny, violence

13   may be the only answer."  He posted that the Declaration of

14   Independence justified overthrowing the government.  Though

15   there's no confirmation, he did post that he brought guns to the

16   Capitol.

17         During a search of his trailer, authorities found a target

18   list and pages with militaristic language referring to

19   Washington, D.C.  They also found reference to QAnon.  And this

20   defendant, unlike Mr. Reffitt, has a prior history of making

21   threats and being belligerent with officers.

22         In the *Fairlamb* case, Judge Lamberth imposed a sentence of

23   41 months' imprisonment after the government asked for 44 months

24   of imprisonment.  This defendant joined a crowd of rioters who

25   pushed through a line of officers and took a police baton from

the ground.  This defendant recorded a video saying, "What patriots do?  We fucking disarm them and then we storm the fucking Capitol."  He later punched an officer in the face while screaming at them, "Are you an American?  Act like a fucking one."

After the riot, he filmed a video threatening future violence.  "They pulled the pin on the grenade, and the blackout is coming.  What a time to be a patriot."  Again, that's *Fairlamb*, 21-120.

In the *Ponder* case, 21-259, Judge Chutkan imposed a sentence of 63 months' imprisonment after the government asked for 60 months' imprisonment.  That defendant assaulted three police officers by swinging metal poles at them, shattering a riot shield and striking one in the shoulder.  After he was arrested that day and released, he came back to the Capitol to participate further in the riot.  As he was being arrested, he told the rioters, "Do not give up."  He told police, "When our country is being attacked with like we are, we have to fight. That is what the Second Amendment was built on."  This defendant also had a lengthy criminal history.

The *Meredith* case, 21-159, Mr. Reffitt's memo mistakenly labeled this case as Cleveland, but Meredith is the defendant's last name, not Cleveland.  In this case Judge Berman Jackson imposed a sentence of 28 months' imprisonment after the government asked for a mid-guideline range sentence.  In that

case there was disagreement over which range applied.  The government was arguing for 37 to 46 months.

The defendant had arrived in D.C. too late to attend the rally.  He made violent statements over text in the days surrounding the riot.  For instance, he said, "Thinking about heading over to Pelosi's."  And then there's an expletive I won't say.  "Her speech and putting a bullet in her noggin on live TV," with a purple devil emoji.  "Ready to remove several craniums from shoulders.  I'm so ready to FK some traitors up.  I'm going to collect a shit tone of traitors' heads.  It's not just me.  Someone has to take the trash out.  FK these mother fuckers.  I'm going to run that" again "Pelosi over while she chews on her gums."  This defendant had a handgun and a rifle in his hotel and over 2,500 rounds of ammunition.

Just for the record, I will cite other cases in which courts applied similar range sentences.  The facts are all a little bit different.  And as both sides, I think, concede, there's no apples-to-apples comparison in this case, but other cases that I think inform my decision here include *Rubenacker*, 21-193, *Mault* and *Mattice*, 21-657, *Wilson*, 21-345, *Miller*, 21-75, *Palmer*, 21-328, *Thompson*, 21-461, *Coffman*, 21-4, *Bancroft*, 21-271.  And there are others as well that I think are cited by the defense.

But the point that I've made repeatedly is you have a lot of highly disturbing comments, not just isolated comments but

comments that are tied in with assaults and in some cases

trespass on the Capitol, in some cases into the Capitol

building, and in some cases pretty egregious physical assaults.

In none of those cases did the government seek any of these

departures, whether it be under 3A1.4(a), Application Note 4,

under 5K2.0, or under 5K2.6.

So for those reasons and a real effort on the Court's part

to ensure that there's not unwarranted sentencing disparity

between various defendants, I am not going to -- I'm going to

exercise my discretion to not impose a departure here.

All right.  We've been going a long while.  Let me ask the

court reporter whether you think we can go another 30 minutes or

so before we take a break.

MR. BRODEN:  Your Honor, can we take a two-minute

break?

THE COURT:  We will take a two-minute break.  I think

the court reporter is going to need a longer break in a moment,

but go ahead.

(Recess taken from 12:16 p.m. to 12:20 p.m.)

THE COURT:  Folks, it's hard to anticipate how long

this will go.  I have a 2:00 hearing that may be pushed back, I

think.  For the court reporter's benefit, there will be a change

in court reporter at some point.  So what we might need to do is

try to get through the allocution on behalf of both sides, and

Mr. Reffitt, you will have a chance to speak if you want to.

1    You don't have to, but you will have a chance.  And then I'm

2    guessing you all might be getting hungry, and we could take a

3    break and come back.

4        This is a complicated sentencing with a lot of complicated

5    legal issues.  So I think it's important to take the time to go

6    through these carefully and create a clear record.

7        All right.  So at this point, I'm going to turn to the

8    allocution by each side, and I will start with you, Mr. Nestler.

9    Just to confirm, all the exhibits that you've provided the Court

10   have been made available to the public through the Dropbox or

11   will be today?

12            MR. NESTLER:  The latter, correct, Your Honor.

13            THE COURT:  All right.  So you can go ahead.  And one

14   thing neither party addressed in their sentencing memoranda are

15   the conditions, and you all may have -- I assume you noticed

16   that the Probation Office has proposed a restriction on both

17   association and computer use, and the way in which it's drafted

18   to me strikes me as very broad.

19       And when we take a break, I might have you all briefly

20   confer to see if -- neither side has addressed it, but I do have

21   potential First Amendment concerns with applying those

22   conditions.  So I'm interested in your viewpoints on that.

23       The one case I was able to find dealing with these

24   provisions was an ISIS terrorism case, so very different factual

25   case.  So again, this is one where it would be helpful if the

1     government could tell me if any court has imposed a similar

2     condition in any other case relating to January 6.  That would

3     be helpful for me to know in deciding whether that's

4     appropriate.

5          And it sounds like with restitution the parties are on the

6     same page.  So you don't need to address that.

7          Go ahead, Mr. Nestler.

8          MR. BRODEN:  Your Honor, I may not have the

9     conditions.

10         THE COURT:  So that is in the recommendation that I

11    asked if you all received.

12         MR. BRODEN:  I'm sorry.  Then no, I did not receive

13    the recommendation.

14         THE COURT:  I'm going to ask that you -- Mr. Hopkins

15    can print it out for you, and during the break, Mr. Reffitt can

16    review it.  So this is the probation officer's recommendation.

17         MR. BRODEN:  We don't get those in Texas.  Maybe

18    that's why I wasn't expecting one.

19         THE COURT:  It should be on the docket.  It's, I

20    think, publicly available.

21         MR. BRODEN:  Then I missed it, Your Honor.

22         THE COURT:  Anyway, you should take a look at that

23    over the break and review it with Mr. Reffitt.

24         You don't have to address those issues that you haven't had

25    time to think about, but Mr. Nestler, just your general

1    allocution and your arguments you want to make under 3553(a).

2           MR. NESTLER:  Yes, Your Honor.  We would like to start

3    with -- Ms. Berkower is going to read a short letter from

4    Jackson Reffitt.

5           THE COURT:  Okay.  Good afternoon, Ms. Berkower.

6           MS. BERKOWER:  Good afternoon, Your Honor.  This

7    letter was submitted to the government by Jackson Reffitt with a

8    request to read it at sentencing as his victim impact statement.

9           THE COURT:  If you can keep your voice up, please.

10           MS. BERKOWER:  "I believe my testimony will tell a

11    better story than I am capable of in words.  I appreciate taking

12    the time to read this short letter.

13           "My father, Guy, is someone who over the last five years

14    has slowly lost himself to countless things.  Whether you view

15    him as a father, family member, or friend, using these labels to

16    justify anything he has done is completely in the wrong.  He

17    will always be these things.

18           "Regardless of how my family might view me and attempt to

19    paint me, the amount of evidence piecing together a painful,

20    slow story of my father falling into a horrible community to

21    attempt to find his place in his life.

22           "To wrap up this letter, I hope to see my father use all

23    the safety nets this country and system can provide:  Mental

24    health and improved conditions.  The prison system should be

25    used to not destroy a person but to rehabilitate one.  I am

1    confident in the prosecution's decision, as long as mental

2    health rehabilitation is taken into consideration."

3         Thank you.

4              THE COURT:  Thank you, Ms. Berkower.

5         Mr. Nestler?

6              MR. NESTLER:  And now the government would like

7    Ms. Shauni Kerkhoff to be able to address the Court.

8              THE COURT:  Of course.  Ms. Kerkhoff?

9              MR. NESTLER:  Court's brief indulgence.  I think she

10   stepped out during the break.

11             THE COURT:  Good afternoon.

12             MS. KERKHOFF:  Good afternoon, ma'am.  How are you?

13             THE COURT:  Doing well.  Thanks.  And you?

14             MS. KERKHOFF:  I'm good.  Thank you.  Thank you for

15   allowing me to do this today.  I appreciate it.

16             THE COURT:  Of course.

17             MS. KERKHOFF:  Are we good to go?

18             THE COURT:  Yes, good to go.

19             MS. KERKHOFF:  I apologize for looking down.  I am

20   reading.

21             THE COURT:  No, take your time.

22             MS. KERKHOFF:  My name is Shauni Kerkhoff, and I was

23   on duty as a United States Capitol police officer on January 6,

24   2021.  I was one of the first officers to confront the defendant

25   that day as he was one of the first to breach the security

1   perimeter.  I witnessed him -- my apologies.

2        I was one of the first to confront the defendant that day

3   as he was one of the first to breach the security perimeter.  I

4   witnessed him lead an angry, motivated mob of armed individuals

5   whose sole intent was to push past officers, officers who swore

6   under oath to protect and serve Congress and the American

7   people.

8        He led this group up the stairs of the Capitol towards

9   members of Congress who were in full session fulfilling their

10  civic duty as elected representatives of the American people.

11  He intended to harm these members of Congress and to stop the

12  certification of electoral vote.

13       Myself and members of my unit were able to thwart the

14  advance of the defendant by debilitating him with the use of

15  less lethal chemical munitions.  But I watched in horror as he

16  encouraged the angry mob to push past him and advance towards

17  the Capitol, physically assaulting my fellow officers in the

18  process.  Some of those officers still haven't returned to duty

19  because of their injuries they sustained that day, and others,

20  to include a good friend, lost their lives as a result of that

21  day and the actions of the defendant.

22       One such officer, my partner, was pushed into a doorway by

23  the mob, his arms pinned to his sides.  His gas mask was pushed

24  off the side of his face.  He was sprayed with some sort of

25  clear liquid or binding agent and then bear sprayed.  His mask

was then placed back on his face, sealed, and his filter was
removed and thrown into the crowd.  His less lethal launcher was
then disassembled.  He was left debilitated by the bear spray,
unable to see, unable to defend himself and others, surrounded
by the mob the defendant encouraged to continue forward when he
himself could not.  I have to live with the fact that I was
unable to protect my partner because we were separated by the
angry mob.

What makes me sick is the fact that the defendant to this
day thinks what he did was right.  He bragged about his
encounter with me and said it was cute I tried to stop him.  He
has written letters and framed himself as a patriot for his
actions that day.

His actions weren't acts of patriotism.  They're acts of
domestic terrorism.  He was intent on harming fellow Americans
and the democratic process itself.  This is a man who threatened
to harm his own children if they turned him in.

I cannot turn on the TV without seeing videos from that day
of my fellow officers being assaulted and beaten.  I have to
worry about my friends and loved ones still on the force.  The
defendant's actions that day and the actions of the angry mob he
led up those stairs have made USCP and the Capitol itself look
like a soft target.

By testifying as a witness in this trial, I have become a
target for the defendant's followers.  My name is plastered all

1     over the Internet and will forever be associated with this case,

2     the defendant -- this case, the defendant, and that terrible

3     day.  I worry about his followers coming to my house, targeting

4     myself and my loved ones.  My life and the lives of every

5     officer on duty that day will forever be changed because of the

6     defendant's actions and the actions of those he encouraged.

7         Because of the defendant's lack of remorse, pride in his

8     actions, and the turmoil his actions resulted in, I recommend

9     the defendant receive the maximum sentence.

10        Thank you for allowing me to make this statement today.

11            THE COURT:  Thank you, Ms. Kerkhoff.  I appreciate

12    your service, particularly on January 6.

13            MS. KERKHOFF:  Thank you, ma'am.

14            MR. NESTLER:  Mr. Hopkins, could I have the monitor

15    and the audio?  Thank you.

16        Your Honor, this is what Guy Reffitt had to tell his boss,

17    the president or leader of the Texas Three Percenters, and Rocky

18    Hardie about Ms. Kerkhoff when he came home from D.C. to brag to

19    them.

20        (Video played.)

21            MR. NESTLER:  We talked earlier about the defendant's

22    words, Your Honor.  We're not here because of the defendant's

23    words.  For a lot of our perspective of what we see in the

24    defendant's sentencing memorandum and a lot of what the letters

25    talk about is his words, as if he's being prosecuted for his

hyperbole or for his words.  He's not.  He's being prosecuted
and he was prosecuted and he should be sentenced for his actions
and his plans.

These are not idle words.  He didn't sit on a couch in
Texas and spew off into the Internet.  He drove all the way
across the country with an AR-15 semiautomatic rifle ready to do
violence upon other people who he didn't agree with.  He had a
loaded handgun on his waist, ready to do violence to other
people.  As he just told other people, he wishes he had "shot
the bitch" who had shot him.  That's what the defendant said,
and that's what he intended to do that day.

He was successful that day.  The defendant did encourage
and lead the mob up the stairs.  He did get people from The
Ellipse to follow him.  He does want to be a leader.

We're not talking about just some of the words that he
uttered.  When he -- before and after he came to D.C. for
January 6, what the defendant wanted to do was physically
overtake Congress.

When we go back to what Jackson Reffitt did on Christmas
Eve, Jackson Reffitt had sent a tip into the FBI that his dad
was going to do something big to the legislators.  It wasn't in
D.C.  It wasn't just he wanted to stop the vote or he wanted
Trump to stay president.  That's what Jackson Reffitt understood
his dad wanted to do, something big to the legislators.

And everything the defendant did from that point forward

was targeted to that path.  He recruited other members of his

malitia group, which he had a leadership role in.  He finally

got Rocky Hardie to come with him.  The defendant made all of

the plans, all of the travel arrangements for the hotel, the

driving path, which car to take.  He packed his weapons and

Mr. Hardie's weapons and his plate carrier.

We talked earlier about not having concrete evidence about

sort of who was in charge between Reffitt and Hardie.  But it's

pretty clear after Your Honor saw Mr. Hardie's testimony,

Mr. Hardie was the follower here.  Mr. Reffitt was the leader.

Mr. Hardie forgot to bring a plate carrier.  He brought ceramic

plates.  We can only assume why he would have brought his

ceramic plates but no carrier to carry them in.  So what did

Mr. Reffitt decide to do the morning of January 6 but tape him

up so that Mr. Hardie was actually walking around with ceramic

plates taped to his body with gorilla tape.

The defendant came into our city with these firearms

planning to do violence to our national legislature.  We cited

in our memorandum in support of the terrorism enhancement all of

the statements he made at the Ellipse.  As we talked about

earlier, he didn't plan to come to D.C. to go to the rally.  He

planned to come to D.C. to go to the Capitol and accomplish his

ends.  He told everybody who would listen, "We're going to the

Capitol, we're dragging them out, and I don't care if Pelosi and

McConnell's heads are hitting every step on the way down, that's

what we're doing."

And what the defendant was trying to do was get more people behind him.  You can see in some of the Telegram messages that the defendant was saying that he wanted to see how many people would be with him to see if he could be successful in actually overtaking Congress.  When he got to the Capitol and saw everyone was standing there and not doing anything, he took charge, and he needed that crowd at his back.  He used that crowd at his back in order to push forward and accomplish his ends.

As we talked about earlier, his job was done.  He is the one who confronted the officers, led people forward.  He didn't need to personally go inside the building in order to accomplish what he wanted to accomplish.  He got his accomplishment because everyone else was able to breach the building.

When he went home, he was boastful and prideful and bragging.  Even his daughter Peyton Reffitt's letter says that same thing, and Jackson Reffitt testified to it.  We see it on the Zoom with his other members of the malitia group.  This was the beginning for him.

And when we talk about comparators for other defendants from January 6, Mr. Reffitt is in a class all by himself.  This was the beginning.  He wanted the rest of his malitia group to start overtaking state capitols all over the country.  He was showing them the way.  He attacked the national capitol, the

national legislature; the rest of the group should attack the
local ones.  He was mad at them they hadn't gone to Austin.

THE COURT:  Sorry to interrupt, but what about these
other folks who made similar, you know, patriot comments about,
you know, taking over and what's coming?  Do you really think
he's the only one espousing?

MR. NESTLER:  No, not the only one espousing.  But he
has the means in order to actually accomplish this.  Other
people showed up late, they couldn't get to D.C. on time, or
they weren't convicted -- I think Your Honor listed all of the
other defendants.  Many of them were convicted of threats.  One
of them was convicted of 875(c), not even of any kind of
obstructive conduct.

THE COURT:  But how do you say they didn't have the
means?  The one guy who had a handgun or rifle in his hotel and
over 2,500 rounds of ammunition?  There are others that had real
large caches.  To say that others didn't have the means to do
something like Mr. Reffitt did here, I don't think that's a fair
statement to make.

I agree with you, completely, it's highly disturbing.  My
point is simply, when you say he's in a class all of his own,
I'm not so sure I agree with the government on that.

MR. NESTLER:  So a couple of responses to that.  Only
a couple of defendants actually had those weapons that we're
talking about here, but I don't believe either of those two

defendants who had weapons were at the Capitol grounds on
January 6.

THE COURT:  One was very close, was he not?  The car
was close?  Am I --

MR. NESTLER:  I need to go back --

THE COURT:  -- remembering the facts incorrectly?

MR. NESTLER:  I don't believe either of those
defendants had any --

THE COURT:  And if they just were late and it was a
mistake, isn't the government equally concerned about those
folks?

MR. NESTLER:  100 percent equally concerned about
those folks, but we're talking about the hundreds of people who
have been sentenced to date and the hundreds more who will be
sentenced.  Mr. Reffitt stands out.  Those might be two other
examples, Your Honor, but we're talking about two who don't have
any obstructive conduct to be sentenced under that Mr. Reffitt
has.

THE COURT:  All right.  So you're saying, as you stand
here now -- none of us have the benefit of the larger conspiracy
cases that will be tried in this case in the future, but as you
stand here now, you're telling me his actions are more
aggravated than those defendants as well?

MR. NESTLER:  No, I'm not saying more aggravated than.

THE COURT:  When you say he's a class of himself,

1    you're saying to date?

2         MR. NESTLER:  Yes, to date.  To all of the defendants

3    who have been sentenced to date, he's in a class by himself.

4    Just starting with the guideline range, his guideline level of

5    29 is far above anyone else's guideline range.  And that is a

6    reflection of the severity of his conduct, and we believe it

7    should be higher, as we asked for in the departures, to fully

8    account for his conduct.

9         But when I say that the other defendants didn't have some

10   of the same means, it's not just access to the firearms.  The

11   defendant had the infrastructure in order to accomplish his

12   ends.  He was part of a malitia group where he had a leadership

13   role.  He was the vetting officer.  He was very close with the

14   president of the group.  He was making plans after he got back

15   to Texas to commit future violent acts, go attack mainstream

16   media, go attack Facebook, people in his group talking about

17   coming back to D.C. for the 20th to attack the Capitol at the

18   inauguration.  The defendant was making what he called bug-out

19   plans in order to go to some compound in Texas in order to have

20   a standoff against the federal government.

21        This is not somebody who was a lone wolf, who was operating

22   by his lonesome.  He had the means, and he had the personality

23   and the wherewithal --

24        THE COURT:  No, no.  To the extent I suggested that, I

25   meant that day, not that he doesn't have the backing of a

1    malitia group.

2          MR. NESTLER:  Right.  And so that is a huge part of

3    the government's concern here and why we believe he should be

4    sentenced at the high end or even above the guideline range, if

5    Your Honor would consider varying upward.  What the defendant

6    did was so serious, his malitia membership -- and we laid it out

7    in our sentencing memorandum, Your Honor, but he had this role,

8    and he had this sort of aggrieved persona.

9          He reached out to Senator Cruz's office in the fall of 2020

10   saying that he and his group were going to use all of their

11   Second Amendment powers against Facebook for taking them

12   off-line.  He needed that platform, that propaganda platform in

13   order to have the world hear what he needed -- what he wanted

14   them to hear, so they could hear his voice.

15         When you hear what he told Jackson and when you hear what

16   he told Mr. Hardie, the defendant was puffing himself up like a

17   leader, that they needed to do what he said to do.  He wanted to

18   start over.  He cites *Marbury v. Madison* repeatedly.  I'm sure

19   Your Honor saw it in some of the things, some of the pleadings.

20         THE COURT:  Preposterous, yeah.

21         MR. NESTLER:  In his mind, what he wanted, he wanted

22   to get rid of Congress.  What he said at the Ellipse that day,

23   that those people at Congress -- and he used all sorts of

24   expletives I won't repeat right now -- that they were there for

25   too long, they had too much power.  And he said this wasn't

about Trump, he wasn't here as a Trump supporter.  What he

wanted to do was remove Congress.

And we talk about why he's different from many of the

people who have been sentenced before.  He didn't just want

President Trump to stay in power.  He wanted to physically and

literally remove Congress.  That is -- we believe he is a

domestic terrorist.  We ask for him to be labeled one.

Ms. Kerkhoff just said it.  What he was doing was terrorism.

THE COURT:  So, Mr. Nestler, this is not really

critical for this sentencing, but I just have to say this,

because I'm shocked that the government didn't forecast some of

the evidence that was coming in consideration of all those

motions.  I mean, the way you walked back the motion in which

he -- I forget what the word was, he charged the officers.  We

were talking about apples and oranges.

The way the government didn't give any hint of what was

coming, I had no idea that the purpose, the stated purpose, in

Mr. Reffitt's words, pretrial was to overtake the United States

government.  That came out nowhere in your briefing.  And I

don't know if you were so close to the case that you didn't

appreciate that the perspective I had was this is a potentially

mere trespasser.

Was that at some point apparent to you?

MR. NESTLER:  It was apparent to me very early on,

Your Honor, but I am very close to the case, and I'm very close

1   to many other cases involving the attack on our democracy that

2   day.  So if we hadn't forecasted that accurately for Your Honor,

3   I apologize for that, but it was.

4          THE COURT:  It created a lot of back and forth that --

5   the standard that I set forth in *Sandlin* was clearly going to be

6   met in multiple ways, and that wasn't clear to me from your

7   argument.

8          MR. NESTLER:  Understood.

9          THE COURT:  It's just an aside, because you must have

10  been thinking, if you thought that you were conveying that, how

11  could she be thinking something different.

12         MR. NESTLER:  Understood, Your Honor.  We do believe

13  that what he was doing that day was terrorism.  We do believe

14  that he is a domestic terrorist.

15      When we talk about what some of the other conduct -- and

16  I'll get into some of the statements he made after the fact

17  since he's been incarcerated.  The defendant's memorandum says

18  that he's remorseful and he's ashamed.  That's what he wrote in

19  his letter.  He didn't say for what.  It sounds like he's

20  remorseful and ashamed for being here.

21         THE COURT:  He regrets what he's done to his family,

22  and he wishes he hadn't screamed at the officers, but that's

23  about it.  I agree with you.

24         MR. NESTLER:  So when we look at the manifesto that he

25  had published on his behalf from the jail, on behalf of the

J6ers, and then the memos that he disseminated through his family, he thinks that he is a martyr.  He said he's going to take a bullet for freedom, for tyranny.  He thinks that the government is some sort of unfairly -- I don't even know exactly what his world view is, but he thinks that what he is doing is that he is being a martyr right now, and that is far from the truth.

To address partially what Your Honor just said about the facts of the case, to be clear, we are not seeking the sentence we're seeking in this case because Mr. Reffitt went to trial. We are not seeking a trial penalty in any stretch of the imagination.  It's because of the defendant's conduct here.

But one thing that does happen at trial is that the record is far more fully developed than it is at a plea.  And so a lot of the facts we're talking about here came out because we had live people testifying at trial.

THE COURT:  I know.  But the government knows what its evidence is before it pleads it out.  You all are not pleading out cases before you, maybe not the judges, but you know full well what the scope of the evidence is.  So you're reaching plea agreements based on that knowledge.  The judges might not have the benefit of seeing a defendant, as I had in this case, basically confess in multiple venues, real-time confession again and again.  It was incredible.  Arguably, this case could have been tried in two days.

1          MR. NESTLER:  We agree.  The facts that we adduced at

2     trial were, in part, because we were at a trial posture.

3          THE COURT:  But I don't think it's fair to say that

4     you discovered something in trial that you wouldn't know in a

5     normal case at the time of plea.

6          MR. NESTLER:  Sorry, I didn't mean to say that we

7     discovered, but the record itself.

8          THE COURT:  The judge certainly learns a lot more,

9     clearly.  I didn't have any idea what his role was from your

10     briefing.  So you are aware of the evidence you possess.  What I

11     summarized here, you were aware of that when you made those

12     sentencing recommendations to those judges.

13          MR. NESTLER:  We are, but those judges are not aware

14     of the same level of factual detail that Your Honor is after

15     having sat through a trial.

16          THE COURT:  But again, that's suggesting that there's

17     a plea penalty.  You are, and you're making recommendations that

18     are way different than you're making in this case, way

19     different.

20          MR. NESTLER:  We believe the defendant's conduct

21     warrants it, but we also believe that the facts that were

22     adduced -- this record is more fully developed than any of the

23     other records --

24          THE COURT:  Understood.  My point is simply that it's

25     fully developed for the government when it walks in and

negotiates a plea and takes a plea in a courtroom.  It's not
fully developed for the judge, but the government is making
recommendations in these cases that are pretty close in line to
what judges are doing in those cases.  They're not recommending
departures.  They're not, you know, recommending high end and
all of that, and that's just my point.

There's a cost for going to trial, and the guidelines make
pretty clear what that cost is.  And the government needs to be
really careful going forward that recommendations it's making in
cases that have similar facts are going to be taken into account
by judges in this court, because we are trying to be really fair
and really even in how we're sentencing defendants.

And so this defendant has some frightening claims that
border on delusional, and they are extraordinarily concerning to
the Court.  Other defendants did, too.  And that's the only
point I'm making, Mr. Nestler.

MR. NESTLER:  Understood, Your Honor.  And we do
believe that the defendant, compared to those defendants who
have been sentenced before -- we don't know what's going to come
after -- is more culpable than others.

There are two points about the defendant's -- or three
about the defendant's history with firearms.  First is, the FBI
found an illegal suppressor, a firearm silencer at the
defendant's house, which he initially claimed was a fuel filter
for a car and admitted --

1          THE COURT:  What's the penalty for that?  Would this

2     be like possession of a firearm?  Possession of a silencer would

3     be 2K2.1 guideline?

4          MR. NESTLER:  Yes.  It's a possession of a firearm

5     offense because a silencer is defined as a firearm.

6          THE COURT:  And so, what, his range would be somewhere

7     around base offense level 14 for that offense?

8          MR. NESTLER:  I believe it was 18.

9          THE COURT:  18, but then acceptance.

10         MR. NESTLER:  Correct.

11         THE COURT:  In a normal case.

12         MR. NESTLER:  Correct.  And we point that out for an

13    additional fact that -- he did legally possess other firearms

14    because there's no registration requirement in Texas, but the

15    silencer was illegal.

16         THE COURT:  And that is an action that the Court

17    certainly can take into account under 3553(a), and also, 3661 of

18    Title 18 puts no limit on what the Court can consider.  And

19    these are actions, not words.  So yes, I hear you loud and

20    clear.

21         MR. NESTLER:  First is the illegal firearm, silencer.

22    Second is his actions of pointing the firearm at his wife's head

23    in the summer of 2020.  Both Jackson Reffitt and Jody Nicole

24    Reffitt talked about it openly with a reporter.  We provided a

25    copy of the podcast to Your Honor, that he twice pointed a gun

1   at her head and one of those times shot a gun near her head.

2   Again, incredibly serious and dangerous conduct with respect to

3   firearms.

4           THE COURT:  I'm just curious.  The Probation Office,

5   as you know, has identified the defendant's clear mental health

6   issues as a potential basis for a variance in this case.

7       Given that kind of conduct, which is impossible to fathom,

8   given the unequivocal support his family has given him

9   throughout the trial -- they're here today.  I see them in the

10  courtroom.  They've written letters -- it's hard to reconcile

11  their views with his actions, and I'm just wondering, given this

12  insane action with respect to the wife, who he clearly loves and

13  she him, does the government think that his mental health

14  conditions warrant any sort of variance?

15      I don't mean necessarily down but in the same way you're

16  saying the Court should consider things like the additional

17  firearm, the additional obstruction.  Is that not a factor,

18  potentially a mitigating factor, that the Court should consider

19  as well in deciding where to sentence him?

20      These are really concerning.  I agree 100 percent with what

21  Jackson Reffitt is saying about the need for mental health

22  treatment.  Probation is suggesting an assessment and treatment,

23  if necessary.  I'm going to impose a condition full-on

24  treatment.  It seems to me obvious, given the information that

25  we now have about Mr. Reffitt, that he has serious mental health

1    issues.

2         MR. NESTLER:  We believe that his mental health issues

3    can and should be taken into account by Your Honor in fashioning

4    the sentence.  We do not believe they are mitigating

5    circumstances that would warrant a lower sentence than otherwise

6    applied.

7         THE COURT:  Than otherwise in the guideline range, but

8    as I'm looking where I might end up in the guideline range, that

9    is something that you agree is mitigating in the sense of it's a

10   factor like the aggravating factors I should consider in

11   deciding where to sentence him?

12        MR. NESTLER:  It could be.  Your Honor has the

13   discretion to look to it.  We don't believe Your Honor should.

14        THE COURT:  You don't?

15        MR. NESTLER:  No.  We don't believe that the

16   defendant --

17        THE COURT:  And why?  Arguably, under -- I know the

18   departure provision for mental health conditions is a very

19   difficult one to meet in any case because of case law

20   interpreting that departure provision, but it does refer to the

21   extent to which mental health contributed to the offense, and

22   arguably -- you know, arguably, his mental health condition

23   contributed to this offense.

24        And so even if it doesn't meet the case law under this

25   guideline, by analogy, in the same way I'm looking at instead of

1    imposing departures upwards for firearms and upwards for the

2    terrorism related nature of this, why, by analogy, should I also

3    not be looking at this mental health situation?

4              MR. NESTLER:  Sure, Your Honor.  So to be clear, we

5    agree Your Honor could consider a defendant's mental health

6    history if it contributed -- well, in any regard, especially if

7    it contributed to the defendant's offense.  We don't believe the

8    defendant's mental health contributed to the defendant's

9    offense.

10             THE COURT:  You don't?

11             MR. NESTLER:  No.

12             THE COURT:  You don't think that his mental health

13   plays a part in his --

14             MR. NESTLER:  Well, first of all, the only mental

15   health diagnosis I saw in the pretrial report, Your Honor, was

16   that he suffers from anxiety.  So there is no other mental

17   health diagnosis.  The defendant explicitly disclaimed needing

18   any mental health treatment.  I agree that he would benefit from

19   it.

20             THE COURT:  Well, he did, but -- I don't want to get

21   into details of the PSR, but you know there's a history that's

22   concerning.

23             MR. NESTLER:  A familial history.

24             THE COURT:  Not just familial.  With him in

25   particular.

1    Anyway, I hear you.  You don't think I should consider it

2  as a mitigating factor under 5K2.0 or 5K2.3 or any of the other

3  Chapter 5 departures?

4          MR. NESTLER:  We don't believe that his mental health

5  condition --

6          THE COURT:  Played any role in his association with

7  this group and his plans and his firing the firearm at his

8  wife's head?  None of that played any role in his behavior?

9          MR. NESTLER:  No.  We think he's dangerous.

10          THE COURT:  Agreed.

11          MR. NESTLER:  He would benefit from mental health

12  treatment, but we don't believe that any mental health condition

13  is what caused him to point a firearm --

14          THE COURT:  Not caused, contributed in any way.

15          MR. NESTLER:  We believe that he had the wherewithal

16  to plan what he did --

17          THE COURT:  No, I'm not suggesting any sort of

18  diminished capacity at all.  I'm just suggesting, you know, by

19  analogy.  I'm not arguing he didn't appreciate the wrongfulness

20  of his conduct at all.  I'm suggesting his actions appear

21  unhinged at times and to what extent that is a reflection in

22  part, not in full, but in part to his mental challenges.  That's

23  all.

24          MR. NESTLER:  It's certainly a factor Your Honor could

25  consider.  We don't believe that it would warrant any kind of

1    mitigating circumstance here.

2        The third piece of the firearms that I wanted to address is

3    the defendant's use of this security company to circumvent

4    Second Amendment laws.  As he told others, he created a security

5    company, which he named TTP Security, and even in his letter to

6    the Court claimed it didn't stand for Texas Three Percenters, it

7    stood for something else, but it was very clearly associated

8    with Texas Three Percenters as a way for him to amass and stock

9    firearms outside of the government's knowledge.

10        THE COURT:  And tell me specifically with the evidence

11   you have how this scheme worked.

12        MR. NESTLER:  What he said was that he created a

13   security company.  He registered it with the Texas Department of

14   State.  And he told others that he could get firearms for them

15   without -- he used the word "circumvent," by circumventing

16   Second Amendment or circumventing firearms laws.

17        THE COURT:  And do you know how the owner of a

18   security company can circumvent the registration laws and

19   otherwise?

20        MR. NESTLER:  I don't; I don't.  He was telling other

21   people that he had the ability --

22        THE COURT:  I know.  He tells people a lot of things.

23   I'm just wondering, is it true that this does enable people to

24   circumvent the firearms registration laws and the like that

25   you're suggesting it did.  I know he used the word "circumvent."

1    But help me understand how having the security company helped

2    him circumvent.

3        Is it simply that it's a cover for him having firearms and

4    not causing ATF or some other federal agent to be suspicious of

5    him?  That's not really circumventing the laws.  That's like not

6    raising suspicions.  But is that the argument you're making?

7            MR. NESTLER:  I do believe that's part of it.  The

8    other part of it is that he's able to get firearms and give them

9    to other people without having the government be aware of it.

10   So he's able to procure firearms through his company, or at

11   least that was his plan, and provide them to other members of

12   the malitia without raising any government red flags because

13   they would be going to a security company.

14           THE COURT:  But any security company has to keep

15   paperwork, does it not, on who it provides the firearms to?

16           MR. NESTLER:  One would assume, yes.  But the

17   defendant was telling other people that he was going to take

18   care of all of this for them, that was his plan, using TTP

19   Security in order to do that.

20           THE COURT:  So your point is that he's sort of

21   orchestrating the gathering of firearms by all the Texas Three

22   Percenters by using this, but not that he truly is circumventing

23   the laws; right?

24           MR. NESTLER:  Correct.  Circumventing was his word.

25   He's using it in order to not amass attention from the

1        government in order to further the aims of his malitia.

2               THE COURT:  Okay.  I get it.

3               MR. NESTLER:  Which is very similar, by the way, to

4        what he did at the Capitol that day.  He told everybody at the

5        Ellipse before he went to the Capitol he was a member of Texas

6        Three Percenters to encourage them to come with him, to give him

7        more credence.  But then he hid all of his insignia for TTP and

8        Three Percenters at the Capitol.  And when one of his malitia

9        members complained to him later that he was going to bring

10       unwarranted attention on the group, he said, "I'm not a fool.  I

11       hid everything."

12               THE COURT:  And who is that?  Russ Teer or --

13               MR. NESTLER:  That was another member of the malitia

14       group, I believe, who said that to him, who was coming back at

15       him on the Telegram thread.

16          But the defendant knew what he was doing.  He wanted to use

17       TTP when it was to his advantage.  He used it to recruit people

18       at the Ellipse.  And also, he met other rioters there who he

19       then tried to recruit afterwards using TTP.  But when he knew it

20       was going to be bad for him and the malitia, he hid it.  That

21       shows a level of sophistication here that we don't often see

22       with respect to other defendants that have been sentenced with

23       respect to January 6.

24          And then I just want to go back to the obstruction.  The

25       defendant, on January 10 -- so he was boastful when he came

home.  He thought that he had started something.  He thought that he had lit the fire, that his malitia group was going to go start attacking other Capitol buildings.  He wanted to go to California, attack Facebook and mainstream media.  He was talking about what was happening in D.C. on the 20th for the inauguration.  All of that is going on with the defendant.  He's happy.  He thought they accomplished something.

And then he sees that the FBI starts arresting people, including near him in Texas.  And around January 10th, all of a sudden, everything changes.  He does a 180.  Mr. Teer gets brought in for questioning.  And who does Mr. Teer reach out to?  Guy Reffitt, so that Guy Reffitt can tell everybody else delete your comms, this is not a drill, purge communications now, the shit is hitting the fan.

And people do.  Rocky Hardie said he got that message, he got scared.  He testified to this.  He started deleting all of his Telegram threads.  And some of those Telegram threads, as we talked about earlier, involve Mr. Reffitt talking about his plans for January 6.

The defendant gets scared.  He tells his kids, both Peyton Reffitt said it in her letter and Jackson Reffitt said it at trial, he thought the three-letter agencies were coming for him.  And this is not delusional, Your Honor.  He thought that the FBI was going to come looking for him.  They did just a few days later.

1    He is starting to take these actions in order to protect
2  himself, which is why he threatens to harm his children.  They
3  knew he had firearms in the house, and he told them that if they
4  turned him in they would be traitors and traitors get shot.  He
5  was going to do whatever was necessary to protect himself.

6    That makes him a danger to his family and a danger to
7  others.  That is a very serious offense there, that obstruction
8  offense, that we believe ought to be taken into account and Your
9  Honor factoring in the 3553(a) factors to vary upward from the
10 top of the guideline range to provide a more severe sentence.

11    In closing, Your Honor, we believe that Your Honor ought to
12 sentence the defendant to a sentence of incarceration above the
13 top of the guideline range because of all of these factors in
14 terms of his obstruction, his actual plan for January 6 that day
15 and afterwards, and his use of firearms before, during, and
16 after January 6.

17            THE COURT:  All right.  Thank you, Mr. Nestler.

18            MR. NESTLER:  Thank you, Your Honor.

19            THE COURT:  All right.  You may proceed.

20            MR. BRODEN:  Your Honor, I think Peyton Reffitt wanted
21 to address the Court first.

22            THE COURT:  Okay.  Ms. Reffitt, you may come on up.

23    Good afternoon, Ms. Reffitt.

24            MS. PEYTON REFFITT:  Good afternoon, Your Honor.

25            THE COURT:  Take your time.

1        MS. PEYTON REFFITT:  As I know my father, he is not a

2   threat to my family, and he is very rhetorical, and he does say

3   a lot of things that he does not mean.

4        His mental health is a real issue.  It's been an issue for

5   himself, and we've always turned a blind eye to it as our family

6   has always looked at him to be the person in charge of our

7   family.

8        I'm sorry, Your Honor.

9        THE COURT:  Take your time; take your time.

10   Ms. Reffitt, I want to let you know that I've also listened

11   to your testimony that you gave Magistrate Judge Faruqui at the

12   time of the detention hearing.  I've read your letter.  I'm

13   happy to hear more.  But I don't want you to feel as though I

14   haven't -- I don't understand your perspective here.  I welcome

15   more that you want to add, but rest assured, I have heard your

16   testimony.

17        MS. PEYTON REFFITT:  I guess the last thing I would

18   like to say is that my father's name wasn't on all the flags

19   that were there that day, that everyone was carrying that day.

20   It was another man's name.  He is not the leader.

21        And that's all.  Thank you, Your Honor.  Sorry.

22        THE COURT:  That's all right.  Thank you, Ms. Reffitt.

23   All right.  Mr. Broden?

24        MR. BRODEN:  Your Honor, I wanted to do a few things.

25   First, I wanted to sort of start with a timeline --

1          THE COURT:  Come on up to the microphone.

2          MR. BRODEN:  Fair enough.  A timeline that puts

3     Mr. Reffitt's actions in some perspective.  So I have a timeline

4     for the Court, and it's going to correspond to some exhibits

5     that we might introduce.

6          As noted in the timeline, they're all -- they all

7     correspond to particular exhibits.  So at this point, we would

8     offer Defendant's Sentencing Exhibit Number 1, which was

9     actually referred to in the sentencing memorandum, which is a

10    timeline I believe the Capitol Police put together, Defendant's

11    Exhibit 2 and Defendant's Exhibit 3, 2 and 3 being cameras -- I

12    don't know who is in charge but I assume Capitol Police, but

13    cameras of that day.

14         THE COURT:  Mr. Nestler, any objection to these

15    exhibits?

16         MR. NESTLER:  Defendant Sentencing Exhibit Number 1,

17    Your Honor, is actually a document that was produced in

18    discovery as sensitive.  So the government does object to it

19    being released to the public but does not object to Your Honor

20    considering it.

21         MR. BRODEN:  And however the government or the Court

22    wants to handle the release of it, I have no problem.

23         THE COURT:  Mr. Nestler, help me, without revealing

24    the contents of this timeline, understand in a general way why

25    this is sensitive.  I just need to make a record that it's

1    appropriate to have this filed under seal.

2            MR. NESTLER:  Can I get back to you on that briefly,

3    Your Honor, at the end of Mr. Broden's allocution?

4            THE COURT:  Okay.  Of course.

5            MR. NESTLER:  Thank you.

6            THE COURT:  So I am admitting all of these exhibits,

7    and I will wait to hear from the government about the need to

8    seal the timeline.

9            MR. NESTLER:  Thank you.  And we have no objections to

10   Exhibits 2 and 3, which are Capitol Police surveillance video.

11       (Defendant's Sentencing Exhibits 1, 2, and 3 received into

12   evidence.)

13           MR. BRODEN:  So with that said, Your Honor, I would

14   like to play sort of snippets of 2 and 3.

15           THE COURT:  These are thumb drives?  You're going to

16   play them for me; right?

17           MR. BRODEN:  We're going to play snippets as a part of

18   the PowerPoint.

19           THE COURT:  Is it important for me to watch the whole

20   thing?

21           MR. BRODEN:  The whole thing, no, no, just for the

22   record.

23           THE COURT:  So, Mr. Hopkins, you're going to work with

24   counsel on what the Court needs to retain and what counsel

25   should retain for purposes of appeal?

1          COURTROOM DEPUTY:  Sounds like fun.

2          THE COURT:  Okay.  Mr. Broden, I'm not sure we retain

3    the thumb drive.  It might be on you.  But Mr. Hopkins knows a

4    lot more about that than I do.

5          MR. BRODEN:  That's fine, Judge.

6          THE COURT:  All right.  Is all this visible to the

7    audience?

8          COURTROOM DEPUTY:  It is, Your Honor.

9          THE COURT:  So this is not the timeline; this is just

10   Exhibits 2 and 3?

11         MR. BRODEN:  It's snippets of 2 and 3 and a reference

12   to a government exhibit that had been admitted at trial.

13         THE COURT:  Okay.

14         MR. BRODEN:  Your Honor, the first slide is the

15   government exhibit that was introduced at trial.  So it sort of

16   puts Mr. Reffitt's location in some sort of time frame.  We see

17   at 1:31 p.m. he's six, seven minutes from the Capitol.  I don't

18   know with that sort of crowd how long it would take for him to

19   walk there.  At 1:31, he's several blocks from the Capitol.  We

20   know from the government exhibit, the compilation exhibit at

21   trial, that he's first seen on the Capitol banister or steps

22   around 1:47, the later part of 1:47.

23         And so we would go to Exhibit 2, if I can make my thing

24   work here, or the second slide.  I'm going to just close out and

25   start again, I think.

1          THE COURT:  Before you continue, Mr. Nestler, let me

2     just say, having reviewed the timeline that you're not sure

3     about whether it should be sealed or not, I find it hard to

4     believe that this entire document needs to be sealed.  So I

5     would ask you to consider whether -- if there is sensitive

6     information, whether it can be redacted.  It seems like a lot of

7     this has come out if not in this trial but in other courtrooms.

8        I don't want to reveal any security information, but it

9     just looks like it's a timeline on what happened when and when

10    people were arrested and that kind of thing without names

11    attached.  Maybe you'll convince me, but I don't see the

12    sensitivity of it.

13         MR. NESTLER:  I understand, Your Honor.  I'm checking

14    with a colleague, and we will get back to you shortly.

15         MR. BRODEN:  Are we ready, Judge?

16         THE COURT:  Yes.  Sorry.

17         MR. BRODEN:  Not a problem.

18       This is a portion of Defendant's Sentencing Exhibit 2, and

19    I tried to fast forward to it.  It's not really meant to be an

20    eye exam.  The time frame is a little small.  It starts showing

21    you the people that started up these steps before Mr. Reffitt.

22       So we're starting to see at 1:21 this first man starting up

23    the steps.  And that's, what, about 26 or 27 minutes before

24    Mr. Reffitt goes up those steps.  You see the crowd behind him.

25       Fast forward to -- you see them come down.  You will see

```
 1    him eventually taken into custody.  And that's also reflected in
 2    Defendant's Exhibit 1, which is the timeline.  Then we keep
 3    going.  You see him interacting with the police officers and
 4    being taken into custody.
 5              THE COURT:  Mr. Broden, is the purpose of all this
 6    together simply to show that he's not the first?
 7              MR. BRODEN:  Correct.  And I don't want to take up the
 8    Court's time.
 9              THE COURT:  I'm happy to watch this, but if that's the
10    point, I get it from the timeline alone, assuming the
11    government --
12              MR. BRODEN:  There's one other with the next slide.
13    But the point of this slide it to show that three other people
14    are going up, he's not the tip of the spear, so to speak.
15              THE COURT:  And the three other people are going up in
16    front?
17              MR. BRODEN:  I'm sorry?
18              THE COURT:  They're going up the stairs in front of
19    him?
20              MR. BRODEN:  Yes.  These are long before Mr. Reffitt
21    even arrives at the Capitol.
22              THE COURT:  And do they get past the officers, or do
23    they come back down?
24              MR. BRODEN:  One gets arrested.  We don't really know
25    what happens to the other two.  But the first one that went up
```

1    at 1:21 is encountered, gets arrested, and actually led away.

2             THE COURT:  Do you concede that none of them succeeded

3    in getting past the officers?

4             MR. BRODEN:  Yeah.

5             THE COURT:  Okay.  So your point is others tried to

6    do --

7             MR. BRODEN:  Right, others got in front of the crowd

8    and went up and were ultimately detained, just as Mr. Reffitt

9    was sprayed with the OC and --

10            THE COURT:  All right.  So in your view, he's not the

11   tip of the spear?

12            MR. BRODEN:  Right.  This -- I think it just

13   juxtaposes the government's argument that somehow Mr. Reffitt

14   made January 6 possible.  I know the Court doesn't think the

15   government went that far, but when I read its sentencing

16   memorandum, it uses words like "possible."

17            THE COURT:  Well, it doesn't help that Mr. Reffitt

18   himself didn't talk about -- did talk about --

19            MR. BRODEN:  Agreed.

20            THE COURT:  -- lighting the fuse, lighting the fire.

21   He wanted to be number 1, whether he was or not.

22            MR. BRODEN:  Agreed.  But then -- and I was going to

23   talk about this a little.  The government started off its

24   allocution by saying this isn't about his words.  Yet, they

25   constantly went back to his words.  So in effect, they are about

1       his words.  We have to make some determination of how serious

2       his words actually are, whether they're hyperbolic.

3                  THE COURT:  I understand.

4                  MR. BRODEN:  And then this last one, the idea that his

5       actions resulted in the cutting of the tarp and scaffolding,

6       before he's even seen on the video up there, we see somebody

7       cutting the scaffolding long before he's waving on -- I

8       shouldn't say "long before," but a few minutes before he's

9       waving people on at the top of the stairs.  So to suggest

10      that -- it's going to be in that bottom left-hand corner.  But

11      around 1:34 is when they start -- somebody has a box cutter or a

12      knife at some point and starts cutting at that bottom.  Here he

13      goes.  So the idea that Mr. Reffitt's actions caused all this, I

14      think, is refuted by the video evidence.

15                 THE COURT:  Okay.

16                 MR. BRODEN:  And those are my only points.  But I

17      think in light of some of the government's arguments, it's

18      important to sort of put this in a little bit of perspective.

19                 THE COURT:  So two points:  One, he wasn't the first,

20      and two, the property damage started before he ascended the

21      steps?

22                 MR. BRODEN:  Right.  I'm less concerned about the

23      property damage per se, more the government's arguments that him

24      going up the steps led to people cutting the -- so they could

25      storm the Capitol and, but for Mr. Reffitt doing this, the tarp

1    wouldn't have cut and people wouldn't have climbed the

2    scaffolding.  So I think both of those are false.

3        I certainly agree that a lot of his stuff was highly

4    disturbing, a lot of his comments.  I couldn't even begin to

5    fathom trying to defend some of his comments.  But then we need

6    to -- the government says it's not about words, but a lot of its

7    argument is about words.

8        And, for example -- and I meant to look this up, but I know

9    it was several months before, he supposedly sends this e-mail to

10   Senator Cruz about going after Facebook.  Yet, he doesn't go

11   after Facebook.  I mean, a lot of this is --

12       THE COURT:  He does talk about it in the Zoom call

13   when he gets back home from the Capitol.  He hasn't let go of

14   that notion.

15       MR. BRODEN:  Right.  There's a lot of mentally ill or

16   delusional people don't let go of things.  But the question is,

17   was there any indication that he was driving out to Palo Alto or

18   wherever Facebook is based and doing anything.

19       THE COURT:  Well, let me tell you what makes this case

20   extraordinarily difficult, in addition to the firearm, which

21   speaks for itself.  But the fact remains, as he sits here now,

22   he has yet to state that what he did was wrong.  He is yet to

23   accept full responsibility for his actions.  He has not walked

24   back his comments about being a martyr.  He hasn't walked back

25   his comments about being a patriot.

1    So here he sits, as I consider what is this man going to do

2    after he's released from prison, because at some point he will

3    be, even under the government's sentencing recommendation.

4    We're not talking about a life sentence for him.  What is this

5    man going to do when he is released.

6    And this notion, the repeated diatribes from jail suggest

7    that his and others' efforts to foment rebellion in our country

8    to respond to the so-called tyranny of our government are

9    legitimate.  Like you said, these are frightening claims that

10   border on delusional.  There are plenty of people who feel like

11   democracy isn't working for them.  There's, unfortunately, a lot

12   in the United States right now who feel that way.  But in a

13   democracy, the answer to frustrations is not rebellion.  And

14   it's really disturbing that he repeatedly persists with these

15   views that are way outside the mainstream.

16   And these are just flat -- his claims are wrong, and to in

17   any way analogize the current-day frustrations of Americans with

18   those of the American colonists who were under the rule of the

19   British crown and who were being taxed without representation, I

20   mean, that analogy is so far off the mark it's absurd.

21   MR. BRODEN:  I just took my kids to Boston last week.

22   So I understand, Judge.

23   THE COURT:  Patriots honor and respect the rule of

24   law.  Patriots are like Officer Kerkhoff who defended our

25   Capitol, who defended the public servants who were inside the

Capitol.  That's a patriot.

MR. BRODEN:  I agree.

THE COURT:  And he seems to really believe that this is legitimate and that -- he cites the Supreme Court's decision, its 1803 decision in *Marbury v. Madison*, along with the First and Second Amendments to the Constitution, as permitting the illegal actions he took in this case.  I don't see how he gets there.

And the group he's a part of, even Rocky Hardie does espouse this view that at a certain point rebellion's required and we're there in democracy.  Again, analogizing this to the American colonists, it's delusional.  In a democracy, we vote our conscience at the election, in the election box.  We don't do it through violence.

And he thought or he claimed that he was going to forcibly remove legislators and install a new government that will be approved by the judges, the constitutionalists down the street. Nothing can be farther from the truth, nothing, and to this day, he has not disavowed these comments.

In democracy, we respect a peaceful transfer of power, and all the claims about the election's being stolen, all of that, the election was challenged in multiple courts across the country, and judge after judge said there's no merit to these claims that there was election fraud to the degree that it affected the outcome of the election.  And the former attorney

general of the United States, William Barr, has said repeatedly
that this was utter nonsense.  And yet, he and others continued
to believe that the election -- or claim that the election was
stolen.

And Mr. Nestler's right.  I was shocked.  I was wondering
whether a defense at trial might have been that the purpose
wasn't to obstruct the vote, the purpose was so much bigger, it
was to remove the government entirely, the stated purpose.  He
is in a class of his own so far as I'm aware in terms of what he
was doing there that day, what he claimed to be there to do.

MR. BRODEN:  I agreed with the Court up until the last
sentence.

THE COURT:  Then help me understand that.

MR. BRODEN:  That he was sort of in this class of
himself, I think that's what -- the Court went through some of
the other cases, and I've certainly cited the other cases.  I
really think -- if he was being sentenced in isolation, I think
we would be having probably a different discussion.  But he's
not being sentenced in isolation.

One of the things when we talk about our democracy and our
Constitution is this idea that you have a right to go to trial.
You're not sentenced to three times as high of a sentence if you
go to trial.  And we treat people similarly situated similarly.

And so we -- part of the sentencing, and that's why you get
paid the big money, I guess, is to sort of juxtapose these

1    two --

2              THE COURT:  Fair enough.  There are other individuals,

3    as I summarized, who made claims about being patriots and claims

4    about rebellion and the like.  It's just his stated purpose that

5    day seems kind of unique here, which --

6              MR. BRODEN:  Well, maybe because he's the one wearing

7    the GoPro, but I think we're kidding ourselves if we don't think

8    that was a lot of the people's purpose that day.  And some of

9    them, when you do have comments, are their expressed purposes.

10   The Court withheld some of the expletives of one of the guys,

11   but, I mean --

12             THE COURT:  The Court what?

13             MR. BRODEN:  Didn't read all of the expletives from

14   one of the sentences.  But that was along the same lines, if not

15   worse.

16             THE COURT:  But he's had a long time to sit in jail

17   since January 6.

18             MR. BRODEN:  Well, we can talk about the wisdom of

19   keeping all these guys together.

20             THE COURT:  But here he sits, and does he still claim

21   that this is justifiable action?  He hasn't even admitted that

22   he committed the offenses with which he was charged and

23   convicted of by a jury.  His letter to me does not say that.  He

24   says he's not proud of what he did on the Capitol staircase that

25   day and his regrets are immense.  He doesn't say what about.

1        MR. BRODEN:  I thought he said he was ashamed of his

2   actions.

3        THE COURT:  He said he "never should have been

4   screaming at the officers at the Capitol, and for that, I am

5   truly ashamed."

6   Does he still see his actions on some level as a

7   justifiable rebellion against a tyrannical democratic government

8   that has a history of over 200 years of peaceful transfers of

9   power?

10       MR. BRODEN:  My discussions with him, and I will share

11  these with the Court, what he has offered to me is he is done

12  with being involved in any kind of politics or political

13  protests or statements.  I've had extensive discussions with

14  him.  Obviously, I'm fairly new on the case.

15       THE COURT:  But his latest statement, public statement

16  was, if not weeks ago, a couple months ago, and it's really easy

17  for a defendant who is facing a judge at sentencing to have a

18  change of heart.

19       MR. BRODEN:  Sort of like the defendants that got

20  acceptance of responsibility because they come in and plead

21  guilty and say the right things, whether they really deserved

22  acceptance of responsibility.

23       THE COURT:  Right.  And many of those or some of those

24  have gone on after their statements of remorse at the time of

25  sentencing to not show any remorse.

1          MR. BRODEN:  Right.  So my point is, I'm not sure him

2     coming in, which I really never have seen a defendant who went

3     to trial come in and say yeah, I robbed a bank, yeah, I dealt

4     the drugs.

5          THE COURT:  Really?

6          MR. BRODEN:  Not in my experience in 30 years, but I

7     can't say it never happened.  Then why are they going to trial

8     in the first place.

9      My point is, I think a lot of these people who have gotten

10    acceptance of responsibility -- and I understand that's sort of

11    how the system is set up.  To get your three points, they will

12    come in and say it, but as the Court points out, a lot of them,

13    you know, as soon as they walk out of the courthouse are giving

14    press conferences about how they were -- did the right thing and

15    were misunderstood.

16         THE COURT:  So it shouldn't matter what he says now at

17    the time of sentencing?

18         MR. BRODEN:  It is, I think, a little harder in these

19    type of cases, because I think it is harder to judge the

20    sincerity based on the track record of what we're seeing.

21         THE COURT:  But am I going to be in a position to not

22    even have the possibility of judging sincerity, that as

23    Mr. Reffitt sits here he still views himself as a martyr who is

24    justified in his rebellion against the tyrannical U.S.

25    government, the democracy in which he lives in?

1          MR. BRODEN:  Well, I will say this:  The plan was not

2     to have Mr. Reffitt address the Court, given that there's a

3     possible appeal and everything.  If --

4          THE COURT:  I'm not asking for --

5          MR. BRODEN:  And I don't want to put this on the

6     Court, but it is something I could revisit with him if the Court

7     has that concern.

8          THE COURT:  Well, you can understand, from a

9     deterrence perspective, a specific deterrence perspective, what

10    is this defendant going to do in the future, that this is

11    something that is very much on my mind.

12         MR. BRODEN:  Well, the one thing I will tell you, and

13    I guess the Court's going to have to take my word on the

14    judgment of sincerity, I do believe when he told me he's done

15    with being involved in politics and demonstrations and things.

16    I took that as sincere.

17       Now, whether that changes his beliefs --

18         THE COURT:  But this is a very carefully crafted

19    letter.  It doesn't say the views that the Texas Three

20    Percenters or the Three Percenters across the country espouse

21    are wrong, that rebellion is appropriate, the analogy to 1776.

22    This is really troubling.

23         MR. BRODEN:  I understand.

24         THE COURT:  You can feel not proud of what you did on

25    the Capitol staircase.  You can have regrets about what you're

1    putting your family through.  And I agree with Mr. Nestler, he's

2    being sentenced on actions, not words.  But this is one where

3    words could actually help him in some way.  But I still have to

4    wonder, is it too little too late.

5         MR. BRODEN:  Well, you know, and I don't want to get

6    too much in the weeds, but if you're talking about specific

7    deterrence, I mean, I understand the Court's concerns about the

8    letter, but I think it's safe to say from reading the letter he

9    never wants to put his family in this position again.  So in

10   that sense --

11        THE COURT:  That's different.  He says his family is,

12   quote, suffering directly while he suffers indirectly for his

13   actions.  That is off the mark, too.  He is in prison.  He's

14   directly serving time, and his family indirectly is being harmed

15   by the poor choices, incredibly poor choices he made.  So his

16   family is not being directly harmed.

17        MR. BRODEN:  I agree with that.  My point was, when

18   you talk about deterrence and you ask is he likely to commit a

19   similar offense in the future, knowing what has happened and

20   what has happened to his family, whether you characterize it

21   directly or indirectly -- I agree with the Court, it's

22   indirectly -- is he going to put his family in a position where

23   that happens indirectly again.  And I think that comes through

24   from the letter.  Regarding the Court's other concerns, I

25   understand.

1          THE COURT:  Okay.  Is there anything else you'd like

2     to --

3          MR. BRODEN:  Just a couple, and I'm really kind of

4     repeating myself.  And I agree -- and I apologize.  I forget the

5     officer's name.

6          THE COURT:  Kerkhoff.

7          MR. BRODEN:  Okay.  Officer Kerkhoff, I agree she is a

8     true patriot, and what she did that day was -- we shouldn't ask

9     people to do.

10         Listening to her, one of the things that caught me, though,

11    was the person that sprayed her partner with the bear spray.

12    Now, should Mr. Reffitt get the same type of sentence as the guy

13    who actually disabled her partner and sprayed him with bear

14    spray.

15         And I think that's when we get back to the juxtaposition

16    we're dealing with, and that's why I think -- as I say, I can't

17    come up here and defend his actions or defend his statements.

18         THE COURT:  You mean the other defendant who used bear

19    spray against the Capitol Police?

20         MR. BRODEN:  Right.  I'm just taking one example, but

21    there's 14 other examples, I think we're up and counting, where

22    people got more than 24 months.  There's only 14 people that got

23    more than 24 months, and some of those are horrific.  And

24    certainly, Mr. Ponder, when you think of -- the government

25    points out some instances of uncharged conduct with Mr. Reffitt.

1    Mr. Ponder was convicted twice of robbery, bank robbery and

2    carjacking, had a history of domestic violence, had a history of

3    drugs.

4        And so I think that's where the crux of the argument is,

5    and the Court can tell by my sentencing memoranda.  As I said,

6    if you were sentencing Mr. Reffitt in isolation, it would be an

7    entire different discussion.  But I think given the enormity of

8    this event and the enormity of defendants, unless the message is

9    we're going to just throw away the key if we go to trial but if

10   you don't go to trial we're going to be fine with this --

11       THE COURT:  Clearly not that.  I have not departed

12   upward.

13       MR. BRODEN:  No, but certainly, the government -- not

14   throw away the key.  I was being hyperbolic in that sense.  But

15   asking for a sentence way above, whether it be twice the amount

16   or three times the amount, I think, is somewhat academic.  I

17   think he has to be sentenced in proportion to the people that

18   have gone before him and be sentenced because of his actions.

19   Granted, he's not getting acceptance of responsibility, but not

20   be punished because he exercised his Sixth Amendment right.

21       And despite the government's argument, that's the only way

22   in my mind to explain the government's sentencing recommendation

23   in this case, three times as much as people spraying bear spray

24   or spraying fire extinguishers or repeatedly hitting police

25   officers or wearing horns into the Capitol and speaking on the

dais and talk about leadership and inviting people up to the
dais to take pictures, people wandering the Capitol, going into
the speaker's office.

I just think there needs to be some proportionality here,
and I think that's sort of where the rubber meets the road, is
to fashion a sentence that is in line with the sentences that
have come before.

Mr. Reffitt talks about, well, we may do this in the
future, we may do that.  There's nothing you or I or even
Mr. Reffitt -- the prosecutor can do except look at what has
happened in the past and say well, the past is prologue, and
we've got to try to do justice and try to stand for the
proposition that we have talked about earlier and the importance
of our country and the importance of our Constitution.  And the
Constitution says Mr. Reffitt should be treated equally to
Mr. Ponder and Mr. Meredith and I forget some of the others.

And just to kind of come full circle, we talked about that
eight-level enhancement, which, you know, a lot of conduct that
goes into -- types of conduct that can go into that eight-level
enhancement, we talked about it earlier, but if the Court was to
find it applied, which it did, eight levels is mandatory, but
that doesn't mean you can't take back some of those levels when
it comes to the 3553 factors and recognize there's a whole lot
of type of conduct that could get you those eight-level
enhancements.

1    And finally, I disagree with the government, and I don't

2    think we need to go into all of Mr. Reffitt's mental history,

3    and I think that sort of led to it.  You feel marginalized, and

4    it sort of all leads to this.  But I think in some of the

5    letters, the Court has a better appreciation of really what his

6    mental history is.  And unfortunately, a lot of people with

7    mental illness don't recognize they have mental illness, and

8    that's a part of the challenge, but that's certainly something

9    the Court can address in any kind of release conditions.

10           THE COURT:  All right.  Mr. Broden, you don't dispute

11   that a fair inference to draw from the facts of this case is

12   that but for the pepper spray Mr. Reffitt would have been in the

13   Capitol?

14   After all, he gives real-time text messages to Rocky Hardie

15   saying, "I can't go in.  I've been sprayed."  I think he repeats

16   those later.

17           MR. BRODEN:  I've actually asked myself that question,

18   because it is a -- given everything he has said and supposedly

19   his fortitude, I would tend to agree with the Court, but at the

20   same point, I'm somewhat surprised that the pepper spray was

21   able to stop him if that was really his intent.

22           THE COURT:  Well, if you had seen the trial, it was

23   multiple attempts.

24           MR. BRODEN:  I saw the video, no, and I saw the paint

25   ball or whatever, the clay --

 1            THE COURT:  Straight in the face.

 2            MR. BRODEN:  I don't know that I saw straight in the

 3    face, but I certainly saw the --

 4            THE COURT:  No, no, I mean the pepper spray and the

 5    water and all of that.

 6            MR. BRODEN:  Well, but then think about this, Judge,

 7    and this is in some of the sentencing memoranda.  There are a

 8    couple of people, at least two that I recall writing upon, where

 9    they got removed one way or the other by police --

10            THE COURT:  And they came back.

11            MR. BRODEN:  And they came back, right.  This went on

12    for three hours.  He certainly could have come back.

13            THE COURT:  And he didn't do that, but the excitement

14    was a little bit over when people are coming out of the Capitol.

15            MR. BRODEN:  Yeah, I don't have that timeline down

16    directly, but it certainly didn't stop other people from coming

17    back and assaulting police officers, maybe towards the end of

18    the -- I don't want to even use the word "party," but at the end

19    of the event.

20            THE COURT:  All right.  Thank you, Mr. Broden.

21        All right.  So, Mr. Reffitt, you've sat silently through

22    the trial.  You've heard us talk a lot about you here today.

23    Now is your opportunity to speak to me if you would like to be

24    heard before I impose sentence.  I've read your letter.  You're

25    also welcome to make an additional statement now if you would

1    like to do so.

2                MR. BRODEN:  Judge, may I have one --

3                THE COURT:  Of course.  Take as long as you want.

4          (Defense counsel and defendant conferred.)

5                THE COURT:  All right.  Mr. Broden?

6                MR. BRODEN:  Mr. Reffitt is going to decline.

7                THE COURT:  Understood.

8          So I think everybody needs a brief break.  So we're going

9    to take about -- how much time do you all need to get a quick

10   bite?

11               MR. BRODEN:  It depends whether the court has a

12   cafeteria.  I don't know.

13               THE COURT:  Come back at 2:15, 2:30.

14         Does Mr. Reffitt have access to some food?

15               MR. BRODEN:  Yes.

16               THE COURT:  Okay.  All right.  So let's come back at

17   2:30.

18         Does the government have anything additional on those

19   cases, the guideline calculation?

20               MR. NESTLER:  Yes.  We can provide something to

21   chambers during the break.

22               THE COURT:  Just make sure Mr. Broden sees it as well.

23               MR. NESTLER:  Yes, of course, Your Honor.

24               THE COURT:  Anything additional on the -- what were

25   the other two issues?  The sealed record and the conditions that

1    raise First Amendment concerns.  Nothing now?

2            MR. NESTLER:  Nothing now.  We will address that when

3    we get back.

4            THE COURT:  All right.  Thank you, all.

5            MR. BRODEN:  So we're going to address the

6    conditions --

7            THE COURT:  When we come back.

8            MR. BRODEN:  For whatever reason, I hadn't seen them

9    before.  Probably my fault.

10           THE COURT:  Take the time.  The other option,

11   Mr. Broden, is if you need -- you all talk ahead of time.  If

12   you needed time to brief this or something -- I'm just really

13   looking for some guidance beyond what I've been able to find,

14   which isn't much on this.

15       All right.  Thank you, all.

16       (Recess taken from 1:41 p.m. to 2:53 p.m.)

17           THE COURT:  All right, folks.  Sorry for the delay.

18       Mr. Nestler, I don't know if you will be glad to hear, but

19   I did have another conversation with the Commission in an effort

20   to understand why I think what I'm doing is correct.

21       So just for the record, I do want to explain this.  And as

22   I've said, this is an issue that applies with the grouping rules

23   generally.  Given the grouping rules, it is the case that not

24   every aggravating factor or every mitigating factor necessarily

25   results in a bump-up in the term of in this case imprisonment.

1    And so while I think that the calculation that I did with

2    respect to 3C1.1 is correct, it's accurate, I do agree with the

3    government that this is certainly something that I can consider

4    in deciding where to sentence Mr. Reffitt within the guideline

5    range or under 3553(a) as well.

6    So let me just explain briefly.  So Counts 1, 2, and 3, as

7    Probation has done, are grouped under 3B1.2(b) because they

8    involve the same victim and are connected by a common criminal

9    objective, scheme, or plan.  Count 5, which is the threat to

10   Mr. Reffitt's children, that is a separate act of obstruction.

11   Under Note 7, which is the piece that I missed, under Note

12   7, Count 2 is also an obstruction type of offense such that

13   Section 3C1.1 normally would not allow for any enhancement to be

14   applied to this offense under 3C1.1.  But in this case, because

15   Count 5 is a significant further obstruction in the

16   investigation of Count 2, so the threats to the children were an

17   obstruction act that was to undermine the investigation of the

18   offense in Count 2, which is an obstruction offense, Note 7

19   allows for Count 5 to be a specific offense characteristic for a

20   two-level adjustment under 3C1.1 to Count 2.  So Count 5 is

21   being counted.

22   But what Note 8 tells us is to group the Count 5

23   obstruction offense with the Count 2 underlying offense, and the

24   offense level for that group is either the underlying offense,

25   obstruction offense, which is Count 2, plus two for the

1    obstruction enhancement that was applied under Note 7, or the

2    level for the obstruction offense, Count 5, whichever is

3    greater.  So here, Count 2 with the plus 2 under 3C1.1 is

4    greater.  So we use that.

5        And so based on all of that, I know it's hard to follow,

6    but Count 5 has been taken into consideration in the offense

7    level for Count 2.  And the problem is the way the grouping

8    rules work here.  There's a big enough discrepancy between the

9    two that it's not counting again.  So there's that.

10       And then I had asked the government to provide a list of

11   cases where the 2J1.2(b)(3) enhancement was agreed to in plea

12   agreements.  I also asked the government to explain the basis

13   for the enhancement in those cases.  The government provided a

14   list of ten cases but didn't explain the basis for the

15   enhancement, and I just didn't have a chance to review each and

16   every one of those cases.

17       I've already agreed to apply the enhancement in this case.

18   I didn't apply the role enhancement for the reasons discussed

19   earlier and my concern about the potential for double counting,

20   given the overlap in the basis for these two potential

21   enhancements.  So that's all I will add with that.

22       I understand that Mr. Reffitt does want to make a

23   statement.  Is that correct?

24            MR. BRODEN:  That is correct, Your Honor.

25            THE COURT:  Okay.  All right.  Before we move on to

1    that, Mr. Nestler, Mr. Broden, any additional information you

2    want to put on the record?  And you can take your masks off

3    again if you desire.

4              MR. NESTLER:  No, Your Honor.

5              MR. BRODEN:  I think other than, and we might not be

6    at that point yet, the agreement we reached on the conditions.

7              THE COURT:  Oh, right, right.  And I do -- where did I

8    put that?  I have so much paper here.

9        Okay.  So what I understand with respect to the contact

10   restriction, correct me if I'm wrong, but I understand that the

11   parties are in agreement that one of the conditions of

12   supervised release would be -- would read as follows:

13       "You must not associate, communicate, or otherwise

14   interact, directly or indirectly, with any extremist malitia

15   group or member of such a group, including but not limited to

16   the Texas Three Percenters, the Oath Keepers, and the Texas

17   Freedom Force.  If you inadvertently associate, communicate, or

18   otherwise interact with such a group or individual, you must

19   immediately report this to the probation officer."

20       Does that correctly state the parties' agreement?

21             MR. BRODEN:  It does, Your Honor.

22             THE COURT:  And the government has agreed that the

23   propaganda condition that Probation suggested not be imposed

24   here; is that correct?

25             MR. NESTLER:  Yes, Your Honor.

1          THE COURT:  Okay.  All right.  And Mr. Broden, any

2     concerns about the clarity of this?

3          MR. BRODEN:  No, Your Honor.  And just to sort of

4     further our conversation earlier, I did have the conversation

5     with Mr. Reffitt about the contact restrictions and it could

6     raise certain First Amendment grounds, but he says he never has

7     any intention of talking to the people in these groups again, so

8     he had no problem including that condition as the Court read it.

9          THE COURT:  All right.  Very well, then.

10         For the record, to be clear, as I will explain in a moment,

11    I do intend to impose a maximum term of supervised release in

12    this case.  To the extent that Mr. Reffitt in the future

13    violates this condition or the mental health condition or any

14    other standard mandatory conditions of release, that would give

15    me grounds, the defense agrees, to violate him and sentence him

16    to additional time in prison up to what would be the statutory

17    maximum of 20 years in this case, taking into account whatever

18    the sentence is imposed here today.

19         Do you agree with that, Mr. Nestler?

20         MR. NESTLER:  Yes, Your Honor.

21         THE COURT:  Mr. Broden?

22         MR. BRODEN:  I don't disagree.  It's been a long time

23    since I've handled a supervised release revocation.  So I forget

24    how the maximums work.

25         THE COURT:  Well, there are guidelines, but the

1  guidelines are not -- even before *Booker*, they weren't binding

2  on me for supervised release, or judges generally.  But I do

3  have the discretion to impose a sentence of imprisonment up to

4  the statutory maximum less the time that he would have served at

5  that point.

6        MR. BRODEN:  And I'm not disagreeing.  That is my

7  recollection.  I just don't know.

8        THE COURT:  Do you agree, Mr. Nestler?

9        MR. NESTLER:  Yes, Your Honor, as far as I'm aware.

10        THE COURT:  All right.  Okay.  Are there any other

11  loose remaining issues to address before I hear from Mr. Reffitt

12  and give my reasons for the sentence?

13        MR. NESTLER:  The only thing is a housekeeping matter

14  with regard to Defendant's Sentencing Exhibit 1.  The government

15  respectfully suggests that we submit a redacted version of that

16  for public dissemination.

17        THE COURT:  Okay.  And I don't have it in front of me,

18  but is the alert the piece that -- without getting into the

19  content of it?

20        MR. NESTLER:  Some colleagues that are not

21  Ms. Berkower or myself are handling that document.  We just ask

22  to consult with them and Mr. Broden and submit a redacted

23  version.

24        THE COURT:  All right.  Can you do that by no later

25  than tomorrow?

1          MR. NESTLER:  Yes, Your Honor.

2          THE COURT:  Okay.  So I've accepted all of the

3    defense's exhibits, and for now, the timeline will remain under

4    seal with the expectation that the government's going to file

5    a -- well, the parties jointly might file a redacted version

6    that addresses any sensitive -- and there may not be,

7    Mr. Nestler, any sensitive information in there.

8          MR. BRODEN:  Just so we are clear, Your Honor, I'm

9    deferring to the government.  It's not my dog in this fight.

10         THE COURT:  Understood.  But I do think a lot of this

11   is just standard factual information that's well known now from

12   all of these various prosecutions.

13      Okay.  So, Mr. Reffitt, you said earlier that you didn't

14   desire to make a statement.  I take it you've given it some more

15   thought, and you would like to be heard today; is that right?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  If you can come up to the podium.

18         THE DEFENDANT:  So this is crushing me because of my

19   anxiety, but I'm going to -- and that's what I hate, is I don't

20   do well speaking.

21         THE COURT:  Take your time, and speak into the

22   microphone.

23         THE DEFENDANT:  I did want to definitely make an

24   apology, multiple apologies really and accept my responsibility,

25   because I really do hate what I did.  I was, to be colorful, a

1    fucking idiot, and that is how it went.  2020 was -- I was a

2    little too crazy.  Everything went stupid, and I was not

3    thinking clearly.

4        But I do want to apologize to Officer Kerkhoff, Adam

5    DesCamp, and Matthew Flood for the interaction I had with them.

6    Again, that was completely stupid.  I was an idiot.

7        And I want to really apologize to my family and to the

8    Court, to the legislators, and to their staff, and everyone that

9    was affected by my actions.

10       And I really do -- I will have nothing to do with politics,

11   nothing.  I just can't believe -- and I don't want anything to

12   do with any groups or malitias or any kind of stupid shit like

13   that.  I will be lucky with my mouth if I get into a church

14   group after this.

15       I really -- it's just -- I don't know what I was thinking,

16   and I was not thinking clearly, and I do deeply regret

17   everything.

18           THE COURT:  It sounds like your mouth's gotten you in

19   trouble all the way back to high school.

20           THE DEFENDANT:  Pretty much, yes.  My mouth is my

21   biggest enemy.  My enemy of my enemy is my friend.

22           THE COURT:  A couple of comments I want to make,

23   Mr. Reffitt.  You understand that as I sit here now at the 11th

24   hour before I'm about to impose sentence on you, I'm hearing

25   some of what I would have expected to hear much earlier.  And I

1    can't help but wonder whether, like many other January 6

2    defendants, I'm hearing what I'd like to hear from you as

3    opposed to what you really believe.  And so I'm going to ask you

4    some follow-up questions.

5         THE DEFENDANT:  I will try to answer them the best I

6    can.

7         THE COURT:  So you've been convicted of every count in

8    the indictment.  That includes two civil disorder counts, an

9    obstruction of justice count, a firearm count, and an

10   obstruction of justice count based on the threats to your kids,

11   so two different obstructions.

12        Do you agree that you violated the law --

13        THE DEFENDANT:  Clearly.

14        THE COURT:  -- as the jury found with respect to each

15   and every one of those offenses?

16        THE DEFENDANT:  Yes, Your Honor.  I clearly -- yeah, I

17   fucked up.

18        THE COURT:  And what about the claims you've made

19   about being a patriot and being a martyr and this being an

20   appropriate rebellion against the tyranny of the U.S.

21   government?  So can you tell me about those claims?

22        THE DEFENDANT:  Yeah, one of those letters, I don't

23   know about that one.  But, I mean, some of it, I needed to

24   support my family, and sometimes to get support for certain

25   things -- I mean, funding's hard to get.  And so you

1      say stuff --

2              THE COURT:  I'm sorry.  What?

3              THE DEFENDANT:  Funding to support my family through

4      accounts, I mean, they'd be on the street if I didn't say

5      something that would garner money for them, and I have to

6      protect my family.  If it means going to prison for however long

7      to protect them, I would always do that.

8              THE COURT:  So you're telling me now that not -- your

9      decision to not accept responsibility early in this case -- I

10     know there was a plea offer at one point.

11             THE DEFENDANT:  No, there wasn't, Your Honor.  I never

12     saw one.  I was never given one.  I don't know of one.  There

13     was numbers.  That's it.

14             THE COURT:  Regardless of whether there was a plea

15     agreement, you certainly could have pled guilty straight up to

16     the indictment.

17             THE DEFENDANT:  I don't know how that went.  I don't

18     understand that part.  I was told by -- I was told I'm going to

19     trial.  That's what I was told.  So I kept my head down and did

20     what I was told to do, until now I have to step up, because now

21     I want to speak out.  But, no, I never had that -- I mean, at

22     the trial, no, I wasn't going to say anything, because I was

23     told not to.  I mean, I just -- my mouth has got me in trouble.

24             THE COURT:  I don't want to get into attorney-client

25     communications, but I'm hearing you suggest that your attorney

1    said you need to go to trial.

2              THE DEFENDANT:  That's correct.

3              THE COURT:  All right.  I'm somewhat familiar with

4    Mr. Welch.  That's not something that is ethical for defense

5    attorneys to do.

6              THE DEFENDANT:  I was never produced a plea agreement,

7    just some numbers.  41 to 51 months was talked about.

8              THE COURT:  You mean you never saw a written plea

9    agreement?

10             THE DEFENDANT:  No, ma'am, no, Your Honor, I never saw

11   one.  I'm just being honest.  I just didn't.  I've never seen

12   one.

13             THE COURT:  Okay.  Your repeated statements in prison,

14   during the trial, after the trial, about being a patriot and,

15   again, rebelling against the tyranny of the government, you're

16   telling me, you want me to believe that the only reason you made

17   those comments was to raise money for your family?

18             THE DEFENDANT:  I think that's parroted throughout my

19   life.  I mean, I've always said things like that.  It was all

20   hyperbole.  But it -- yeah, it was never meant to be serious on

21   that level.  I've heard it all my life.  People around me say it

22   all the time.  I parrot a lot of stuff.  I say a lot of stupid

23   shit.

24             THE COURT:  It's pretty serious to go to the Capitol,

25   restricted grounds, with a firearm, I presume loaded firearm.

1      THE DEFENDANT:  I intended to go to The Ellipse, and

2  then we were going to go to the Capitol.  I didn't know what was

3  going to happen.  It was a big blur.

4      THE COURT:  It was a what?

5      THE DEFENDANT:  It was a big blur.  I was -- it was

6  just very chaotic and confusing.  I showed up.  There was a lot

7  of people there.  And then --

8      THE COURT:  Again, Mr. Reffitt, in light of all the

9  comments that you made before January 6, on January 6, and after

10  January 6, and you compare those statements to the physical

11  actions, the unlawful acts that you committed on January 6, they

12  line up.  It's hard to sit here and --

13      THE DEFENDANT:  I understand.

14      THE COURT:  -- agree, with a straight face, draw the

15  conclusion that you got roped into this on January 6 and caught

16  up in the crowd.  You came prepared with zip ties, armor for --

17  body armor to protect you from bullets, the helmet, everything

18  else.  That just doesn't ring true.

19      THE DEFENDANT:  The helmet was plastic.

20      THE COURT:  The helmet was plastic?

21      THE DEFENDANT:  Yeah.

22      THE COURT:  Even so, you had --

23      THE DEFENDANT:  Right.

24      THE COURT:  -- bulletproof armor on, did you not?

25      THE DEFENDANT:  All that was for defense at the

1    Ellipse because of BLM and Antifa and all the stuff that went

2    on.  I mean, that's what that was about.  It wasn't meant for

3    all of that.  It was meant for protection of my body, for my

4    safety.

5              THE COURT:  So how do I know that tomorrow I don't

6    read about your latest diatribe from prison --

7              THE DEFENDANT:  No, that's not going to happen.

8              THE COURT:  -- "I'm really a patriot, everybody, keep

9    sending money to my family, I just said that to get a lower

10   sentence"?  How do I have any confidence that what you're saying

11   here is heartfelt?

12             THE DEFENDANT:  You just don't.  I can't say anything

13   more than what I can say, and it's -- I have to leave that to

14   you, Your Honor.

15             THE COURT:  Can you help me understand why it took so

16   long?  Even like an hour ago, you were reluctant to do this.

17   How do I not sit here and think because I'm getting ready to

18   impose sentence, this is the last opportunity, and so you're

19   going to say what you have to say to get the sentence -- the

20   most lenient sentence you can?

21             THE DEFENDANT:  The reason I'm saying is because I do

22   think that -- I think everyone deserves to hear my apology.  I

23   think that that's a fair thing to do.

24        And I do have a lot of anxiety.  So I do fear what I would

25   just ramble about and talk about.  It's a very calming effect

1    with me.  It's very clear that I have an issue with just

2    rambling and saying stupid shit.  I do that a lot.  And I don't

3    want to do that here and cause more problems.  I just was scared

4    to do that before.

5         But clearly, I need to step up here and say this to you.  I

6    really think the Court needs to hear it, and I need to try to at

7    least release this so that I can say I want nothing to do with

8    any of this stuff anymore.  I want nothing to do with malitia

9    groups.

10        And I am sorry.  I'm so sorry about all of it.  I just

11   don't know how to express it.  I don't express myself well

12   anyway.  I never have.

13             THE COURT:  So you --

14             THE DEFENDANT:  It's difficult for me to let that out

15   of me and express how much I'm sorry about things and how I feel

16   about things.  I have a hard time expressing it.  It's in me,

17   but I don't portray it well.  It doesn't come across well.  Most

18   people don't -- I don't know.  I feel like it never comes across

19   well, and I was scared that it wouldn't come across well.  And I

20   don't want to fuck this up.  Excuse my language.  I just don't.

21             THE COURT:  So you took a long time to write the

22   letter that you sent to me, didn't you?

23             THE DEFENDANT:  Which one?

24             THE COURT:  The letter in support of sentencing, the

25   one where you talked about your regrets in terms of your family.

1          THE DEFENDANT:  The allocution?

2          THE COURT:  Yes.

3          THE DEFENDANT:  It was just hard to put it down on

4    writing, and then when you put it down and you're trying to --

5    yeah, it just was -- and it's really -- that's just a very

6    smidgen of all the stuff that I said.  I was just trying to

7    compress it down more, and it didn't come off so great.

8          THE COURT:  It doesn't make sense to me that you

9    wouldn't be completely forthcoming about how truly remorseful

10   you are at that point when you have time to reflect, plenty of

11   time to reflect in D.C. Jail to reflect on just what message you

12   want the Court to hear.

13      Can you understand, it kind of comes across a little

14   half-hearted?  It was concern about your family, concern about

15   some law enforcement, not concern about the basic mission that

16   you pressed again and again and again.

17          THE DEFENDANT:  It was 14 pages long.  It's not all

18   there anymore.  It was initially much longer, and it had a lot

19   of apologies in it, but I just tried to compress it down better.

20   And some of it's missing.  And I didn't know what to say.  I

21   don't really know what to say half the time.  Clearly, I say too

22   much.

23          THE COURT:  I just don't understand why you would

24   compress it down.  Is part of this that you -- it seems like you

25   like to be the big guy, the important guy, the first guy to be

in trial.  You pushed hard for that trial over your defense

attorney's concern about that, the first guy up there, the rebel

in the press.  You want to be an important person who makes a

difference, and yet, you're going about it in all of the wrong

ways.

THE DEFENDANT:  My point exactly, Your Honor, is that

I don't know how to portray myself well.

THE COURT:  You don't know how to what?

THE DEFENDANT:  I don't portray myself well.

THE COURT:  But you've had a lot of time to think.

THE DEFENDANT:  Yes.

THE COURT:  Well over a year, year and a half.

THE DEFENDANT:  And I think about it every day.

THE COURT:  And you keep publishing these statements

out of jail doubling down on your view about the need for

rebellion and being a patriot and being a martyr.

THE DEFENDANT:  And I don't know what to say.

THE COURT:  Up until just a few months ago.

THE DEFENDANT:  And I don't know how to explain that.

There's so many moving parts in all of this.  It's just crazy,

this whole thing.  It's very crazy.  It's been crazy.  It's been

wild.

THE COURT:  Moving parts, help me understand.  What do

you mean by that?

THE DEFENDANT:  There's just so much involved in all

1   of this Jan 6 stuff.  It's not like I robbed a bank.  There's

2   just more to it.  It's just crazy.  I don't know what happened

3   with everything as far as -- what happened on January 6, ever

4   since then, it's just been rough.  It's just been crazy.  I

5   write stuff, and then I don't know if that's the right things.

6   I say things.  I don't know if that's the right things.  I don't

7   know.

8           THE COURT:  But you're a smart guy, Mr. Reffitt.

9           THE DEFENDANT:  Clearly, I'm not that smart.  Clearly,

10  I'm not as smart as I'd like to think I am.

11          THE COURT:  But you know when you write things about

12  rebellion and being a martyr that's not going to be received

13  well.

14          THE DEFENDANT:  Well, and you're right.  A lot of it's

15  what I read.  George Washington, Franklin Douglas, different --

16  Benjamin Franklin, I mean, you read about the forefathers and

17  the things they said.  It just comes from a lot of that.  It's

18  all the founding fathers and stupid shit like that.

19          THE COURT:  But how do you analogize the current-day

20  situation to 1776?

21          THE DEFENDANT:  I don't.  People send this stuff to me

22  in the mail, and I read it.  And so yeah, that's pretty much how

23  that works.  I get mail all the time in jail from around the

24  country.  And then I read stuff like that.  It just -- it sounds

25  grandeur.  It seems like you're supposed to say it.  But it's

1   not really -- I don't know.  Like again, I'm still no good at

2   this saying how I feel, about how this works out, but I just

3   wanted to try.

4          THE COURT:  You just wanted a what?

5          THE DEFENDANT:  Try.

6          THE COURT:  You wanted a trial?

7          THE DEFENDANT:  I wanted to try to explain it.  And

8   again, I'm not coming off as well as I would like to.

9          THE COURT:  I appreciate your remarks.  It's just,

10   again, a hard situation when, you know, there's been such a

11   lapse of time and it's taken so long for you to express, you

12   know, apologies, not just to your family or to law enforcement

13   officers but, it sounds like, to the country as a whole.

14      And you're now standing in front of me waiting to have

15   sentence imposed.  And I want to believe what you're saying, and

16   you've heard what I've said about supervised release.  You will

17   come before me within 60 days of release.  I will not transfer

18   this case, I will not transfer jurisdiction to your home in

19   Texas.  So you will be supervised in your residence district,

20   but any violation comes to me.  And you spouting off tomorrow

21   about that was a load of bunk is not going to be a violation,

22   but there are many other things that will be.  And I hope you

23   appreciate that there's quite the stick on the back end.

24          THE DEFENDANT:  Yes, Your Honor.  And before

25   January 6, I liked to follow the law.  I don't know what

1    happened on January 6, but --

2                THE COURT:  Well, you had an unlawful --

3                THE DEFENDANT:  -- clearly, it wasn't great.

4                THE COURT:  Not so much around firearms.

5                THE DEFENDANT:  Yeah, no, I won't have any of those

6    anymore, clearly.  Those are gone.

7                THE COURT:  You had a silencer without a license.  You

8    had way back -- a while ago, you had a firearm without it being

9    registered, right, unlicensed possession?

10               THE DEFENDANT:  No, that's not correct.

11               THE COURT:  What was it?

12               THE DEFENDANT:  No, that was a fuel filter that they

13   are calling a suppressor.

14               THE COURT:  So the earlier firearm charge wasn't a --

15   the conviction that you got probation for?

16               THE DEFENDANT:  The unlawfully carrying a weapon from

17   1993?

18               THE COURT:  Yes.

19               THE DEFENDANT:  That was a boot knife.  That was not a

20   firearm.  It was a boot knife.  It was a double-edged boot knife

21   that I was using as a screwdriver.  I was 20 something years old

22   working on a stereo in my car, and I had to go pay the payment.

23               THE COURT:  Okay.  That's odd.  The way in which it

24   was described, it seemed like a firearm.

25               THE DEFENDANT:  Yeah, it's Texas.

1          THE COURT:  All right.  There was something else you

2    said just then.  It's late in the day.

3          THE DEFENDANT:  Yes, it is.  Longest sentencing ever

4    maybe?

5          THE COURT:  Yeah, maybe for me.

6          THE DEFENDANT:  Well, we're setting precedence.  We

7    set precedence pretty often around this place, don't we?

8          THE COURT:  That's right.  Mr. Reffitt, is there

9    anything else you would like to say before I impose sentence?

10          THE DEFENDANT:  I think I've said enough, Your Honor,

11    and again, I apologize.

12          THE COURT:  All right.  Thank you.

13          THE DEFENDANT:  Thank you for letting me talk.

14          THE COURT:  I appreciate it.

15     All right.  Mr. Broden, anything else you would like to

16    add?

17          MR. BRODEN:  No, Your Honor, and I'm just going to

18    repeat what I said today.  I mean, I certainly understand the

19    Court's -- I don't know the exact adjective to use, but why you

20    might be suspect.  But I think the fact that maybe he could

21    challenge the restriction on dealing with any Three Percenters

22    and stuff like that and he's not, I think, is at least a smidge

23    of an indication that he is being sincere about this.

24          THE COURT:  All right.  Mr. Nestler, would you like to

25    be heard?

1          MR. NESTLER:  Your Honor, just briefly on a couple of

2     those points.

3          First, Mr. Reffitt not only thinks that he's staring down

4     the barrel of tyranny and prepared to receive the bullet of

5     freedom, he also told a reporter for the *New Yorker* just a few

6     months ago that what happened on January 6 was a false flag, the

7     whole thing was staged, and Mr. Reffitt had been entrapped.

8          So I know what Your Honor heard today from Mr. Reffitt.  We

9     heard that for the first time today, too.  But statements like

10    that to reporters obviously belie the sincerity of anything he

11    is saying.

12         I will tell the Court that his manifesto that was published

13    in May of last year was dictated by him.  We have all of the

14    jail calls and jail messages.  He dictated it word for word to

15    his family from the jail.  So it's not like people are sending

16    him things and he is repeating what he is hearing elsewhere.  He

17    is the one who is making these statements, and we see it again

18    and again and again.  All of the statements he made about being

19    a martyr and receiving the bullet of freedom, that is from him.

20         There is literally a GiveSendGo up for him right now on his

21    behalf talking about how he is a patriot.  His family is still

22    using his situation, and I don't know if it's with his consent

23    or not, to fund-raise right now talking about how it's

24    preposterous that the government is asking to have him declared

25    a terrorist, it's preposterous that a sentence so harsh would be

used as a deterrent, things like that.  There's a post just from last week on his GiveSendGo.

So I say all of this so the Court is aware.  Your Honor just heard from Mr. Reffitt directly, but we don't give any credence to that, and we don't find any of that to be credible.

With regard to the plea offer, again, what Mr. Reffitt is saying is not credible.  We've worked with Mr. Welch for a long time.  Ms. Berkower and I personally engaged in plea negotiations with him many times.  We did discuss a range of 41 to 51 months, and Mr. Welch said he talked to Mr. Reffitt about it and it was being rejected and Mr. Reffitt would not accept any felony plea and he would not accept any plea that took responsibility for a gun, hard stop, not even a question.  So that was as far as we got in our plea negotiations.

Your Honor, at the end of the day, we do not believe that the defendant is remorseful, and we do believe that Your Honor should vary upward from the sentencing guideline range and sentence him for the conduct that he is ultimately responsible for, including all of his statements which do evidence his intent and his motive.

Thank you.

THE COURT:  Thank you, Mr. Nestler.

All right.  Before I impose sentence, I'm going to explain my reasons for the sentence.

In deciding a defendant's sentence, a Court must consider

consistent with Title 18 United States Code Section 3553(a) not
only the sentencing guidelines, which are merely advisory, but
also the other Section 3553(a) factors.  I will not state all
those factors here, but I have considered each in deciding where
to sentence Mr. Reffitt.

I will note that the maximum statutory penalty for the lead
charge in this case, a violation of Title 18 United States Code
Section 1512(c)(2), is 20 years in prison.  The maximum
statutory term of supervised release is three years.

The parties have reached an agreement over restitution,
which I believe is $2,000.  And there has been nearly, as the
record clearly reflects, $3 million damage to the Capitol
building and grounds as a result of the January 6 events.
That's to date.

I've already explained how I determined the applicable
guideline range, which is, again, a total offense level of 29
with a criminal history category I.  That results in a guideline
range of 87 to 180 months.  That's seven-and-a-quarter years to
nine years in prison.

And I've explained why an upward departure is not warranted
here based on the facts and circumstances of this offense and,
in particular, the potential for unwarranted sentencing
disparities for similar cases prosecuted in this court related
to January 6 of 2021.

Judges on this court have certainly seen a large number of

1      cases related to the events of January 6, close to, I think,

2      1,000 to date.

3           Is that right, Mr. Nestler?

4                MR. NESTLER:  I believe close to 900, Your Honor.

5                THE COURT:  Close to 900.  I don't think there is any

6      question we will get over 1,000, do you think?

7                MR. NESTLER:  I agree with you, Your Honor.

8                THE COURT:  All right.  And as I've already said,

9      there's no apples-to-apples comparison in many of these cases,

10     especially in this one.  As I did note earlier, in some ways,

11     Mr. Reffitt is in a class of his own with regard to the purpose,

12     the stated purpose here, which I don't think I've heard quite as

13     explicitly, at least in the cases I've reviewed, as he stated it

14     in terms of literally overthrowing the elected officials,

15     removing them, and coming down here for the constitutionalist

16     judges to install a new government.  That seems, again based

17     upon my review of the record, that that's notable and different

18     than others.

19          Also, in terms of the possession of firearms, that doesn't

20     mean that no one else at the Capitol or on the grounds or near

21     the grounds certainly had firearms that day.  It's that the

22     government has not proven that to date except in this case.

23          So in those respects, I do find that he's in a class of his

24     own, but not in terms of the conduct, in terms of general

25     threatening conduct, and as I've noted, I've described a number

of cases in which other defendants committed very violent
assaults on law enforcement.  So I just want to clarify what I
mean by that.

There are some key factors that judges on this court have
consistently considered in attempting to draw meaningful
comparisons and distinctions between January 6 defendants.  So
rather than summarizing all the relevant facts of this case, I
will begin by focusing on those factors that judges on this
court have relied upon to draw distinctions.  The facts are in
the record of the trial.  They're also thoroughly discussed in
the parties' sentencing memoranda, and they're well documented
in the factual background section of the PSR which I have
adopted here without objection -- well, certain factual
objections have been clarified and legal objections as well.
But the basic factual background is stated in the PSR and one I
adopted.

So first, looking at the key facts which form the nature of
the offense conduct, as I said, most significantly, Mr. Reffitt
carried a firearm on Capitol grounds.  This fact, which the jury
found beyond a reasonable doubt, is by far the most aggravating
factor related to this offense.  And it is, again, the factor
that makes this case very different than all cases prosecuted to
date.

It is true that Mr. Reffitt did not use or otherwise
brandish his firearm.  It stayed in its holster the entire day

so far as we're aware, even as Capitol police officers pelted him repeatedly with rubber bullets and pepper spray.

Still, as I've explained, his carrying of a firearm, which I think it's fair to infer was a loaded firearm, at the scene of the January 6 riots substantially heightened the risk of serious injury to law enforcement officers who courageously defended the Capitol, as well as everyone else who was present that day, Mr. Reffitt included.

As I've mentioned, other January 6 defendants have been prosecuted for having firearms and explosives and other dangerous weapons in vehicles nearby.  Some have had dangerous weapons on their person.  But again, the government's represented to date that no other defendant on Capitol grounds has been charged with possessing a firearm.

Mr. Reffitt also engaged in two related obstructive acts when he returned to Texas following January 6.  First, he warned other Texas Three Percenters about the federal investigation, and he directed members of that group to destroy chats that they had engaged in online.

Second, Mr. Reffitt made highly disturbing threats to his children if they were to cooperate with law enforcement, inform law enforcement.  Mr. Reffitt's son Jackson told the FBI about these threats.  Mr. Reffitt's daughter Peyton and her boyfriend Mr. Mitchell also testified at his detention hearing and submitted letters to the Court.  Both testified under oath that

they did not believe that Mr. Reffitt meant what he said when he threatened them.  Still, they acknowledge, at least Peyton Reffitt acknowledges that his actions were, in fact, intended to intimidate and discourage his children from talking to law enforcement.

So clearly, I think both of these instances are proven obstructive acts that, although they do not both increase the defendant's base offense level under the guidelines, as we've discussed at length, the government argues that the Court should vary upward or at least sentence high in the range for this reason.  And I'll also add, the government's made the same point with respect to the additional firearms that were not on his person.

Third, Mr. Reffitt, like many other January 6 defendants, made many offensive, highly disturbing statements before, during, and after January 6.  Those he captured in real-time on his GoPro camera, and as I've said, it provided, in effect, multiple real-time confessions to his crimes.  Mr. Reffitt's camera footage showed that he claimed to be less upset about the results of the 2020 election than dismantling the government as a whole.  As he said repeatedly on tape, his goal was to drag the corrupt legislators out of the Capitol and to bring them, in his words, to bring, quote, the people's house down.

His threats continued when he arrived home.  He bragged to his family about what he did at the Capitol.  Those comments

were taped by his son Jackson.  And soon after January 6,
Mr. Reffitt spent about an hour and 40 minutes on Zoom, this is
Government's Exhibit 1A, discussing various grand plans and
half-baked ideas to take over state capitols and attack media
outlets.

He also referenced his security company.  I can't remember
if it was in the Zoom tape or other chats.  But the government
is correct, he referenced his security company and his
willingness to use it to obtain firearms for other Three
Percenters members.

In addition to the aggravating factors, there are a number
of mitigating factors that distinguish this case from other
January 6 defendants who have been charged with the obstruction
offense.  Under Section 1512(c)(2), first, Mr. Reffitt did not
assault any law enforcement officers that day.  He did refuse to
follow their commands.  He did advance up the stairs.  And that,
certainly, as the officer explained, Kerkhoff, it was
threatening.  So I don't mean to suggest that it wasn't
threatening.  What I mean is there was not a violent physical
assault as occurred in other January 6 cases.

Second, he did not enter the Capitol building.  But as
we've discussed, according to a message he sent Rocky Hardie
that day, it appears to the Court that that was not for lack of
trying.  It was, rather, because he had been immobilized
eventually with pepper spray after many attempts to pelt him

1    with rubber bullets and pepper spray as well.

2         But the fact does remain, he did not go inside the Capitol.

3    The government has not shown, aside from Rocky Hardie, it's not

4    shown that Mr. Reffitt actively coordinated ahead of time with

5    other members who were at the Capitol on January 6, other

6    members of the Three Percenters.  There was another member of

7    the Three Percenters, the government points out, he did know.

8    But unlike some of the other groups, namely the Proud Boys and

9    the Oath Keepers who have been charged with large-scale

10   conspiracies, which by the way at this point are unproven, I

11   simply want to make the point that there's not a charged

12   conspiracy in the same way that other allegations suggest a

13   level of coordination and planning ahead.

14        Mr. Reffitt did try to encourage Three Percenters to come.

15   The leader did drop out, hard to know exactly why, but at least

16   the facts as proven at trial don't support the conclusion that

17   he was working hand in hand with other folks at that time beyond

18   the government's point that he, you know, encouraged people to

19   follow him and he, in the government's view, assumed a

20   leadership role on the spot.  But there was not the degree of

21   preplanning that appears to exist or at least be alleged in

22   other cases.

23        Turning to Mr. Reffitt's personal history and his

24   characteristics, first his criminal history.  It's relatively

25   dated.  It's a category 1.  We've talked, I've talked with him

just now about his offense which he says related to a knife.
For that offense, he received probation, and I believe in, is
it, 2009 or 2013, that he -- 2009, Mr. Reffitt was convicted of
driving under the influence.

There's also strong evidence in the record that Mr. Reffitt
held a gun next to his wife's head previously and apparently
shot it on another occasion, not at her but by her head.  Again,
this is highly disturbing conduct that contributes to the
concerns the Court has about Mr. Reffitt's mental health
condition.

Mr. Reffitt has a very supportive family that describes him
on balance as a caring and loving father who would do anything
to support them.  His daughter Peyton, whose political views
align more with her brother Jackson's than with her father's,
has explained that her father was there for her in similarly
difficult times when she was depressed.  Both of Mr. Reffitt's
daughters describe him as the kind of guy who will open his home
to kids in trouble and do anything to help out a friend.  That's
true also for some of the letters from friends.  There's
evidence that he helped take care of his grandmother who lived
with the family for most of the kids' childhood.

Mr. Reffitt had a very successful career at one time in the
oil industry until 2016 when the industry collapsed.  At that
time Mr. Reffitt was living abroad with his family in Malaysia
providing generously for them and insisting that they be exposed

to a wide range of cultures and viewpoints.  His daughters, in particular, refer to his efforts to do that.

It's also clear that Mr. Reffitt over the years has worked very hard to provide for his family and that he felt deep despair and disappointment in himself when he was unable to provide for his family after the collapse of the oil industry and then the pandemic.

The record suggests that Mr. Reffitt experienced a mental health crisis of sorts in this period.  There's also evidence, as documented in the PSR, paragraphs 103 through 107, that he has had significant struggles with mental health issues and with excessive drinking over the course of his adult life.  He has a prior conviction.  In the Zoom video, which if viewed start to finish he can be seen downing several beers over the course of that tape.

The Probation Office has identified Mr. Reffitt's long history of mental health challenges as a potential basis to vary downward from the guideline range under Section 3553(a).  Not only does it constitute a potential grounds for variance, but the mental health challenges are factors that the Court can and will take into account in deciding where to sentence Mr. Reffitt within the guideline range and in fashioning conditions of release and recommended programming, which we've discussed already.

Mr. Reffitt's family and friends and even his son Jackson

1    testified that he is certainly prone to exaggeration.  All of
2    them say he became very wrapped up in the divisive political
3    climate, again especially during the pandemic when he was
4    struggling to find work and pay bills.

5        Remarkably, as we've talked about a lot here today, he
6    somehow viewed his illegal -- his multiple illegal actions on
7    and around January 6 as helpful for his family, specifically his
8    children and his grandchildren.

9        Another significant factor that the Court is considering
10   and must consider in fashioning a sentence that is sufficient
11   but not greater than necessary is the need to avoid unwarranted
12   sentencing disparities.  I've touched on this already in
13   discussing the ways in which this case is similar and different
14   than other cases that have been sentenced in this court.  As
15   mentioned, to date, the longest sentence that has been imposed
16   in a January 6 case is 63 months' imprisonment.

17       This is, however, the first sentencing hearing in which a
18   defendant went to trial rather than pled guilty, and as a result
19   of that decision alone, the guideline range for this offense is
20   roughly two years higher than it would have been had Mr. Reffitt
21   accepted responsibility early and received a full reduction for
22   acceptance of responsibility, which he's not eligible now,
23   having taken this case to trial and also having disputed the
24   factual case that the government presented through
25   cross-examination of witnesses and the like.

1    Although no mandatory minimum sentence applies here, for

2    context, I do think it's helpful to know that carrying a firearm

3    in connection with a crime of violence does carry a mandatory

4    minimum statutory penalty of five years in prison.  The civil

5    disorder, the obstruction offenses, the trespassing offenses,

6    Mr. Reffitt, all those offenses that he was convicted of do not

7    meet the statutory crime of violence definition.

8        Nonetheless, the actions of the mob of which Mr. Reffitt

9    was a part of was certainly violent, and here, Mr. Reffitt

10   engaged in crimes in addition to unlawfully possessing a firearm

11   on Capitol grounds, again such as obstructing Congress,

12   obstructing the criminal investigation, and by threatening his

13   kids and trespassing.

14       So this, as well as the sentences imposed in other

15   January 6 cases, as well as the guideline calculations, all

16   support a significant sentence of imprisonment in this case.

17       A final and critical factor that the Court will emphasize

18   today is Mr. Reffitt's statement of remorse -- statements of

19   remorse or lack thereof.  As I've made clear here, Mr. Reffitt's

20   reluctance to admit early that his behavior was illegal is

21   concerning.  And I want to be very clear and unequivocal in

22   this.  As I've said, under no legitimate definition of the term

23   "patriot" is Mr. Reffitt's behavior on or around January 6

24   worthy of the term.  What he and others who attacked the Capitol

25   on January 6 did is the antithesis of patriotism.  Together,

1   Mr. Reffitt and others put law enforcement officers like Officer

2   Kerkhoff, who courageously defended the Capitol, as well as

3   government officials and staff, the public servants who were

4   inside the Capitol that day, at enormous risk.  The officers at

5   the Capitol were patriots, as well as those who fought and even

6   died defending our freedoms, our democracy, the rule of law, and

7   even our peaceful transition of power.  Those are the patriots;

8   those who stormed the Capitol are not.  Not only are they not

9   patriots, they are a direct threat to our democracy and will be

10  punished as such.

11       As I hope I've made clear, Mr. Reffitt has every right to

12  voice his strongly held views about the state of our country,

13  its elected officials, and other views he holds about what's

14  wrong in our country.  And under our Constitution, he has a

15  right to express those views freely, to protest peacefully, to

16  associate with those who hold the same views, to vote at the

17  ballot box to remove politicians from office, to support

18  political candidates.

19       But what Mr. Reffitt and the hundreds of other Capitol

20  rioters did not have the right to do was to storm the Capitol,

21  to illegally carry firearms, to trespass, to refuse law

22  enforcement's commands, or to resort to violence.

23       In this country, we respect the peaceful transfer of power.

24  We vote our conscience at the ballot box.  And to the extent

25  there are legitimate challenges to an election, our courts stand

ready to address them.  And with respect to the 2020 election, as I've stated already, there were no meritorious challenges brought in any state or federal court.  Every single court rejected them as baseless.

I am pleased to hear Mr. Reffitt's attempt here, though late, to take responsibility for what he did and to denounce some of the -- well, both his actions and his statements.  As I've said, it's awfully late, but I am crediting it to a degree.

I simply don't find credible, though, the statements that he makes regarding any plea offer.  I don't think that that's a statement I can credit, and I genuinely hope that Mr. Reffitt's statements, if there's future statements coming out of prison or after he's released from prison when he's on the outside, that they are not inconsistent with what he stated here in the courtroom this afternoon.

The other thing that I want to make very clear before I announce sentence is that it bears emphasizing clearly that although I've referenced Mr. Reffitt's disturbing comments as potential aggravated factors in this case, the basis for the sentence imposed here reflects what Mr. Reffitt actually did on and around January 6, not what he said.

And just to review, among other things, he carried a gun on Capitol grounds that he trespassed on, and he refused to abide the lawful commands of law enforcement officers who fought to defend the Capitol.  He, along with the rest of the crowd,

obstructed the electoral vote count.  He delayed the vote count.

He required -- his actions and the actions of others required

law enforcement officers to come in and protect the members of

Congress who were fulfilling their constitutional duty.  He

stored an AK-47 in a D.C. parking lot, which was unlawful.  He

possessed an unlicensed and unlawful silencer in his home.  And

he further obstructed justice by threatening his kids and

directing others to delete evidence in a federal investigation.

All of these illegal actions, not his words, justify the

sentence the Court imposes here.

Considering where to sentence or whether to -- within the

guideline range or whether to sentence above or below the

guideline range, I am taking into account all of the aggravating

and the mitigating factors that we've discussed here.  I'm

taking into account the fact that he engaged in multiple acts of

obstruction and he possessed or had constructive possession of

multiple firearms.  I'm taking into account his serious mental

health issues.

I'm also making an effort to ensure that there are not

unwarranted sentencing disparities.  And so I am taking into

account the other cases that have been sentenced in this court.

Although no two cases have the same facts, I do think that there

are, in many respects, analogous cases that have been sentenced

in this district related to the January 6 events themselves.

I'm also taking into account, although Mr. Reffitt's

statements did not come as early and are not as fulsome and there are aspects of it I find a hard time crediting, I do credit him for apologizing here.  And again, I trust that what we hear, if anything, from Mr. Reffitt going forward is consistent with those comments and not the many other comments that he's made before January 6, after January 6, during January 6.

So considering all of these aggravating and mitigating factors, in the end, I am not going to vary upwards or downwards, and I do conclude, principally looking at the other cases' sentencing in this district, I do conclude that a sentence at the low end of the guideline range, which is 87 months, or seven-and-a-quarter years, is sufficient but not greater than necessary to achieve the purposes of sentencing.

This is, of course, taking into account the fact that Mr. Reffitt is not entitled to a three-level downward adjustment for acceptance of responsibility.  And considering that, instead of his sentence being 63 to 78 months, it's 87 to 108 months.

And for all the reasons I've stated, I think this sentence is comparable to the other sentences imposed by other judges in this court.

As I've said, I'm also going to impose the maximum term of supervised release, which is three years, with stringent conditions to ensure that Mr. Reffitt gets on and remains on a law-abiding path after he's released from prison.

1          Again, I won't transfer jurisdiction of this case to

2    another district.  In the unlikely event that today's remorse is

3    short-lived and Mr. Reffitt violates his terms of supervision, I

4    stand ready to impose a maximum term of imprisonment that I can

5    impose for any future violations up to the statutory maximum

6    penalty of 20 years.

7          All right.  I will now read the formal sentence of the

8    Court, and I will give both parties a chance to object before I

9    actually impose sentence in this case.

10         Pursuant to the Sentencing Reform Act of 1984 and in

11   consideration of the provisions of Title 18 United States Code

12   Section 3553, as well as the advisory sentencing guidelines, it

13   is the judgment of the Court that you, Guy Wesley Reffitt, are

14   hereby committed to the custody of the Bureau of Prisons for

15   concurrent terms of 60 months, or five years, on each of Counts

16   1 and 4, and 87 months, or 7.25 years, on each of the Counts 2,

17   3, and 5.

18         You're further sentenced to serve a 36-month, three-year,

19   term of supervised release on Counts 1 through 5 with such terms

20   to run currently.

21         In addition, you are ordered to pay a special assessment of

22   $100 per count, for a total of $500, in accordance with Title 18

23   United States Code Section 3013.

24         While on supervision, you shall abide by the following

25   mandatory conditions, as well as the standard conditions of

1   supervision, which are imposed to establish the basic

2   expectations for your conduct while on supervision.

3        The mandatory conditions include not committing another

4   federal, state, or local crime, not unlawfully possessing a

5   controlled substance, refraining from any unlawful use of a

6   controlled substance, submitting to one drug test within 15 days

7   of placement on supervision and at least two periodic drug tests

8   thereafter as determined by the Court, cooperating in the

9   collection of DNA as directed by the probation officer, making

10  restitution in accordance with Title 18 United States Code

11  Sections 3663 and 3663(a) or any other statute authorizing a

12  sentence of restitution.

13        In addition, as the parties have agreed, I am imposing

14  restitution in the amount of $2,000, and I believe these should

15  be paid to the U.S. District Court for the District of Columbia.

16  Correct, Mr. Nestler, with ultimately the money going to the

17  Architect of the Capitol?  Is that right?

18        MR. NESTLER:  Yes, Your Honor.

19        THE COURT:  All right.  In addition, you shall comply

20  with the following special conditions.  Number 1, you must

21  submit to and participate in mental health treatment and comply

22  with the treatment program recommended and follow the rules and

23  regulations of the program.  The probation officer, in

24  consultation with the treatment providers, will supervise your

25  participation in the program.

1       In addition, you must provide the probation officer access

2   to any requested financial information and authorize the release

3   of any financial information.  The Probation Office may share

4   the financial information with the U.S. Attorney's Office.

5       With regard to the contact restriction, as I've stated

6   already, you must not associate, communicate, or otherwise

7   interact, directly or indirectly, with any extremist malitia

8   group or member of such a group, including but not limited to

9   the Texas Three Percenters, the Oath Keepers, and the Texas

10  Freedom Force.  If you inadvertently associate, communicate, or

11  otherwise interact with such a group or individual, you must

12  immediately report this to the probation officer.

13      As I've noted, within 60 days of release from

14  incarceration, you will appear before the Court for a re-entry

15  progress hearing, and the United States Probation Office in the

16  district in which you are supervised will submit a progress

17  report to the Court within 30 days of the beginning of your

18  supervision, and upon receipt of the progress report, the Court

19  will determine if your appearance is required.

20      The Court finds you do not have the ability to pay a fine,

21  and therefore, I waive imposition of the fine.  And again, the

22  financial obligations are immediately payable to the Clerk of

23  Court.

24      Within 30 days of any change of address, you shall notify

25  the Clerk of Court of the change until such time as the

1    financial obligations are paid in full.

2         Because I'm waiving the ability to pay the fine, I will

3    also waive the interest that might accrue as well on this.

4         Again, the Probation Office shall release the presentence

5    report to all appropriate agencies, which includes the Probation

6    Office in the approved district of residence.  In order to

7    execute the sentence of the Court, the treatment agency shall

8    return the presentence report to the probation officer upon

9    completion or termination from treatment.

10        Pursuant to Title 18 United States Code Section 3742,

11   Mr. Reffitt, you do have the right to appeal the verdict and the

12   sentence imposed in this case.  If you choose to appeal, you

13   must file any appeal within 14 days after the Court enters

14   judgment, which in all likelihood will be tomorrow, but I'm not

15   sure.

16        As defined in Title 28 United States Code Section 2255, you

17   also have the right to challenge the conviction entered or the

18   sentence imposed if new and currently unavailable information

19   becomes available to you or on a claim that you received

20   ineffective assistance of counsel in entering a plea of guilty

21   to the offense of conviction or in connection with sentencing.

22   If you're unable to afford the cost of an appeal, you may

23   request permission from the Court to file an appeal without cost

24   to you.

25        Before I order that the sentence as announced is to be

imposed, does either party have any objections or does Probation have any objections to the sentence announced that's not already noted on the record?  Mr. Nestler?

          MR. NESTLER:  No, Your Honor.

          THE COURT:  Mr. Broden?

          MR. BRODEN:  No, Your Honor.

          THE COURT:  All right.  Probation?

          PROBATION OFFICER:  No, Your Honor.  Thank you.

          THE COURT:  So I will order that the sentence announced be the sentence imposed.

    And, Mr. Reffitt, I do -- before we adjourn, I do want to say, you really are a talented, intelligent man who has a great deal to offer your family and the country.  And yes, your family suffered emotionally and financially because of the bad choices you've made, but you still have the opportunity to make them proud, to make your country proud.  You can speak to those who have held the views that you have held, I hope, in the past in a way that other people can't.  And you can actually play a role.  You can be a real leader, not the kind of leadership you demonstrated or tried to demonstrate on January 6, but a real leader in trying to turn things around and becoming a part of the solution in this country.

    I recognize our democracy's not perfect.  There's still much to be grateful for.  You have been blessed to live in a country in which you have more protected rights than any country

in the world.

        And while you serve your term of imprisonment, I hope that you will pursue a different law-abiding path with the same degree of passion you pursued this path.  And I know you have the ability to do this, and I genuinely hope that you will seize the opportunity, if for no other reason than to make your family proud, who care deeply about you.

        I also hope while you are in prison you will take the opportunity to help those who are less fortunate than you. There are a lot of people who can really benefit from someone with your intellectual -- your abilities, your charisma.  They can develop job skills.  They can be encouraged to figure out a path moving forward when they get out.  They can learn to read and write.

        You can do things while you're in prison that will help set not just yourself up but other people up for success on the outside.  And when I see you within 60 days of your release, I very much hope and look forward to hearing how you've used your time in prison not only to take advantage of every programming opportunity that's offered to you in terms of mental health, substance abuse, alcohol abuse, but also to really make a difference and to be a leader in prison.

        All right.  Is there anything else from the government?

                MR. NESTLER:  No, Your Honor.

                THE COURT:  From the defense?

1          MR. BRODEN:  Judge, we would simply ask that you

2    recommend that he be designated to a facility as close to the

3    Dallas-Fort Worth area as possible.

4          THE COURT:  All right.  I will do so.

5       And Mr. Reffitt, I guess he will not be eligible for any

6    reduction under the RDAP program given that he had a firearm in

7    this offense?

8          MR. NESTLER:  I do not know, Your Honor.

9          MR. BRODEN:  I don't think so, but it wouldn't hurt to

10   recommend it.

11         THE COURT:  I will recommend the RDAP program.

12      My view on that, Mr. Reffitt, is regardless of whether you

13   get credit for it, you can certainly benefit, given your history

14   of alcohol abuse and also some drug abuse in your past, not

15   recent past.  Again, that's another example of the ways in which

16   you can make the most of what I'm certain will be a difficult

17   time, and I hope you will do so.

18      All right.  Thank you, everyone.  Sorry for the long

19   hearing, but I think it's important to flush out on the record

20   all the reasons for the sentence in this case.

21      (Proceedings adjourned at 4:00 p.m.)

22

23

24

25

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8    /s/ Sara A. Wick_____          August 16, 2022_____

9    SIGNATURE OF COURT REPORTER              DATE